**IN THE UNITED STATES DISTRICT COURT**
**FOR THE DISTRICT OF COLUMBIA**

ESTATE OF MYLES CODY SEBASTIEN, KELIE SEBASTIEN, BRIAN ANSLEY, ANTONIO BANUELOS-SANCHEZ, KATHARINE BAUCUS, GIOVANNI BENNETT, ELIZABETH TAYLOR, MICHAEL TAYLOR, DOUGLAS BENNETT JR, LAVOHN WILLIAMS, STEWART BENNETT, GERALD BOWERS, JOHN DOE 1, JOHN DOE 2, JOHN DOE 3, JOHN DOE 4, CURTIS BROWN, THOMAS BROYLES, JEFFREY BUTLER, JOSEPH CEDENOPEREIRA, ESTRELLITA PEREIRA, ALEX CEDENO, JONATHAN CEDENO, EDUARDO CORREA-VEGA, ADAM DAVIS, JENNIFER RIDER, ROBERT EMERICK, JERRY FIGUEROA, JR., DOUGLAS GARNER, EDWIN GHEE, ROHAN GOLDING, WILLIAM GREEN, JR., MARK GRENINGER, JR., DANIEL GROGMAN, CAROL RORTVEDT, ROBERT HARBIN, BRIAN HAWKINS, DAVID HENDERSON, MARCUS HENSLEY, LUKE HOUSE, ANDREW KEITH, LAUREN KEITH, ARCADIO LACAYANGA, JR., SANDRA MANN LUCAS, KEVIN ARTHUR LUCAS, DEVIN LUCAS YOKELEY, ROBERT MARTIN, SUZANNE MARTIN, KELTIE PASKO, TAYLOR PHILLIPS, MICHAEL MCGRATH, SUSAN MCGRATH, GEORGE MUNN, STORMIE D'ANN MUNN, RUBY MUNN, LARRY MUNN, JOHN PRICE, KYLE RAGER, ANDREW SINCLAIR, MICHAEL SMITH, JR., KARLA DIMMIT, BRANDON STUBBLEFIELD, THOMAS STUBBLEFIELD, SAMUEL TURNER, JASON WARD, NATHAN WIENS, RANDELL WIENS, FINNLY WIENS, HUDSON WIENS, JOMAR WOOTEN, BRYAN WYRICH, CHIAWEN YANG, WILLIAM BARRERA, JESSICA BARRERA, MARTHA AREOLA, DEMITRO BARRERA, JOSEPH CHERRY, CINDY CHERRY, JONATHAN CHIA, DOMINICK CHIA, DIANE CHIA, CARLOS CHIA, GARTH

Civil Action No. 1:26-cv-3386

**COMPLAINT**

DALSON, KATHY DALSON, RICHARD DALSON, GLORIA DOWNEY, STACY HENDRIX, MARY HENDRIX, DEANNA DELOACH, DENISA DELOACH, JOSEPH JAMES, JARIN JAMES, RACHEL JAMES, SALLY ADAMS, MARK JAMES, CARRIE NUNEZ, JASON MCCORKLE, KELSEY PARK, ADOLFO MARTINEZ-MORALES, NOE SANTOS DILONE, ROSMERY DILONE DE SANTOS, STEFANY SANTOS, GABRIEL SANTOS, ESTATE OF BRANDON SAPP, JOHN SAPP, HEIDI SAPP, CHRISTOPHER SAPP, HAILEE SCHEIRER, HARRISON SAPP, SHAWN SAPP, DARREL SAWYER, JR., KEVAN SIPLA, MATTHEW SIPLA, ROBERT SKINNER, JOHN DOE 5, JOHN DOE 6, JOHN DOE 7, JOHN DOE 8, JOHN DOE 9, JOHN DOE 10, JOHN DOE 11, JOHN DOE 12, JOHN DOE 13, JOHN DOE 14, JOHN DOE 15, JOHN DOE 16, JOHN DOE 17, JOHN DOE 18, JOHN DOE 19, JOHN DOE 20, JOHN DOE 21, JOHN DOE 22, JOHN DOE 23, JOHN DOE 24, JOHN DOE 25, JOHN DOE 26, JOHN DOE 27, JOHN DOE 28, JOHN DOE 29, JOHN DOE 30, JOHN DOE 31, JOHN DOE 32, JOHN DOE 33, JOHN DOE 34, JOHN DOE 35, JOHN DOE 36, JOHN DOE 37, JOHN DOE 38, JOHN DOE 39, JOHN DOE 40, JOHN DOE 41, JOHN DOE 42, JOHN DOE 43, JOHN DOE 44, JOHN DOE 45, JOHN DOE 46. JOHN DOE 47, JOHN DOE 48, JOHN DOE 49, JOHN DOE 50, JOHN DOE 51, JOHN DOE 52, JOHN DOE 53, and JOHN DOE 54

*Plaintiffs,*

v.

THE ISLAMIC REPUBLIC OF IRAN,
THE SYRIAN ARAB REPUBLIC,
ISLAMIC REVOLUTIONARY GUARD CORPS,
IRANIAN MINISTRY OF INTELLIGENCE AND SECURITY,

NATIONAL IRANIAN OIL COMPANY,
BANK MARKAZI JOMHOURI ISLAMIC IRAN,
BANK MELLI IRAN,
BANK SADERAT IRAN,
HEZBOLLAH, and
BASHAR AL-ASSAD, in his individual capacity,

*Defendants.*

# TABLE OF CONTENTS

INTRODUCTION ..... 10

JURISDICTION AND VENUE ..... 12

THE PARTIES ..... 14

I. The Plaintiffs ..... 14

II. The Defendants ..... 15

A. The Iran Defendants ..... 15

B. Syria ..... 18

C. Bashar al-Assad ..... 19

D. Hezbollah ..... 19

FACTUAL BACKGROUND ..... 20

III. IRAN AND SYRIA HAVE HISTORICALLY USED TERRORISM AND SUPPORT FOR TERRORIST ORGANIZATIONS AS INSTRUMENTS OF STATE POLICY ..... 22

IV. IRAN PROVIDED MATERIAL SUPPORT TO SUNNI TERRORIST ORGANIZATIONS (STOs) ..... 23

E. Iran Has Historically Supported Al-Qaeda ..... 23

F. Iran Provided Material Support to Al-Qaeda During the Relevant Period ..... 25

G. Iran Provided Material Support to Zarqawi's Network and AQI During the Relevant Period ..... 26

H. Iran Provided Material Support and Resources to Ansar al-Islam During the Relevant Period ..... 27

V. IRAN AND HEZBOLLAH PROVIDED MATERIAL SUPPORT TO SHIA MILITIA ORGANIZATIONS (SMOs) ..... 29

I. Iran Developed and Supported a Network of the SMOs in Iraq ..... 29

J. Hezbollah Assisted the IRGC-QF in Training the SMOs ..... 31

VI. SYRIA PROVIDED MATERIAL SUPPORT TO THE STOs AND STRENGTHENED HEZBOLLAH'S CAPACITY TO SUPPORT THE SMOs ..... 33

K. Syria Served as a Facilitation and Transit Hub for the STOs ..... 33

L. Syria Supported Hezbollah and Facilitated Iran's Resupply of Hezbollah ..... 35

VII. BASHAR AL-ASSAD KNOWINGLY SUSTAINED SYRIA'S ASSISTANCE TO AQI AND HEZBOLLAH ..... 36

M. Assad Appointed and Continued to Empower Al-Rawi After Direct Warnings Concerning Syria-Based Support for Attacks Against Americans ..... 36

N. Assad Maintained and Directed Syria's Strategic Relationships with Iran and Hezbollah ........ 38

VIII. THE IRANIAN BANKS AND NIOC PROVIDED FUNDING AND FINANCIAL SERVICES THAT ENABLED IRAN'S MATERIAL SUPPORT ........ 39

O. Bank Markazi Supplied and Preserved the Financial Infrastructure of Iran's Terrorist Support Apparatus ........ 41

P. Bank Melli Funded and Facilitated the IRGC and the IRGC-QF ........ 43

Q. Bank Saderat Funded and Facilitated Hezbollah ........ 43

R. International Correspondent Banks Processed Transactions and Maintained Records Concerning the Bank Defendants' International Payment Activity ........ 44

IX. DEFENDANTS PROXIMATELY CAUSED THE PLAINTIFFS' INJURIES ...... 47

S. Iran Sustained and Strengthened the STOs' Operational Capacity ........ 48

T. Iran and Hezbollah Sustained and Strengthened the SMOs' Operational Capacity 49

U. Syria Facilitated the Flow of Personnel and Resources to the STOs and Strengthened Hezbollah's Capacity to Support the SMOs ........ 50

V. Assad Sustained Syria's Support for AQI and Hezbollah ........ 51

W. The Bank Defendants' Financial Support Increased the IRGC-QF's and Hezbollah's Capacity to Support the STOs and SMOs ........ 52

X. THE STOS AND SMOS COMMITTED THE TERRORIST ATTACKS THAT KILLED OR INJURED PLAINTIFFS IN IRAQ ........ 53

X. Terrorist Attacks Committed by the STO ........ 54

*(1)* ***The Myles Cody Sebastien Family (The December 20, 2006, Attack)*** ........ 54

*(2)* ***The Brian Ansley Family (The October 15, 2006, Attack)*** ........ 55

*(3)* ***The Antonio Banuelos-Sanchez Family (The June 3, 2007, Attack)*** ........ 56

*(4)* ***The Philip Baucus Family (The July 29, 2006, Attack)*** ........ 57

*(5)* ***The Giovanni Bennett Family (The April 4, 2004, Attack)*** ........ 58

*(6)* ***The Stewart Bennett Family (The October 1, 2005, Attack)*** ........ 59

*(7)* ***The Gerald Bowers Family (The December 21, 2004, Attack)*** ........ 60

*(8)* ***The Curtis Brown Family (The April 8, 2004, Attack)*** ........ 61

*(9)* ***The Thomas Broyles Family (The October 13, 2005, Attack)*** ........ 62

*(10)* ***The Jeffrey Butler Family (The September 8, 2004, Attack)*** ........ 63

*(11)* ***The Joseph Cedenopereira Family (The July 23, 2005, Attack)*** ........ 63

*(12)* ***The Eduardo Correa-Vega Family (The October 1, 2005, Attack)*** ........ 65

*(13)* ***The Adam Davis Family (The February 24, 2007, Attack)*** ........ 66

*(14)* ***The Jonathan Dozier Family (January 9, 2008, Attack)*** ........ 67

*(15)* ***The Robert Emerick Family (The May 16, 2004, Attack)*** ............................68

*(16)* ***The Jerry Figueroa, Jr. Family (The November 20, 2005, Attack)*** .............69

*(17)* ***The Douglas Garner Family (The March 24, 2007, Attack)***........................69

*(18)* ***The Edwin Ghee Family (The May 21, 2009, Attack)*** ..................................70

*(19)* ***The Rohan Golding Family (The March 31, 2004, Attack)*** .........................71

*(20)* ***The William Green, Jr. Family (The August 4, 2007, Attack)***......................72

*(21)* ***The Mark Greninger, Jr. Family (The December 25, 2006, Attack)***............73

*(22)* ***The Daniel Grogman Family (The December 21, 2004, Attack)*** .................74

*(23)* ***The Jason Hanson Family (The July 29, 2006, Attack)***...............................75

*(24)* ***The Robert Harbin Family (The January 3, 2005, Attack)***..........................76

*(25)* ***The Brian Hawkins Family (The November 28, 2003, Attack)***....................77

*(26)* ***The David Henderson Family (The June 24, 2010, Attack)*** ........................77

*(27)* ***The Marcus Hensley Family (The May 31, 2005, Attack)*** ...........................78

*(28)* ***The Joel House Family (The June 23, 2007, Attack)***...................................79

*(29)* ***The Andrew Keith Family (The December 13, 2007, Attack)*** ......................80

*(30)* ***The Arcadio Lacayanga, Jr. Family (The August 19, 2003, Attack)***............81

*(31)* ***The Kevin Adam Lucas Family (The May 26, 2006, Attack)*** .......................82

*(32)* ***The Robert Martin Family (The May 4, 2005, Attack)***.................................83

*(33)* ***The Michael McGrath Family (The September 14, 2006, Attack)***................84

*(34)* ***The George Munn Family (The October 18, 2005, Attack)*** .........................85

*(35)* ***The John Price Family (The December 29, 2006, Attack)***...........................87

*(36)* ***The Kyle Rager Family (The November 4, 2004, Attack)*** ............................88

*(37)* ***The Andrew Sinclair Family (The December 24, 2006, Attack)*** ..................88

*(38)* ***The Michael Smith, Jr. Family (The November 8, 2004, Attack)*** .................89

*(39)* ***The Brandon Stubblefield Family (The February 5, 2008, Attack)***.............90

*(40)* ***The Samuel Turner Family (The August 27, 2003, Attack)***.........................91

*(41)* ***The Jason Ward Family (The March 7, 2005, Attack)*** .................................92

*(42)* ***The Nathan Wiens Family (The April 15, 2008, Attack)*** ..............................93

*(43)* ***The Jomar Wooten Family (The July 11, 2004, Attack)*** ...............................95

*(44)* ***The Bryan Wyrich Family (The June 6, 2005, Attack)***.................................95

*(45)* ***The Chiawen Yang Family (The June 7, 2006, Attack)***................................96

*(46)* ***The John Doe 5 Family (Attack)*** ....................................................................97

*(47)* ***The John Doe 6 Family (Attack)*** ....................................................................98

*(48)* ***The John Doe 7 Family (Attack)*** .......... 99
*(49)* ***The John Doe 8 Family (Attack)*** .......... 100
*(50)* ***The John Doe 9 Family (Attack)*** .......... 101
*(51)* ***The John Doe 10 Family (Attack)*** .......... 102
*(52)* ***The John Doe 11 Family (Attack)*** .......... 103
*(53)* ***The John Doe 12 Family (Attack)*** .......... 104
*(54)* ***The John Doe 13 Family (Attack)*** .......... 104
*(55)* ***The John Doe 14 Family (Attack)*** .......... 105
*(56)* ***The John Doe 15 Family (Attack)*** .......... 106
*(57)* ***The John Doe 16 Family (Attack)*** .......... 107
*(58)* ***The John Doe 17 Family (Attack)*** .......... 108
*(59)* ***The John Doe 18 Family (Attack)*** .......... 109
*(60)* ***The John Doe 19 Family (Attack)*** .......... 110
*(61)* ***The John Doe 20 Family (Attack)*** .......... 111
*(62)* ***The John Doe 21 Family (Attack)*** .......... 112
*(63)* ***The John Doe 22 Family (Attack)*** .......... 113
*(64)* ***The John Doe 23 Family (Attack)*** .......... 114
*(65)* ***The John Doe 24 Family (Attack)*** .......... 114
*(66)* ***The John Doe 25 Family (Attack)*** .......... 115
*(67)* ***The John Doe 26 Family (Attack)*** .......... 116
*(68)* ***The John Doe 27 Family (Attack)*** .......... 117
*(69)* ***The John Doe 28 Family (Attack)*** .......... 118
*(70)* ***The John Doe 29 Family (Attack)*** .......... 119
*(71)* ***The John Doe 30 Family (Attack)*** .......... 120
*(72)* ***The John Doe 31 Family (Attack)*** .......... 121
*(73)* ***The John Doe 32 Family (Attack)*** .......... 122
*(74)* ***The John Doe 33 Family (Attack)*** .......... 123
*(75)* ***The John Doe 34 Family (Attack)*** .......... 124

Y. Terrorist Attacks Committed by the SMOs .......... 124

*(1)* ***The William Barrera Family (The August 16, 2004, Attack)*** .......... 124
*(2)* ***The Joseph Cherry Family (The December 20, 2006, Attack)*** .......... 126
*(3)* ***The Jonathan Chia Family (The May 17, 2007, Attack)*** .......... 127
*(4)* ***The Garth Dalson Family (The November 20, 2007, Attack)*** .......... 128

*(5)* ***The Gloria Downey Family (The July 10, 2007, Attack)*** .......... 129
*(6)* ***The Stacy Hendrix Family (The April 19, 2005, Attack)*** .......... 130
*(7)* ***The Joseph James Family (The April 8, 2008, Attack)*** .......... 131
*(8)* ***The Adolfo Martinez-Morales Family (The September 6, 2005, Attack)*** .......... 133
*(9)* ***The Noe Santos Dilone Family (The September 6, 2005, Attack)*** .......... 134
*(10)* ***The Brandon Sapp Family (The August 15, 2004, Attack)*** .......... 135
*(11)* ***The Darrel Sawyer, Jr. Family (The September 11, 2007, Attack)*** .......... 136
*(12)* ***The Kevan Sipla Family (The March 27, 2008, Attack)*** .......... 137
*(13)* ***The Robert Skinner Family (The August 19, 2009, Attack)*** .......... 138
*(14)* ***The John Doe 35 Family (Attack)*** .......... 139
*(15)* ***The John Doe 36 Family (Attack)*** .......... 140
*(16)* ***The John Doe 37 Family (Attack)*** .......... 140
*(17)* ***The John Doe 38 Family (Attack)*** .......... 141
*(18)* ***The John Doe 39 Family (Attack)*** .......... 142
*(19)* ***The John Doe 40 Family (Attack)*** .......... 143
*(20)* ***The John Doe 41 Family (Attack)*** .......... 144
*(21)* ***The John Doe 42 Family (Attack)*** .......... 145
*(22)* ***The John Doe 43 Family (Attack)*** .......... 146
*(23)* ***The John Doe 44 Family (Attack)*** .......... 147
*(24)* ***The John Doe 45 Family (Attack)*** .......... 148
*(25)* ***The John Doe 46 Family (Attack)*** .......... 149
*(26)* ***The John Doe 47 Family (Attack)*** .......... 149
*(27)* ***The John Doe 48 Family (Attack)*** .......... 150
*(28)* ***The John Doe 49 Family (Attack)*** .......... 151
*(29)* ***The John Doe 50 Family (Attack)*** .......... 152
*(30)* ***The John Doe 51 Family (Attack)*** .......... 153
*(31)* ***The John Doe 52 Family (Attack)*** .......... 154
*(32)* ***The John Doe 53 Family (Attack)*** .......... 155
*(33)* ***The John Doe 54 Family (Attack)*** .......... 156
CLAIMS FOR RELIEF .......... 157
COUNT I: ACTION FOR DAMAGES – GENERAL .......... 157
COUNT II: PERSONAL INJURY – ASSAULT AND BATTERY .......... 158
COUNT III. PERSONAL INJURY - WRONGFUL DEATH AND SURVIVAL .......... 159

COUNT IV. INTENTIONAL INFLICTION OF EMOTIONAL DISTRESS .................... 161
COUNT V. INTENTIONAL INFLICTION OF EMOTIONAL DISTRESS .................... 162
COUNT VI. ACTION FOR INTERNATIONAL TERRORISM AND AIDING AND ABETTING .................... 163
COUNT VII. ASSAULT AND BATTERY UNDER APPLICABLE STATE LAW .......... 164
COUNT VIII. WRONGFUL DEATH AND SURVIVAL UNDER APPLICABLE STATE LAW 165
COUNT IX. INTENTIONAL INFLICTION OF EMOTIONAL DISTRESS UNDER APPLICABLE STATE LAW .................... 165
PRAYER FOR RELIEF .................... 166

# INTRODUCTION

1. This action arises from a series of terrorist attacks ("Terrorist Attacks") committed in Iraq between 2003 and 2009 (the "Relevant Period") against United States service members, United States government contractors, and others supporting the United States mission in Iraq, who were engaged in efforts to stabilize and rebuild Iraq following the fall of Saddam Hussein's regime.

2. Plaintiffs bring this Complaint under the terrorism exception to the Foreign Sovereign Immunities Act, 28 U.S.C. § 1605A, against the Islamic Republic of Iran ("Iran"), the Islamic Revolutionary Guard Corps ("IRGC"), including its Quds Force ("IRGC-QF"), the Iranian Ministry of Intelligence and Security ("MOIS"), the National Iranian Oil Company ("NIOC"), Bank Markazi Jomhouri Islami Iran ("Bank Markazi"), Bank Melli Iran, ("Bank Melli"), Bank Saderat, (jointly and severally, the "Iran Defendants"), as well as the Syrian Arab Republic ("Syria") and Bashar al-Assad ("Assad"); and (2) under the civil-damages provision of the Anti-Terrorism Act, 18 U.S.C. § 2333(a) ("ATA"), as amended by the Justice Against Sponsors of Terrorism Act, 18 U.S.C. § 2333(d) ("JASTA"), against U.S.-designated foreign terrorist organization Hezbollah.

3. The attacks were committed by two distinct terrorist networks. One consisted of al-Qaeda, al-Qaeda in Iraq ("AQI"), Ansar al-Islam, and related operatives (collectively, the "Sunni Terrorist Organizations" or "STOs"). The other consisted of Iranian-backed Shi'a militias and terrorist organizations, including Jaysh al-Mahdi ("JAM") and the "Special Groups," among them Asa'ib Ahl al-Haq ("AAH"), Kata'ib Hezbollah ("KH"), and related operatives (collectively, the "Shia Militia Organizations" or "SMOs").

4. Throughout the Relevant Period, the Iran Defendants, Syria, and Assad knowingly and intentionally provided the STOs and SMOs with substantial material support and resources that enabled the Terrorist Attacks.

5. As detailed below, Iran directed, financed, armed, trained, and coordinated the STOs and SMOs through the IRGC, MOIS, NIOC, and other instrumentalities of the Iranian state. That assistance preserved the organizations' leadership and strengthened their ability to plan and carry out attacks against United States and Coalition personnel.

6. With respect to the SMOs, the IRGC-QF and Hezbollah organized and trained the militants; supplied weapons, explosives, and components; and provided the financial, logistical, and operational assistance that strengthened the SMOs' capacity to attack United States and Coalition forces. Hezbollah also participated in planning, authorizing, and directing certain SMO attacks.

7. Defendant Syria separately facilitated the STOs by permitting fighters, suicide bombers, weapons, and other resources to pass through its territory into Iraq.

8. Syria also supported Hezbollah by providing similar territorial access and other logistical support, which strengthened Hezbollah's ability to work with the IRGC-QF in organizing and training the SMOs.

9. Defendant Assad, who served as Syria's President throughout the Relevant Period, directed and sustained Syria's support for AQI and Hezbollah.

10. Iran financed and facilitated its terrorist support activities in part through Bank Markazi, Bank Melli, and Bank Saderat (the "Bank Defendants").

11. Bank Markazi supplied and routed government funds and preserved access to international payment channels; Bank Melli maintained accounts, transferred funds, and provided financial services to the IRGC and the IRGC-QF; and Bank Saderat transferred Iranian government funds and provided financial services to Hezbollah.

12. The Bank Defendants preserved access to the international financial system through foreign correspondent and intermediary banks that processed United States-dollar and cross-border transactions for Iranian financial institutions.

13. The Bank Defendants' financial services were not isolated commercial transactions or generalized support for the Iranian economy. They supplied and preserved resources for Iran's terrorist support apparatus that financed, trained, armed, and assisted the STOs and SMOs.

14. The material support and resources provided by each Defendant were a substantial factor in the sequence of events leading to the attacks attributable to that Defendant, and the resulting deaths and injuries were natural and reasonably foreseeable consequences of that support.

15. Each of the attacks included an act of extrajudicial killing within the meaning of 28 U.S.C. § 1605A.

16. Each of the attacks was a violent act, dangerous to human life, that violated the criminal laws of the United States, including 18 U.S.C. §§ 2332, 2332a, 2332b, 2332d, 2332f, 2339A, 2339B, 2339C and 2339D, and was intended to intimidate or coerce a civilian population, influence the policy of a government by intimidation or coercion, or affect the conduct of a government by mass destruction, assassination, or kidnapping within the meaning of § 2331(1).

## JURISDICTION AND VENUE

17. This Court has jurisdiction over this matter and over the Iran Defendants and Syria pursuant to 28 U.S.C. §§ 1330(a) and 1605A(a), which create subject-matter and personal jurisdiction for civil actions for personal injury against State Sponsors of Terrorism and their officials, employees, and agents.

18. The Foreign Sovereign Immunities Act ("FSIA"), at 28 U.S.C. § 1605A, provides jurisdiction for private rights of action for personal injury or death against a foreign state — and any official, employee, or agent of that foreign state while acting within the scope of his or her office, employment, or agency — that was a State Sponsor of Terrorism at the

time of the terrorist acts at issue, or was designated as a result of that act, and either remains so designated when the claim is filed or was so designated within the six-month period preceding the filing of the claim.

19. Defendants Iran and Syria were continuously designated State Sponsors of Terrorism throughout the Relevant Period and remained so designated within the six-month period preceding the filing of this action, and are therefore subject to the Court's jurisdiction under 28 U.S.C. § 1605A(a).

20. As alleged below, the IRGC and MOIS are political subdivisions of Iran, and NIOC and Banks Markazi, Melli, and Saderat are agencies and instrumentalities of Iran. Accordingly, for all relevant purposes, these Defendants are also considered the foreign state of Iran under 28 U.S.C. § 1603(a).[1]

21. As alleged below, this Court has subject matter jurisdiction over qualifying Plaintiffs' claims against Assad under 28 U.S.C. § 1331. Those claims arise under § 1605A(c) and seek relief for injuries caused by material support Assad provided for extrajudicial killings while acting within the scope of his office.

22. Venue is proper in this District as to the Iran Defendants and Syria pursuant to 28 U.S.C. § 1391(f)(4), which provides that a civil action against a foreign state, its political subdivisions, and/or any agency or instrumentality of a foreign state may be brought in the United States District Court for the District of Columbia.

23. This Court has subject matter jurisdiction over qualifying Plaintiffs' claims against Hezbollah under 28 U.S.C. § 1331 and § 2338. Those claims arise under 18 U.S.C. § 2333(d)(2) and seek relief for injuries caused by acts of international terrorism that Hezbollah

[1] 28 U.S.C. § 1603(a) defines "foreign state" to include "a political subdivision of a foreign state or an agency or instrumentality of a foreign state." The statute defines an "agency or instrumentality of a foreign state as any entity - (1) which is a separate legal person, corporate or otherwise, and (2) which is an organ of the foreign state or political subdivision thereof, or a majority of whose shares or other ownership interest is owned by the foreign state or political subdivision thereof, and (3) which is neither a citizen of a State of the United States as defined in section 1332(c) and (e), nor created under the laws of any third country." 28 U.S.C. § 1603(a)–(b).

planned or authorized and whose perpetrators Hezbollah knowingly and substantially assisted.

24. Venue is proper in this District as to Defendants Hezbollah and Assad pursuant to 28 U.S.C. §§ 1391(b)(3) and § 1391(c)(3) because neither Defendant resides in the United States.

25. This Court has supplemental jurisdiction under 28 U.S.C. § 1367(a) over Plaintiffs' alternative state law claims against Assad because those claims arise from the same acts and form part of the same case or controversy as Plaintiffs' federal claims.

26. Upon service under Rules 4(f) and 4(h)(2), this Court has personal jurisdiction over Assad and Hezbollah under Rule 4(k)(2) because Plaintiffs' claims arise under federal law, neither Defendant is subject to general jurisdiction in any State, and the conduct giving rise to Plaintiffs' claims knowingly facilitated terrorist campaigns directed against the United States and its nationals.

## THE PARTIES

### I. The Plaintiffs

27. Plaintiffs consist of persons killed or injured in the Terrorist Attacks who, at the time of the attacks, were nationals of the United States, members of the United States Armed Forces, or employees or contractors of the United States Government acting within the scope of their employment.

28. Plaintiffs also include qualifying immediate family members of persons killed or injured in the Terrorist Attacks and legal representatives asserting claims on behalf of deceased or otherwise legally disabled claimants.

29. Plaintiffs asserting claims against Hezbollah under 18 U.S.C. § 2333 are nationals of the United States who were injured in person, property, or business by reason of an act of international terrorism, or are the estates, survivors, or heirs of such nationals, within the meaning of 18 U.S.C. § 2333(a).

## II. The Defendants

### A. The Iran Defendants

30. ***Iran.*** Iran is, and was at all relevant times, a foreign state as defined by the FSIA, 28 U.S.C. § 1603(a). Since 1984, Iran has been designated by the United States as a State Sponsor of Terrorism pursuant to Section 6(j) of the Export Administration Act of 1979, previously codified at 50 U.S.C. § 4605(j), Section 620 of the Foreign Assistance Act, 22 U.S.C. § 2371, and Section 40(d) of the Arms Export Control Act, 22 U.S.C. § 2780(d). At all relevant times, Iran provided the SMOs and STOs with substantial material support, including training, weapons, money, and resources for acts of extrajudicial killings as that term is used in the FSIA, 28 U.S.C. § 1605A(a)(1), that enabled these groups to recruit terrorists and commit terroristic violence, like the attacks that injured Plaintiffs.

31. ***IRGC (and the Quds Force).*** The IRGC is a subdivision of the state of Iran and is, for all relevant purposes, treated as Iran itself.[2] The IRGC functions as an intelligence organization and paramilitary force whose role is to defend the Islamic fundamentalist revolution within Iran and to export the revolution's principles throughout the world, including through acts of terrorism. As this Court has held, the IRGC "is the military arm of a kind of shadow government answering directly to the Ayatollah and the mullahs who hold power in Iran. It is similar to the Nazi party's SA organization prior to World War II."[3]

32. The IRGC also holds a controlling number of positions in the Iranian government and its economy. IRGC veterans have served as governors of many of Iran's thirty-one provinces. The IRGC also controls many companies spanning a wide range of industries, including petroleum production, construction, nuclear power, banking, and others—some of

---

[2] *See, e.g., Henkin v. Islamic Republic of Iran, No. 18-cv-1273 (RCL), 2021 WL 2914036, at *17 (D.D.C. July 12, 2021); Fritz v. Islamic Republic of Iran, 320 F. Supp. 3d 48, 77, 85 (D.D.C. 2018); Akins v. Islamic Republic of Iran, 332 F. Supp. 3d 1, 33 (D.D.C. 2018); Bluth v. Islamic Republic of Iran, 203 F. Supp. 3d 1, 19 n.15 (D.D.C. 2016); Rimkus v. Islamic Republic of Iran, 575 F. Supp. 2d 181, 194 (D.D.C. 2008).*

[3] *Blais v. Islamic Republic of Iran*, 459 F. Supp. 2d 40, 47 (D.D.C. 2006).

the proceeds from which the IRGC uses for illicit purposes, including funding terrorism. On October 13, 2017, the United States designated the IRGC as a Specially Designated Global Terrorist ("SDGT") under Executive Order 13224, and the IRGC remains so-designated.[4] On April 15, 2019, the United States designated the IRGC as an FTO pursuant to AEDPA § 219, codified at 8 U.S.C. § 1189, and the IRGC remains so-designated.

33. The Quds Force is a branch of the IRGC and is Iran's primary tool for exporting the Iranian Islamic revolution beyond Iran's borders. The Quds force does so by setting up and operating armed terrorist cells, establishing educational systems for indoctrination, and otherwise acting to subvert secular, pro-Western Arab-Muslim regimes. It also provides material support to terrorist organizations. In October 2007, the Quds Force was designated an SDGT pursuant to Executive Order 13224—which authorizes the U.S. government to designate and block the assets of foreign individuals and entities that commit, or pose a significant risk of committing, acts of terrorism—and remains designated to this day. The Quds Force was also included in the April 15, 2019, designation of the entire IRGC as an FTO.

34. ***MOIS.*** MOIS is the Iranian intelligence service. It is the part of the Iranian government's security apparatus responsible for the assassination of Iranian political dissidents, and supports Iran's international terrorist activities by providing resources and intelligence for acts of extrajudicial killing. This Court has consistently found MOIS to be a political subdivision of Iran for purposes of liability and damages under the FSIA.[5] In 2012, the United States designated MOIS as a terrorist organization under E.O. 13224 (and two other

---

[4] Executive Order 13224, as amended, has the effect of blocking the assets of and transactions with certain identified terror groups and individuals. It also provides the Secretary of State with the authority to (1) designate additional individuals or entities that have committed or pose a significant risk of committing terrorist acts and (2) identify individuals or entities controlled or owned by terrorist groups or individuals. An entity or individual designated under E.O. 13224, as amended, is referred to as an SDGT.

[5] *See, e.g.*, *Valore v. Islamic Republic of Iran*, 700 F. Supp. 2d 52, 721-722 (D.D.C. 2010); *Bennett v. Islamic Republic of Iran*, 507 F. Supp.2d 117, 125 (D.D.C. 2007) ("Defendant MOIS is considered to be a division of state of Iran, and is treated as a member of the state of Iran itself."); *Salazar v. Islamic Republic of Iran*, 370 F.Supp.2d 105, 116 (D.D.C. 2005).

executive orders specific to human rights abuses in Iran and Syria, E.O. 13553 and E.O. 13572, respectively), stating, "we are designating the MOIS for its support to terrorist groups, including al Qa'ida, al Qa'ida in Iraq, Hizballah and HAMAS, again exposing the extent of Iran's sponsorship of terrorism as a matter of Iranian state policy."[6]

35. ***NIOC.*** The NIOC is an Iranian government-operated entity overseen by Iran's Ministry of Petroleum. NIOC is responsible for the exploration, drilling, production, refining, distribution, and export of Iran's oil and natural gas reserves. NIOC has routinely awarded contracts to IRGC-controlled entities and coordinated closely with the Central Bank of Iran to collect and funnel billions of dollars in oil revenues directly to the IRGC-QF and Hezbollah. Because NIOC operates as a corporate legal entity whose core functions are commercial rather than strictly sovereign, this Court has previously recognized NIOC to be an agency or instrumentality of Iran for purposes of liability and damages under the FSIA.[7] In 2008, the U.S. Treasury Department identified NIOC as "centrally involved in the sale of Iranian oil, as entities that are owned or controlled by the [Government of Iran]." In September 2012, the Treasury Department further reported to Congress that: "NIOC is an agent or affiliate of the IRGC."[8] On October 26, 2020, the United States designated NIOC as a Specially Designated Global Terrorist ("SDGT") pursuant to Executive Order 13224 for its material and financial support of the IRGC-QF, and NIOC remains so designated.

36. ***Bank Markazi***. Bank Markazi, also known as the Central Bank of Iran, is Iran's wholly government-owned central bank and is responsible for the design and implementation of Iran's monetary and credit policies. During the Relevant Period, Bank Markazi provided

[6] U.S. Treasury Department, *Treasury Designates Iranian Ministry of Intelligence and Security for Human Rights Abuses and Support for Terrorism* (Feb. 16, 2012), https://www.treasury.gov/press-center/press-releases/Pages/tg1424.aspx.
[7] See *Hake v. Bank Markazi Jomhouri Islami Iran,* Civ. A. No. 17-0114 (TJK), 2022 WL 4130837 (D.D.C. Sept. 12, 2022).
[8] https://www.treasury.gov/resource-center/sanctions/Programs/Documents/report_to_congress_09242012.pdf.

funding and financial services to the IRGC and IRGC-QF, which, in turn, trained, armed, funded, and otherwise materially supported the STOs and SMOs responsible for the Terrorist Attacks. In 2019, the United States designated Bank Markazi for providing financial support to the IRGC, the IRGC-QF, and Hezbollah.

37. ***Bank Melli.*** Bank Melli is Iran's largest commercial bank. It was established in 1927 by order of the Iranian Parliament. Following the Iranian Revolution in 1979, all banks in Iran were nationalized, and, as discussed below, have since been effectively controlled by the Iranian regime. Bank Melli describes itself as "a powerful arm of the government."[9] Bank Melli most notably provides banking services to entities involved in Iran's nuclear and ballistic missile programs. It also provides banking and financial services to the IRGC and the Quds Force, and is one of Iran's main conduits for funding terrorist organizations. Accordingly, Bank Melli is an agency or instrumentality of Iran.[10] In October 2007 and throughout the remainder of the relevant period, Bank Melli Iran was designated as an SDN pursuant to Executive Order 13382, and included on the Office of Foreign Assets Control's SDN list.

38. ***Bank Saderat.*** Bank Saderat was established in 1952 and became a commercial state-owned bank of Iran in 1979 after the revolutionary government nationalized the bank. It has approximately 3,200 branch offices, and has been used by the Government of Iran to channel millions of U.S. dollars to terrorist organizations. October 25, 2007, the Treasury Department designated Bank Saderat under E.O. 13224 as a terrorist financier, specifically noting that the reason for the designation was in part Bank Saderat's provision of financial services to Hezbollah. Although Bank Saderat claims to have been "privatized" in 2009, this Court has since held that Bank Saderat is still an agency or instrumentality of Iran.[11]

**B. Syria**

---

[9] Bank Melli Iran, *History of Bank Melli Iran*, http://bmi.ir/En/BMIHistory.aspx?smnuid=10011
[10] Bank Melli Iran, *History of Bank Melli Iran*, http://bmi.ir/En/BMIHistory.aspx?smnuid=10011
[11] *Shoham v. Islamic Republic of Iran,* 2017 WL 2399454, at *8 (D.D.C. June 1, 2017) (holding that Bank Saderat is an instrumentality of Iran), *appeal dismissed*, 2019 WL 1270405 (D.C. Cir. Feb. 25, 2019).

39. ***Syria.*** Syria is, and was at all relevant times, a foreign state as defined by the FSIA, 28 U.S.C. § 1603. In 1979, Syria was designated by the United States as a State Sponsor of Terrorism pursuant to Section 6(j) of the Export Administration Act of 1979, previously codified at 50 U.S.C. § 4605(j), and remained so designated within the six-month period preceding the filing of this action until August 24, 2026, when the Secretary of State formally rescinded its designation. During the Relevant Period, Syria served as a principal facilitation hub for AQI and other Sunni terrorist organizations, permitting operatives and facilitators to use Syrian territory and enabling fighters, funds, weapons, and other resources to enter Iraq. Syria also supported Iran's terrorist apparatus by providing Hezbollah with territorial access, protection, and logistical assistance and by facilitating the movement of Iranian personnel, weapons, and other materiel through Syrian territory.

**C. Bashar al-Assad**

40. ***Assad.*** Assad is a Syrian national and the former President of the Syrian Arab Republic. Plaintiffs' claims against Assad arise under 28 U.S.C. § 1605A(c) from official acts through which he sustained Syria's provision of material support or resources for acts of extrajudicial killing. Assad no longer serves as Syria's President and is not entitled to status-based head-of-state immunity. Assad is likewise not entitled to conduct-based immunity because Plaintiffs seek judgment solely against him personally and satisfaction solely from his personal assets, rather than relief against Syria. *See Lewis v. Mutond*, 918 F.3d 142, 146–48 (D.C. Cir. 2019).

**D. Hezbollah**

41. Defendant Hezbollah is a Lebanon-based terrorist organization that Iran and Syria financed, armed, trained, and used as an intermediary for operations outside Iran. Hezbollah worked with the IRGC-QF to organize and train the SMOs operating in Iraq. The United States designated Hezbollah as a Foreign Terrorist Organization in 1997, and Hezbollah

remained so designated throughout the Relevant Period. Qualifying Plaintiffs seek to hold Hezbollah secondarily liable for attacks it planned or authorized.

## FACTUAL BACKGROUND

42. This case concerns terrorist attacks that killed and injured persons serving the United States mission in Iraq between 2003 and 2009, and the state, financial, and operational support that enabled those attacks.

43. Through the IRGC, the IRGC-QF, MOIS, NIOC, and other state organs and intermediaries, Iran knowingly provided the STOs with safe haven, financing, training, weapons, logistical assistance, personnel, transportation, and access to its territory and support infrastructure.

44. Syria complemented Iran's support for the STOs by providing a principal facilitation and transit route through which terrorist operatives, fighters, suicide bombers, weapons, and other resources moved into Iraq.

45. Iran also organized, financed, armed, trained, and otherwise materially supported the SMOs. Acting through the IRGC-QF and Hezbollah, Iran supplied the SMOs with funding, weapons, explosives, training, personnel, intelligence, logistical assistance, and operational support used to carry out attacks against United States personnel in Iraq.

46. Syria also provided Hezbollah with political and material support, territorial access, protection, and logistical assistance and permitted Iran to resupply Hezbollah through Syrian territory. That assistance strengthened Hezbollah's capacity to work with the IRGC-QF in organizing, training, arming, and supporting the SMOs.

47. The Iranian banks supplied financial resources and banking infrastructure to different components of Iran's terrorist support apparatus. Bank Markazi supplied and routed Iranian government funds and preserved access to foreign currency and international payment channels; Bank Melli maintained accounts, transferred funds, and provided other financial

services to the IRGC and IRGC-QF; and Bank Saderat transferred Iranian government funds and provided financial services to Hezbollah.

48. Bank Markazi's and Bank Melli's services increased the resources available to the IRGC and IRGC-QF to support the STOs and SMOs. Bank Saderat's services strengthened Hezbollah's capacity to assist the IRGC-QF in organizing, training, arming, and supporting the SMOs.

49. The assistance provided by the Iran Defendants and Syria constituted "material support or resources" within the meaning of 28 U.S.C. § 1605A(h)(3) and 18 U.S.C. § 2339A(b)(1).[12]

50. That material support was a substantial factor in enabling the STOs and SMOs to plan, prepare for, and carry out the Terrorist Attacks, and Plaintiffs' resulting injuries were a natural and reasonably foreseeable consequence of that support.

51. The Iran Defendants and Syria are therefore liable under 28 U.S.C. § 1605A(c) for the injuries and damages proximately caused by their respective provision of material support or resources for the Terrorist Attacks.

52. Assad is separately liable under 28 U.S.C. § 1605A(c) for injuries arising from the AQI and SMO attacks, proximately caused by his official acts sustaining Syria's provision of material support or resources for acts of extrajudicial killing.

53. After receiving direct warnings that Syria-based networks were supplying and attacking United States personnel in Iraq, Assad appointed and continued to empower a senior Syrian Ba'ath Party official who materially supported AQI. Assad also maintained Syria's

[12] The term "material support or resources" is defined as any property, tangible or intangible, or service, including currency or monetary instruments or financial securities, financial services, lodging, training, expert advice or assistance, safehouses, false documentation or identification, communications equipment, facilities, weapons, lethal substances, explosives, personnel and transportation, except medicine or religious materials. 28 U.S.C. § 1605A(h)(3); 18 U.S.C. § 2339A(b)(1).

strategic relationships with Iran and Hezbollah and continued providing Hezbollah and its Iranian sponsors territorial access, logistical infrastructure, and transit through Syria.

54. Only the attacks alleged in Section X.B of this Complaint are asserted against Hezbollah under the ATA. Each was committed by an SMO, was planned or authorized by Hezbollah while Hezbollah was designated as a Foreign Terrorist Organization, and was carried out by persons whom Hezbollah knowingly and substantially assisted.

55. Accordingly, Hezbollah is liable under § 2333(d)(2) for knowingly providing substantial assistance to the persons who committed acts of international terrorism that Hezbollah planned or authorized.

## III. IRAN AND SYRIA HAVE HISTORICALLY USED TERRORISM AND SUPPORT FOR TERRORIST ORGANIZATIONS AS INSTRUMENTS OF STATE POLICY

56. Since the 1979 Iranian Revolution, Iran has used terrorism and support for terrorist organizations as instruments of state policy to undermine the United States and its allies, expand Iranian influence, and advance Iran's strategic objectives throughout the Middle East.

57. Iran implemented that policy principally through the IRGC, IRGC-QF, and MOIS. The IRGC-QF conducted external operations and cultivated, financed, armed, trained, and supported terrorist organizations and militant groups, while MOIS conducted intelligence and covert operations and supplied terrorist organizations with intelligence, documentation, logistical assistance, and other resources.

58. Iran also helped establish Lebanese Hezbollah and thereafter financed, armed, trained, and supported the organization as a principal instrument for projecting Iranian power and conducting or facilitating terrorist operations outside Iran.

59. Syria performed a complementary role in sustaining and strengthening Hezbollah. Syria provided Hezbollah with material support, such as facilitating the

transportation of Iranian personnel, weapons, and other materiel through Syrian territory.

60. During the Relevant Period, Hezbollah used capabilities preserved through that support to assist the IRGC-QF in organizing, training, arming, and supporting the SMOs operating against the United States and Coalition forces in Iraq.

61. Iran's support for terrorist organizations was not limited by sectarian affiliation. When its strategic interests aligned with STO networks, Iran provided them with safe haven, financing, training, weapons, logistics, and other assistance.

62. Syria likewise provided sanctuary, transit, and logistical support to STO networks fighting the United States and Coalition forces in Iraq.

63. These longstanding relationships supplied the institutional, financial, and logistical architecture through which Iran and Syria supported the STOs and SMOs responsible for the Terrorist Attacks.

## IV. IRAN PROVIDED MATERIAL SUPPORT TO SUNNI TERRORIST ORGANIZATIONS (STOs)[13]

### E. Iran Has Historically Supported Al-Qaeda

64. Iran's relationship with al-Qaeda began by at least the early 1990s. At that time, Ayman al-Zawahiri, the leader of Egyptian Islamic Jihad ("EIJ"), had negotiated an arrangement under which Iran provided EIJ with approximately $2 million in funding and training to support its campaign against the government of Egyptian President Hosni Mubarak. EIJ was closely connected to al-Qaeda, and these two organizations eventually formally merged in 2001.

[13] Federal courts in this District have repeatedly found Iran responsible for providing material support for terrorist attacks against Americans and United States interests. *See, e.g.*, *Peterson v. Islamic Republic of Iran*, 264 F. Supp. 2d 46, 58–61 (D.D.C. 2003) (1983 bombing of the United States Marine barracks in Beirut); *Owens v. Republic of Sudan*, 826 F. Supp. 2d 128, 139–51 (D.D.C. 2011) (1998 bombings of the United States Embassies in Kenya and Tanzania); *Estate of Fishbeck v. Islamic Republic of Iran*, No. 18-cv-2248 (CRC), 2023 U.S. Dist. LEXIS 201125 (D.D.C. Aug. 18, 2023) (attacks against United States forces in Iraq from 2003 through 2011).

65. Between approximately 1992 and 1996, al-Qaeda representatives met with Iranian officials in Sudan to develop a tripartite arrangement among al-Qaeda, Sudan's National Islamic Front, and elements of the Iranian government. The 9/11 Commission described the resulting relationship as an "informal agreement" to cooperate in supporting actions directed principally against the United States and Israel.

66. Pursuant to that arrangement, senior al-Qaeda operatives and trainers traveled to Iran to receive instruction in explosives, intelligence, and operational security. Other al-Qaeda members received training from Hezbollah in Lebanon, including instruction in the use of sophisticated explosives and suicide operations. Hezbollah commander Imad Mughniyeh helped coordinate that relationship.

67. Iran also provided al-Qaeda members with transit assistance through Iranian territory. Iranian border officials were instructed not to stamp the passports of certain al-Qaeda travelers, thereby concealing their passage through Iran and facilitating their movement between Afghanistan, the Persian Gulf, and other locations.

68. The 9/11 Commission found strong evidence that Iran facilitated the transit of al-Qaeda members through its territory before September 11, 2001. Shortly before the September 11 attacks, Osama bin Laden's son Saad bin Laden met with Iranian officials concerning a refuge for al-Qaeda leaders and their families.

69. After the United States invaded Afghanistan, Iran permitted senior al-Qaeda figures and their families to enter and remain in Iran, including Saif al-Adel, a senior military commander with ties to jihadist leaders operating in and around Iraq. Iran also permitted Abu Musab al-Zarqawi ("Zarqawi"), who later established the organization that became AQI, to enter and remain in Iran.

70. Iran housed the senior al-Qaeda leaders and their families at a secure Tehran facility known as Block 300, where al-Qaeda personnel remained together, communicated with outside operatives, and continued leadership and planning activities.

### F. Iran Provided Material Support to Al-Qaeda During the Relevant Period

71. Iran's provision of training, concealed transit, refuge, communications access, and organizational continuity established the infrastructure through which it continued supporting al-Qaeda and its affiliates during the Relevant Period.

72. Iran's support was coordinated through its security apparatus. In June 2003, United States intelligence officials reported that both MOIS and the IRGC-QF were deeply involved in supporting al-Qaeda.

73. Iran permitted al-Qaeda facilitators to operate an organized pipeline through Iranian territory. That pipeline moved funds, recruits, facilitators, and operatives throughout the Middle East and al-Qaeda's senior leadership in Afghanistan, Pakistan, and Iraq.

74. By 2005, Iran permitted Yasin al-Suri, a Syrian national, to operate in Iran as a senior al-Qaeda facilitator under an agreement between al-Qaeda and Iran. Al-Suri collected funds and recruits from across the Middle East, moved them through Iran, and arranged their onward travel for the benefit of al-Qaeda's senior leadership.

75. Under the same agreement, al-Qaeda refrained from conducting operations or recruiting operatives within Iran and kept Iranian authorities informed of its activities. In return, Iran granted the network freedom of operation.

76. The Iran-based network directly supported terrorist operations in Iraq. In an October 2007 letter recovered from Osama bin Laden's compound and attributed to bin Laden, Iran was described as al-Qaeda's "main artery for funds, personnel, and communication." The letter instructed al-Qaeda members to avoid conflict with Iran because of the importance of that support.

77. In July 2011, the United States Department of the Treasury designated al-Suri and five other members of the Iran-based network pursuant to Executive Order 13224. Treasury described Iran as a critical transit point and the network as the core pipeline through which al-Qaeda moved resources from the Middle East to South Asia.

### G. Iran Provided Material Support to Zarqawi's Network and AQI During the Relevant Period

78. Iran also directly and indirectly supported the growth of AQI, al-Qaeda's principal affiliate and one of the most lethal terrorist organizations operating in Iraq.

79. After fleeing Afghanistan in 2001, Zarqawi entered Mashhad, Iran, on approximately January 5, 2002. According to German intelligence reporting, Iran provided Zarqawi with refuge and medical treatment, and he remained in Iran until at least April 2002.

80. While using Iran as a refuge and transit point, Zarqawi reassembled members of his terrorist network, maintained communications with operatives outside Iran, and arranged for personnel to travel through Iranian territory. Iran's assistance enabled Zarqawi and his associates to relocate to northern Iraq and establish relationships with Ansar al-Islam.

81. Following the United States-led invasion of Iraq in 2003, Zarqawi's organization developed an extensive terrorist network that recruited and transported foreign fighters, maintained safe houses and logistical routes, obtained weapons and explosives, and planned and carried out attacks throughout Iraq.[14]

82. At the same time, Zarqawi's organization received substantial financial and strategic support from al-Qaeda. In November 2003, Osama bin Laden announced that al-Qaeda would provide $1.5 million per month to support the Iraqi insurgency and dispatched

---

[14] For instance, Zarqawi's organization has been linked to the August 7, 2003, car bombing of the Jordanian Embassy in Baghdad, which killed at least 17 people and wounded approximately 40 others; the August 19, 2003, truck bombing of the newly established United Nations headquarters in Baghdad, which killed 22 people, including United Nations Special Representative Sérgio Vieira de Mello; and the August 29, 2003, suicide bombing outside the Imam Ali Mosque in Najaf, which killed prominent Shi'a cleric Ayatollah Mohammed Baqir al-Hakim and scores of others. In May and September 2004, Zarqawi personally beheaded captured American civilians Nicholas Berg and Eugene Armstrong.

two associates to convey that message, together with a plan for jihad in Iraq, to Zarqawi and other militant leaders.

83. In October 2004, Zarqawi formally pledged allegiance to Osama bin Laden and renamed his organization as al-Qaeda in Iraq, or AQI. The United States designated AQI as a Foreign Terrorist Organization the same month.

84. Iran knew that al-Qaeda's senior leadership and facilitation networks were supplying AQI's organization with financing, recruits, communications, logistical assistance, and strategic support.

85. Iran nevertheless continued providing al-Qaeda's leaders and facilitators with safe haven, freedom of movement, communications access, and territorial access.

86. The IRGC-QF also provided AQI operatives with communications channels and couriers and supplied false documents and special passports, which enabled Zarqawi and his fighters to move between Iran, Iraq, and neighboring countries.

87. In December 2006, two IRGC-QF agents arrested in Baghdad possessed documents on weapons shipments, which reflected Iran's cooperation with AQI- and Ansar al-Islam-affiliated individuals.

88. Iran's assistance therefore increased AQI's personnel, resources, and operational capacity, enabling it to sustain the terrorist attacks against United States and Coalition personnel that caused Plaintiffs' injuries.

### H. Iran Provided Material Support and Resources to Ansar al-Islam During the Relevant Period

89. Ansar al-Islam was established in Iraqi Kurdistan in 2001 through the merger of Kurdish Islamist factions. It maintained its principal stronghold near Biyara and Tawela along the Iranian border. The United States designated Ansar al-Islam as a Foreign Terrorist Organization on March 22, 2004.

90. From its inception, Ansar al-Islam was closely integrated with al-Qaeda. Al-

Qaeda and Osama bin Laden participated in its formation and financing, supplied approximately $300,000 to $600,000 in seed money, and provided its members with training and logistical assistance.

91. Ansar al-Islam also cooperated with AQI, whose network operated a poisons and explosives training center in territory controlled by Ansar al-Islam.

92. Ansar al-Islam's location along the Iran-Iraq border made access to Iranian territory particularly important to its operations. The International Crisis Group concluded that Ansar al-Islam could not survive without support from factions in Iran because Iran provided its principal connection to the outside world.

93. Iran continued providing that connection during the Relevant Period. The United States Department of State reported that Iranian government officials helped Ansar al-Islam members transit through Iran and obtain safe haven there.

94. In March 2003, United States Special Forces and Kurdish forces conducted Operation Viking Hammer against Ansar al-Islam's stronghold and dismantled its Iraqi base.

95. Most of the organization's surviving fighters fled across the border into Iran, where they regrouped with the assistance of the IRGC and Iranian authorities before fighters reentered Iraq and resumed anti-Coalition operations. Ansar al-Islam subsequently reconstituted its operations and operated under the name Ansar al-Sunna.

96. Iran's support enabled Ansar al-Islam to survive the destruction of its Iraqi enclave, regroup in Iran, preserve its personnel, and continue conducting attacks against United States and Coalition forces.

97. Iran also facilitated cooperation among Ansar al-Islam, AQI, and al-Qaeda. In August 2003, Iran facilitated a meeting in Tehran between lieutenants of Zarqawi and Ansar al-Islam concerning the establishment of a permanent terrorist base in Kurdistan and preservation of the Iran-based pipeline between Iraq and al-Qaeda's broader network.

98. From 2003 through at least 2010, al-Qaeda, AQI, and Ansar al-Islam shared safe houses, logistical routes, personnel, explosives, and other terrorist resources. Ansar al-Islam also employed the cell-based organizational structure used by al-Qaeda, with each cell divided into small units of ten to fifteen members led by an emir or commander.

99. With that support, Ansar al-Islam conducted a sustained campaign of violence against the United States and Coalition forces. By February 2007, the organization had claimed responsibility for more than 1,600 attacks in Iraq.

100. Iran also provided training directly to Ansar al-Islam members. A U.S. intelligence report indicated that approximately 320 Ansar al-Islam terrorists were being trained in Iran for attack scenarios including suicide bombings, assassinations, and operations against U.S. forces in Iraq. British intelligence likewise reported that elements of the IRGC were providing safe haven and basic training to Iran-based Ansar al-Islam cadres.

101. Iranian assistance included weapons and explosives expertise. Intelligence reporting indicated that Iranian personnel instructed Ansar al-Islam operatives in constructing and deploying improvised explosive devices, while other reporting identified Iranian assistance in supplying the group with weapons and munitions.

102. Iran's material support preserved and strengthened Ansar al-Islam's ability to carry out those attacks and thereby proximately caused Plaintiffs' injuries.

## V. IRAN AND HEZBOLLAH PROVIDED MATERIAL SUPPORT TO SHIA MILITIA ORGANIZATIONS (SMOs)

### I. Iran Developed and Supported a Network of the SMOs in Iraq

103. Following the fall of Saddam Hussein's regime, Iran sought to expand its influence in Iraq and compel the withdrawal of United States forces. Iran pursued those objectives in part by cultivating and supporting Iraqi Shi'a militias capable of conducting attacks against United States and Coalition forces.

104. In 2003, Iran backed a "young and relatively low-ranking Shi'a cleric" named Muqtada al-Sadr, who purported to speak "for Iraq's disenfranchised Shi'a." Al-Sadr eventually went on to establish Jaysh al-Mahdi ("JAM"), also known as the Mahdi Army.

105. Between 2003 and 2006, Iran provided selected elements of JAM with financing, weapons, and other assistance used to conduct attacks against United States and Coalition forces. The IRGC-QF also dispatched Hezbollah operatives to provide JAM with logistical assistance and combat training.

106. As JAM fragmented after fighting Coalition forces in 2004, Iran began cultivating select JAM members into more closely controlled cells. The IRGC-QF and Hezbollah later trained these militants in constructing and deploying improvised explosive devices ("IED"), explosively formed penetrators ("EFP"), and other weapons used against Coalition forces.

107. Asa'ib Ahl al-Haq ("AAH") emerged from JAM's Special Groups, while Kata'ib Hezbollah ("KH") developed as a separate Iran-backed organization operating alongside them. The United States and Coalition officials referred to them as the "Special Groups."

108. In 2006, Iran invited Qais al-Khazali and his brother Layth al-Khazali and promised to support their militant activities. With Iran's support, al-Khazali formed AAH, a Special Group modeled on Hezbollah and designed to operate more directly under Iranian influence and control than JAM.

109. From 2006 through the end of the Relevant Period, AAH operated as a proxy of the IRGC-QF and Hezbollah and conducted attacks against United States and Coalition personnel.

110. In early 2007, the IRGC-QF organized KH, another Iran-backed Special Group, to deploy experienced operatives and sophisticated Iranian-supplied weapons against United

States and Coalition forces. KH was led by Abu Mahdi al-Muhandis, an adviser to the IRGC-QF commander Qasem Soleimani.

111. The IRGC-QF financed, armed, and trained AAH, KH, and other Special Groups. It reportedly paid between $4,000 and $13,000 for individual rocket or roadside bomb attacks, depending on the circumstances, and supplied the Special Groups with weapons and between $750,000 and $3 million in monthly funding.

112. Iran also used NIOC helicopters and border guards to gather intelligence along the Iranian border with Iraq to study U.S. and Iraqi troop movements.[15]

### J. Hezbollah Assisted the IRGC-QF in Training the SMOs

113. Hezbollah's involvement in the SMOs' campaign was operational and sustained. Hezbollah helped organize JAM, recruited and trained Iraqi militants, and supplied weapons expertise and tactical guidance. Hezbollah also worked with the IRGC-QF to prepare selected militants for attacks against United States and Coalition forces.

114. In approximately 2005, Iran asked Hezbollah to establish a unit dedicated to training Iraqi militants to fight Coalition forces. Hezbollah Secretary-General Hassan Nasrallah responded by creating a covert unit to train and advise JAM members and JAM Special Groups that later became AAH.

115. In 2006, Hezbollah assigned senior commander Ali Mussa Daqduq to work with the IRGC-QF in organizing, training, and equipping the JAM Special Groups. Hezbollah ordered Daqduq to provide those militants with training and equipment to increase their ability to inflict casualties on United States forces. Daqduq helped restructure AAH into compartmentalized cells modeled on Hezbollah, enabling operatives to conduct attacks while limiting exposure of the broader organization

[15] Combatting Terrorism Center at West Point report (2009)

116. The IRGC-QF and Hezbollah instructors trained groups of approximately twenty to sixty Special Groups members at a time in Iran before returning them to Iraq. For instance, Hezbollah trained KH members in constructing and planting IEDs and in coordinating small-arms, sniper, mortar, and rocket attacks. By November 2006, U.S. intelligence assessed that Hezbollah had trained between 1,000 and 2,000 Iraqi Shia militia members in Lebanon.

117. Further, the IRGC-QF and Hezbollah helped plan the January 20, 2007 attack on the Karbala Provincial Joint Coordination Center. Daqduq participated in the planning, and AAH operatives carried out the attack, kidnapping and killing five United States soldiers.

118. When Coalition forces captured Daqduq in March 2007, they recovered his journal and tactical manuals concerning attacks on Coalition forces, including IEDs, kidnappings, and helicopter attacks. One manual instructed operatives to coordinate rocket and small-arms fire against convoys. His journal documented a plan to abduct a British soldier and meetings with Special Groups operatives conducting IED and small-arms attacks in Diyala Province.

119. Hezbollah also provided weapons training and operational support to KH. As of 2008, KH received funding from the IRGC-QF and weapons training and support from Hezbollah. Hezbollah trained KH members in Iran to construct and plant IEDs and coordinate small-arms, sniper, mortar, and rocket attacks.

120. KH used those capabilities to attack United States and Coalition personnel. Among other attacks, KH conducted the February 19, 2008 rocket attack on a United States base near Rustamiya, Iraq, which killed a United States civilian and injured other United States and Coalition personnel. An August 2008 United States military incident report also identified a Hezbollah cell operating in and around Sadr City, which coordinated EFP attacks against Coalition forces with a JAM reconnaissance element operating in the area.

121. Through this sustained operational integration, Hezbollah planned or authorized certain attacks carried out by JAM and affiliated Special Groups, and knowingly provided substantial assistance to them.

122. Hezbollah's weapons training, operational support, and other assistance materially strengthened the SMOs' capacity to carry out the Terrorist Attacks.

123. That assistance was a substantial factor in causing Plaintiffs' injuries and deaths, which were reasonably foreseeable consequences of Hezbollah's conduct.

## VI. SYRIA PROVIDED MATERIAL SUPPORT TO THE STOs AND STRENGTHENED HEZBOLLAH'S CAPACITY TO SUPPORT THE SMOs

### K. Syria Served as a Facilitation and Transit Hub for the STOs

124. After the March 2003 invasion of Iraq, Syria became a principal transit route for foreign fighters, suicide bombers, funds, weapons, and other resources bound for AQI and other insurgent groups in Iraq. By 2005, U.S. officials estimated that 65 to 75 percent of foreign fighters entering Iraq had transited Syria, with Damascus (Syria's capital) serving as a "funnel point."

125. The Syrian regime knowingly permitted AQI members, financiers, and facilitators to operate from Syrian territory. AQI's Syria-based facilitation network moved fighters, funds, weapons, and other resources into Iraq and provided recruits with false passports, weapons, guides, safe houses, allowances, and border-crossing assistance.

126. In 2004, Zarqawi appointed Abu Ghadiyah as AQI's logistics commander in Syria. Under Abu Ghadiyah's direction, the network controlled the movement of funds, weapons, operatives, and other resources through Syria into Iraq.

127. By 2005, Abu Ghadiyah's network was supplying AQI with substantial financial and operational support. In November 2005, Fawzi Mutlaq al-Rawi, whom Syrian President Bashar al-Assad had appointed to lead the Iraqi wing of the Syrian Ba'ath Party, also facilitated the transfer of approximately $300,000 to AQI members and supplied AQI with vehicle-borne

improvised explosive devices, rifles, and suicide bombers. Treasury further reported that al-Rawi maintained close ties to Syrian intelligence and operated from Syrian government and Ba'ath Party facilities in Damascus.

128. Al-Rawi's support extended beyond financing. Treasury reported that, in September 2005, al-Rawi met in Ramadi with senior AQI representatives to discuss financing, consolidating AQI forces, attacks against the United States Embassy, and attacks targeting Baghdad's International Zone. As late as December 2006, al-Rawi continued meeting with senior AQI members to discuss funding and future operations in Iraq.

129. Abu Ghadiyah's Syria-based AQI network continued operating after Zarqawi's death. Records recovered near Sinjar in 2007 documented hundreds of foreign recruits who transited Syria before entering Iraq and an organized system for registering, receiving, and assigning them to AQI operations. In 2008, Treasury designated Abu Ghadiyah for running the network, which controlled the flow of money, weapons, terrorists, and other resources through Syria into Iraq.

130. In early 2009, Abu Khalaf assumed control of Abu Ghadiyah's foreign-fighter network and continued to move terrorists from Syria into Iraq, recruit North Africans for AQI, including prospective suicide bombers, and facilitated equipment transfers to AQI networks in Iraq.

131. Ansar al-Islam and Ansar al-Sunna likewise used Syria-based facilitation routes. In November 2003, Treasury reported that an al-Qaeda-linked cell in Italy recruited individuals and sent them "to Iraq via Syria to the camps of Ansar Al Islam," supplying forged documents and maintaining contacts with terrorist leaders in Syria and Iraq.

132. Treasury repeatedly called upon Syria to halt this activity. In December 2007, Treasury specifically urged Syria to "deny safe haven to those supporting violence from within its borders." Nevertheless, AQI's facilitation infrastructure continued operating from Syrian

territory into at least 2009. By knowingly permitting that infrastructure to operate, Syria provided the STOs with territorial access, safe haven, transportation, and logistical assistance and materially increased their capacity to conduct attacks in Iraq.

### L. Syria Supported Hezbollah and Facilitated Iran's Resupply of Hezbollah

133. In 2003, the United States Department of State reported that Syria was providing Hezbollah with safe haven and political protection in Lebanon, permitting Hezbollah to obtain Iranian resupply through Damascus, and allowing Hezbollah operatives to travel through and take refuge in Syrian territory. Syria continued facilitating Iranian support after the U.S. invasion of Iraq. In 2004 and 2005, the State Department reported that Syria continued providing political and material support to Hezbollah and permitting Iran to use Damascus as a transshipment point for Hezbollah's resupply.

134. Syria's assistance to Hezbollah included more than passive tolerance of Iranian shipments. In 2006, the State Department described the relationship among Hezbollah, Iran, and Syria as "symbiotic" and reported that Iran and Syria cooperated with Hezbollah to supply funds, arms, and training and to facilitate the travel of Hezbollah members.

135. Syria and Iran continued providing Hezbollah military and logistical support during and after its July–August 2006 war with Israel. After Hezbollah suffered substantial weapons and material losses, the State Department reported that Syria and Iran "worked successfully to rearm Hizballah."

136. By July 2007, United States officials had publicly identified that Hezbollah personnel were working with the IRGC-QF to organize, train, arm, and direct Iraqi Special Groups attacking United States and Coalition forces. Syria nevertheless continued supporting Hezbollah and facilitating Iran's resupply of the organization.

137. By 2009, the State Department continued to report that Syria provided Hezbollah with political and material support and allowed Iran to use Syrian territory as a

transit point for assistance to the organization.

138. Syria's sustained support preserved and strengthened Hezbollah's personnel, training infrastructure, supply networks, and operational capabilities while Hezbollah assisted the IRGC-QF in organizing, training, arming, and supporting the SMOs.

139. Syria's support was therefore a substantial factor in enabling Hezbollah's assistance to the SMOs. The resulting attacks and Plaintiffs' injuries were natural and reasonably foreseeable consequences of that support.

## VII. BASHAR AL-ASSAD KNOWINGLY SUSTAINED SYRIA'S ASSISTANCE TO AQI AND HEZBOLLAH

140. During the Relevant Period, Assad served as President of Syria and presided over an authoritarian regime in which he and a small circle of senior officials made Syria's principal foreign policy, security, and personnel decisions. The conduct alleged below was undertaken within the scope of his office.

141. After receiving direct warnings that Syria-based networks were facilitating attacks on United States personnel, Assad continued to empower a senior Syrian official who financed and supplied AQI. Assad also continued Syria's support for Hezbollah despite knowing its role in organizing and training the SMOs responsible for attacks on the United States personnel.

### M. Assad Appointed and Continued to Empower Al-Rawi After Direct Warnings Concerning Syria-Based Support for Attacks Against Americans

142. In April 2003, United States officials reported that fighters had entered Iraq from Syria carrying substantial funds and materials offering rewards for killing American soldiers.

143. Secretary of State Colin Powell subsequently conveyed directly to Assad the United States' concerns regarding Syria's support for terrorist organizations. Powell personally delivered those warnings to Assad during a May 2003 meeting and reiterated them on later occasions.

144. By September 2003, the United States had publicly advised that Syria was permitting military equipment and volunteers to enter Iraq to attack and kill United States service members. Congress subsequently found that Syria had allowed fighters and military equipment to enter Iraq and that Syrian officials had expressed an interest in defeating United States and Coalition forces. *See* Syria Accountability and Lebanese Sovereignty Restoration Act, Pub. L. No. 108-175, § 2(31)–(34) (2003).

145. Despite those warnings, Assad appointed Fawzi Mutlaq al-Rawi in 2003 to lead the Iraqi wing of the Syrian Ba'ath Party.

146. As relevant here, Al-Rawi developed direct relationships with senior AQI operatives. In September 2005, he met in Ramadi with a senior AQI leader and other AQI representatives to discuss financing, consolidating AQI's forces, attacking the United States Embassy, and concentrating attacks against Baghdad's International Zone.

147. In November 2005, al-Rawi facilitated the transfer of approximately $300,000 to AQI members. He also supplied AQI with vehicle-borne improvised explosive devices, rifles, and suicide bombers at the request of a senior AQI leader.

148. The United States' December 2007 designation publicly identified al-Rawi by name as an AQI financier operating from Syria and called upon Syria to deny safe haven to persons supporting violence from Syrian territory.

149. Notwithstanding that disclosure and the prior warnings, Assad did not remove al-Rawi from the leadership position or terminate the Syrian government's financial and institutional support for al-Rawi's activities.

150. By appointing al-Rawi, continuing to empower him after receiving direct warnings concerning Syria-based support for attacks against Americans, and retaining him after the United States publicly identified his support for AQI, Assad preserved a Syrian-based channel that had supplied AQI with weapons, suicide bombers, and operational assistance.

### N. Assad Maintained and Directed Syria's Strategic Relationships with Iran and Hezbollah

151. Assad's relationship with Hezbollah began at the outset of his presidency. Shortly after Assad succeeded his father in 2000, Hezbollah leader Hassan Nasrallah led a delegation to Damascus to meet with him and support his succession.

152. Assad thereafter personally embraced Syria's support for Hezbollah as his own policy. Following Hezbollah's 2006 war with Israel, Assad praised Hezbollah's military achievements, defended the organization's conduct, and characterized armed "resistance" as a legitimate means of advancing Syria's regional objectives.

153. In February 2007, despite United States pressure on Syria to cease supporting Hezbollah and other terrorist organizations, Assad personally vowed that Syria's support for Hezbollah would continue and described its activities as legitimate resistance.

154. By July 2007, United States officials had publicly disclosed that Hezbollah personnel were working with the IRGC-QF to organize, train, arm, and direct the SMOs attacking United States and Coalition forces. Assad therefore knew that Syria's continued support for Hezbollah strengthened an organization operationally involved in attacks against United States personnel in Iraq.

155. Despite that knowledge, Assad continued Syria's political and material support for Hezbollah, including territorial access, protection, logistical assistance, and transit routes.

156. Assad's maintenance of those relationships continued after the Relevant Period. In February 2010, Assad hosted Iranian President Mahmoud Ahmadinejad and Nasrallah in Damascus, publicly reaffirmed Syria's alliance with Iran, and met with Hezbollah's leadership.

157. These meetings, public commitments, and continued implementation of these policies support the inference that Assad knew of and deliberately sustained Syria's assistance to IRGC-QF and Hezbollah, including Hezbollah's operations involving the SMOs.

158. Assad's appointment and continued empowerment of al-Rawi and his maintenance of Syria's support for Hezbollah were official decisions undertaken within the scope of his office. Through those official acts, Assad sustained Syria's provision of material support or resources to AQI and Hezbollah despite knowing that those organizations were supporting campaigns of terrorist violence against United States personnel in Iraq.

159. That material support sustained AQI's operational network and strengthened Hezbollah's capacity to support the SMOs through which the relevant Terrorist Attacks were carried out.

## VIII. THE IRANIAN BANKS AND NIOC PROVIDED FUNDING AND FINANCIAL SERVICES THAT ENABLED IRAN'S MATERIAL SUPPORT

160. Iran's support for the STOs and SMOs depended upon a financial infrastructure capable of supplying government funds, obtaining foreign currency, transferring money across borders, and preserving access to the international financial system.

161. NIOC generates billions of dollars in revenue each year for the Iranian government, in addition to generating the revenue to fund its operations and investment in developing Iran's oil industry. According to NIOC's website, "it is estimated that the company holds 156.53 billion barrels of liquid hydrocarbons and 33.79 trillion cubic meters of natural gas,"[16] making it the second largest oil company in the world, after Saudi Arabia's Aramco.

162. An Iranian government audit in 2009 found that more than one billion in oil revenue from the previous year was missing from the state coffers.[17] The practice continues,

[16] *Id.*

[17] https://www.upi.com/Business_News/Energy-Industry/2009/11/20/Iran-looking-for-missing-oil-revenue/UPI-97311258729114/

with recent Iranian reports referring to billions in revenues going unaccounted for each year.[18] Missing revenue is directly controlled by the IRGC.[19]

163. In September 2012, the U.S. Treasury Department reported to Congress that: "NIOC is an agent or affiliate of the IRGC."[20] The Treasury's finding was pursuant to section 104(c)(2)(E)(i) of the Comprehensive Iran Sanctions, Accountability, and Divestment Act of 2010 ("CISADA") and section 312 of the Iran Threat Reduction and Syria Human Rights Act of 2012 ("ITRSHRA"). ITHSHRA Section 312 reads in part:

> SENSE OF CONGRESS.—It is the sense of Congress that the National Iranian Oil Company and the National Iranian Tanker Company are not only owned and controlled by the Government of Iran but that those companies provide significant support to Iran's Revolutionary Guard Corps and its affiliates.

164. NIOC also obtained letters of credit from western banks to provide financing and credit to the IRGC.[6]

165. The Iranian banks also supplied the financial infrastructure by which Iran funded the SMOs and STOs. During the Relevant Period, Bank Markazi served as the Iranian government's banker, supplied and routed government funds, and preserved designated Iranian institutions' access to foreign currency and international payment channels. Bank Melli provided accounts, transfers, and other financial services directly to the IRGC, the IRGC-QF,

---

[18] http://aftabnews.ir/fa/news/297462/%DB%B8%DB%B0%DB%B0-%D9%85%DB%8C%D9%84%DB%8C%D8%A7%D8%B1%D8%AF-%D8%AF%D9%84%D8%A7%D8%B1-%D8%AF%D8%B1%D8%A2%D9%85%D8%AF-%D9%86%D9%81%D8%AA%DB%8C-%D8%AF%D9%88%D8%B1%D9%87-%D8%A7%D8%AD%D9%85%D8%AF%DB%8C%E2%80%8C%D9%86%DA%98%D8%A7%D8%AF-%D8%B5%D8%B1%D9%81-%DA%A9%D8%AF%D8%A7%D9%85-%D8%AA%D9%88%D8%B3%D8%B9%D9%87-%D8%AF%D8%B1-%DA%A9%D8%B4%D9%88%D8%B1-%D8%B4%D8%AF

[19] *See* Mark Gregory, Expanding Business Empire of Iran's Revolutionary Guards, BBC News, July 26, 2010, available at http://www.bbc.com/news/world-middle-east-10743580.

[20] https://www.treasury.gov/resource-center/sanctions/Programs/Documents/report_to_congress_09242012.pdf.

and entities they owned or controlled. Bank Saderat supplied financial services through which Iran transferred substantial government funds to Hezbollah.

166. The banks' activities were not limited to routine or incidental banking services. They also employed practices that obscured the involvement of Iranian institutions in international transactions and helped designated Iranian entities preserve access to the international financial system.

167. Bank Markazi and Bank Melli increased and preserved the resources available to the IRGC and IRGC-QF, while Bank Markazi and Bank Saderat increased and preserved the resources available to Hezbollah. In turn, the IRGC-QF used its resources to support the STOs and SMOs, and Hezbollah assisted the IRGC-QF in organizing, training, arming, and supporting the SMOs.

168. The banks' respective funding and financial services were a substantial factor in sustaining the support networks that enabled the relevant Terrorist Attacks, and Plaintiffs' resulting injuries were a natural and reasonably foreseeable consequence of that support.

### O. Bank Markazi Supplied and Preserved the Financial Infrastructure of Iran's Terrorist Support Apparatus

169. As Iran's central bank and governmental banker, Bank Markazi manages Iranian government funds, supplies foreign currency to Iranian financial institutions, and facilitates Iran's access to international payment channels.

170. During the Relevant Period, Bank Markazi used those functions to supply and route funds to institutions supporting the IRGC-QF and Hezbollah.

171. Beginning in February 2001, Bank Markazi worked with Standard Chartered Bank to develop procedures for concealing Iranian involvement in payment instructions routed through Standard Chartered's New York branch. Under that agreement, Standard Chartered manually processed Bank Markazi's SWIFT messages and replaced Bank Markazi's identifier

with its own. The arrangement continued through March 2006, and Standard Chartered continued its Iranian U.S.-dollar business until October 2006.

172. Between 2001 and 2006, Bank Markazi supplied approximately $50 million to Bank Saderat for transfer, through its London subsidiary and Beirut branch, to Hezbollah-controlled organizations in Lebanon that supported acts of violence.

173. Bank Markazi also preserved access to the international financial system for Iranian banks serving Iran's terrorist support networks. In February 2008, Bank Markazi's governor publicly stated that the central bank assisted Iranian private and state-owned banks in meeting their commitments "regardless of the pressure on them."

174. In March 2008, the Financial Crimes Enforcement Network warned that Bank Markazi and Iranian commercial banks had requested that their names be removed from international transactions and expressed concern that Bank Markazi was facilitating transactions for sanctioned Iranian banks.

175. Bank Markazi's conduct continued after the Relevant Period. By mid-2011, Bank Markazi had transferred several billion dollars to designated Iranian banks, including Bank Melli, through payment mechanisms that minimized the direct involvement of major international financial institutions.

176. Bank Markazi's support for the IRGC-QF and Hezbollah continued after the Relevant Period. In 2019, the United States designated Bank Markazi pursuant to Executive Order 13224 after determining that it had materially assisted, sponsored, or provided financial, material, or technological support to the IRGC-QF and Hezbollah.

177. By supplying Iranian government funds to Hezbollah and maintaining the financial infrastructure used by Iranian institutions serving the IRGC-QF, Bank Markazi increased and preserved the resources available to the organizations through which Iran supported the STOs and SMOs.

### P. Bank Melli Funded and Facilitated the IRGC and the IRGC-QF

178. Bank Melli served as a principal financial conduit for the IRGC and the IRGC-QF. Bank Melli provided banking services to the IRGC and the IRGC-QF, and entities owned or controlled by those organizations used Bank Melli for a variety of financial services.

179. Between 2002 and 2006 alone, Bank Melli was used to transfer at least $100 million to the IRGC-QF.

180. When processing transactions for the IRGC, Bank Melli employed deceptive banking practices, including requesting that its name be removed from transaction records. Those practices helped the IRGC-QF retain access to funds and international payment channels despite increasing scrutiny of Iran's support for terrorism.

181. The connection between Bank Melli and the IRGC-QF's support for Iraqi Shia militias was subsequently confirmed by the United States. In 2018, Treasury confirmed that the IRGC-QF had used Bank Melli to dispense funds to Iraqi Shia militant groups and that Bank Melli's presence in Iraq was part of that scheme.

182. By maintaining accounts, transferring funds, and preserving banking access for the IRGC and IRGC-QF, Bank Melli supplied and preserved resources that the IRGC-QF used to finance, arm, train, and otherwise support the STOs and SMOs.

### Q. Bank Saderat Funded and Facilitated Hezbollah

183. Bank Saderat served as a principal financial conduit between the Iranian government and Hezbollah.

184. As discussed above, Bank Saderat received approximately $50 million from Bank Markazi and moved those funds to Hezbollah-controlled organizations in Lebanon.

185. Bank Saderat provided those funds while Hezbollah was assisting the IRGC-QF in organizing, training, arming, and supporting the SMOs that attacked United States and Coalition personnel.

186. These transfers increased Hezbollah's resources and strengthened its capacity to support the SMOs.

187. In September 2006, Treasury cut Bank Saderat off from direct and indirect access to the United States financial system because of its role in facilitating Iranian financing of Hezbollah and other terrorist organizations.

188. In October 2007, the United States formally designated Bank Saderat pursuant to Executive Order 13224 as a terrorist financier.

### R. International Correspondent Banks Processed Transactions and Maintained Records Concerning the Bank Defendants' International Payment Activity

189. During the Relevant Period, the Bank Defendants depended on foreign correspondent and intermediary banks to obtain foreign currency, clear United States-dollar transactions, transfer funds across borders, and maintain access to the international financial system.

190. Public enforcement records establish that multiple international banks processed United States-dollar transactions for Iranian banks and entities during periods overlapping the Relevant Period. These banks included HSBC, Commerzbank, Barclays, BNP Paribas, Standard Chartered Bank, ABN AMRO and its successors within the Royal Bank of Scotland group, Crédit Agricole, Credit Suisse, Deutsche Bank, and Bank Saderat PLC, together with relevant branches and affiliates (collectively, the "International Banks").

191. The International Banks are not named as Defendants. Their activities are alleged because Iranian financial institutions used their payment channels and because their transaction and compliance records are likely to contain evidence concerning the Bank Defendants' international payment activity during the Relevant Period.

192. ***HSBC***. During the Relevant Period, HSBC processed U.S.-dollar transactions for customers in Iran and other sanctioned countries. In 2012, HSBC Holdings plc and HSBC

Bank USA, N.A. entered into a deferred-prosecution agreement with the Department of Justice addressing that conduct, correspondent-account due-diligence failures, preservation of relevant SWIFT messages and investigative records, and procedures to prevent the removal or alteration of identifying information used to evade U.S. sanctions.

193. ***Commerzbank***. During the Relevant Period, Commerzbank processed U.S.-dollar transactions for sanctioned Iranian entities through the U.S. financial system. In 2015, it admitted that, from 2002 through 2008, it knowingly moved approximately $263 million for Iranian and Sudanese entities using cover payments, altered payment messages, and other structures designed to evade sanctions filters, including transactions routed through its New York Branch by state-owned Iranian banks.

194. ***Barclays***. During the Relevant Period, Barclays processed transactions for customers in Iran and other sanctioned countries while removing identifying information and using cover payments that concealed the sanctioned parties from U.S. financial institutions. In 2010, Barclays acknowledged responsibility for that conduct.

195. ***BNP Paribas***. During the Relevant Period, BNP Paribas knowingly processed more than $650 million in U.S.-dollar transactions involving Iran-linked entities, using third-party institutions and altered payment messages to conceal sanctioned parties from the U.S. financial system.

196. ***Standard Chartered Bank***. During the Relevant Period, Standard Chartered processed U.S.-dollar transactions for Iranian entities through U.S. financial institutions while omitting or removing references to the Iranian parties from payment messages. It later admitted that, between 2007 and 2011, it processed approximately 9,500 such transactions worth about $240 million, with Dubai-branch employees helping conceal customers' Iranian connections.

197. ***ABN AMRO and the Royal Bank of Scotland***. During the Relevant Period, ABN AMRO processed U.S.-dollar transactions for Iranian financial institutions and customers

while removing or altering references to sanctioned countries from payment messages; some transactions continued through 2007. Royal Bank of Scotland later separately resolved OFAC allegations involving payment practices that resulted in apparent violations of the Iranian Transactions Regulations.

198. ***Crédit Agricole***. During the Relevant Period, Crédit Agricole subsidiaries processed approximately $312 million through the U.S. financial system for entities in sanctioned countries, including Iran, using cover payments and other practices that omitted sanctioned-party information from payment messages and avoided sanctions screening by U.S. financial institutions, including Crédit Agricole's New York Branch.

199. ***Credit Suisse***. During the Relevant Period, Credit Suisse processed U.S.-dollar transactions for Iranian clients while removing identifying information from payment messages and instructing clients how to avoid U.S. sanctions filters. It also sought additional Iranian clearing business, contributing to a substantial increase in Iran-related transactions through the United States between 2002 and 2005.

200. ***Deutsche Bank***. During the Relevant Period, Deutsche Bank processed more than 27,200 U.S.-dollar clearing transactions worth over $10.86 billion for entities in Iran and other sanctioned countries, using stripped payment messages, cover payments, and manual alterations to conceal sanctioned connections from its New York Branch and other U.S. correspondent banks.

201. ***Bank Saderat PLC***. During the Relevant Period, Bank Saderat PLC, Bank Saderat Iran's separately incorporated British subsidiary, served as part of the transfer chain through which approximately $50 million supplied by Bank Markazi moved from Bank Saderat Iran to its Beirut branch for the benefit of Hezbollah-controlled organizations in Lebanon.

202. Based on the foregoing public records and the Bank Defendants' documented use of international payment channels, one or more International Banks processed transactions

involving the Bank Defendants during the Relevant Period. The relevant transaction and compliance records are expected to identify the specific payment pathways, counterparties, and financial institutions through which those transactions were conducted.

## IX. DEFENDANTS PROXIMATELY CAUSED THE PLAINTIFFS' INJURIES

203. Defendants' respective provision and facilitation of material support was a substantial factor in the sequence of events that led to the relevant Terrorist Attacks, and Plaintiffs' resulting injuries were natural and reasonably foreseeable consequences of that support.

204. The relevant support chain differed according to the organization responsible for each attack:




205. Iran supported both the STOs and SMOs. Hezbollah assisted the IRGC-QF in organizing, training, arming, and supporting the SMOs and helped plan or authorize certain SMO attacks.

206. Syria facilitated the STOs' operations and strengthened Hezbollah's capacity to support the SMOs. Assad sustained those channels of support through official decisions made within the scope of his office.

207. The Bank Defendants supplied or preserved financial resources used by the IRGC-QF and Hezbollah to support the STOs and SMOs.

### S. Iran Sustained and Strengthened the STOs' Operational Capacity

208. As discussed above, Iran's support preserved and strengthened the operational capacity of al-Qaeda, AQI, and Ansar al-Islam.

209. That support enabled those organizations to protect and replace senior leaders and operatives, recruit and transport personnel, obtain funding and weapons, maintain safe houses and communications, receive training and expert assistance, and sustain terrorist operations in Iraq.

210. Al-Qaeda's own internal communications confirm the importance of its access to Iran. As discussed above, Osama bin Laden described Iran as al-Qaeda's "main artery," reflecting al-Qaeda leadership's understanding that continued access through Iran was important to the organization's operations.

211. Iran also supplied the STOs with weapons, explosives expertise, and improvised-explosive-device technology. MOIS facilitated the movement of al-Qaeda operatives through Iran, furnished them with identification and travel documents, and provided AQI with money and weapons. Iranian specialists also trained Ansar al-Islam operatives in the construction and deployment of improvised explosive devices.

212. Iran's support was particularly important to Ansar al-Islam. After it lost its territorial stronghold in March 2003, Iran's safe haven and transit support enabled surviving members to evade capture, regroup, and resume operations in Iraq.

213. Without Iran's assistance, the STOs would have had reduced access to the personnel, territory, transportation, financial channels, weapons, documents, communications, and expertise needed to sustain their operations.

214. The attacks committed by the STOs were therefore natural and reasonably foreseeable consequences of Iran's deliberate provision of resources that preserved and increased those organizations' ability to attack United States personnel in Iraq.

### T. Iran and Hezbollah Sustained and Strengthened the SMOs' Operational Capacity

215. Iran's support likewise created, preserved, and strengthened the operational capacity of the SMOs that attacked United States and Coalition personnel in Iraq.

216. The IRGC-QF supplied selected JAM elements, AAH, KH, and related Special Groups with financing, weapons, explosives, training, logistical assistance, intelligence, operational guidance, and access to Iranian territory and training facilities.

217. Hezbollah amplified that support by organizing and training JAM and other Special Groups, restructuring AAH along Hezbollah's cellular model, and training KH members and other Iraqi militants in explosives, rockets, mortars, sniper rifles, and other weapons. As discussed above, in 2006, Hezbollah ordered Daqduq to work with the IRGC-QF to provide training and equipment to JAM and the Special Groups.

218. The IRGC-QF and Hezbollah selected and trained those militants because they were preparing to attack United States and Coalition forces. Hezbollah also participated in planning and directing certain SMO operations, including the January 20, 2007 attack on the Karbala Provincial Joint Coordination Center.

219. The IRGC-QF's and Hezbollah's financing, weapons, training, and operational assistance materially increased the SMOs' access to weapons and technical expertise and strengthened their capacity to conduct coordinated attacks against United States personnel.

220. Hezbollah's organizing, training, arming, operational support, and participation in planning certain SMO operations were substantial factors in enabling the relevant SMO attacks committed by JAM, AAH, KH, and related Special Groups, and Plaintiffs' resulting injuries were natural and reasonably foreseeable consequences of that conduct.

### U. Syria Facilitated the Flow of Personnel and Resources to the STOs and Strengthened Hezbollah's Capacity to Support the SMOs

221. Syria complemented Iran's support by providing the STOs with a principal staging and transit route into Iraq.

222. As discussed above, AQI's Syria-based facilitation network controlled the movement of money, weapons, operatives, and other resources through Syria to AQI commanders in Iraq.

223. Members of the network provided foreign fighters with safe houses, false passports, weapons, guides, allowances, supplies, and transportation; recruited prospective suicide bombers; smuggled weapons into Iraq; and assisted in planning attacks.

224. Syria also enabled individuals operating from Syrian territory to finance and supply AQI. Al-Rawi, whom Assad appointed to lead the Iraqi wing of the Syrian Ba'ath Party, transferred approximately $300,000 to AQI members and supplied AQI with vehicle-borne improvised explosive devices, rifles, and suicide bombers.

225. Syria's territorial access and logistical infrastructure substantially increased the number of foreign fighters and resources available to AQI. By December 2006, nearly ninety percent of known foreign terrorists in Iraq had used Syria as an entry point.

226. Syria separately strengthened Hezbollah during the same period that Hezbollah was assisting the IRGC-QF in organizing, training, and supporting the SMOs.

227. As discussed above, Syria provided Hezbollah with political and material support, permitted Iran to use Syrian territory to resupply Hezbollah, and helped preserve the weapons, logistical infrastructure, and organizational capabilities upon which Hezbollah depended.

228. That assistance preserved and strengthened Hezbollah's personnel, weapons, training infrastructure, and operational capabilities, including the capabilities Hezbollah used to assist the IRGC-QF and the SMOs in Iraq.

229. Acting through personnel including Ali Mussa Daqduq, Hezbollah participated in planning, authorizing, and directing certain SMO attacks against United States and Coalition personnel.

230. Syria knew that AQI and Hezbollah regarded the United States as an enemy and were participating in campaigns of terrorist violence against United States personnel in Iraq. Syria also had notice that Hezbollah was working with the IRGC-QF to organize, train, arm, and direct the SMOs and to plan or authorize attacks carried out by those organizations.

231. The attacks committed by the STOs and SMOs were therefore natural and reasonably foreseeable consequences of Syria's knowing facilitation of the personnel, financing, weapons, training infrastructure, and logistical support used by those organizations and their sponsors.

## V. Assad Sustained Syria's Support for AQI and Hezbollah

232. Assad sustained two channels through which Syria facilitated attacks against United States personnel in Iraq.

233. First, after direct warnings of Syria-based support for attacks on Americans, Assad appointed and continued to empower al-Rawi, who financed AQI and supplied weapons and suicide bombers. Assad retained al-Rawi even after the United States publicly identified him as an AQI financier operating from Syria.

234. Second, Assad reaffirmed and maintained Syria's support for Hezbollah after its role in organizing, training, arming, and supporting the SMOs became public. Those decisions preserved Hezbollah's territorial access, protection, logistical infrastructure, and access to Iranian personnel and weapons transiting Syria.

235. Assad made these personnel, foreign policy, and security decisions within the scope of his office as President of Syria. Through those official acts, he sustained support channels that increased AQI's and Hezbollah's capacity to facilitate the terrorist attacks.

236. Assad's conduct substantially sustained those networks, and the resulting Terrorist Attacks and Plaintiffs' injuries were natural and reasonably foreseeable consequences.

### W. The Bank Defendants' Financial Support Increased the IRGC-QF's and Hezbollah's Capacity to Support the STOs and SMOs

237. Iran relied on the IRGC-QF and other state-owned entities to finance, train, arm, transport, and otherwise support the STOs and SMOs operating in Iraq.

238. The Bank Defendants performed complementary roles in supplying and preserving the financial resources available to the IRGC-QF and Hezbollah.

239. Bank Markazi supplied and routed Iranian government funds and maintained access to foreign currency and international payment channels; Bank Melli maintained accounts, transferred funds, and provided other financial services to the IRGC and IRGC-QF; and Bank Saderat transferred Iranian government funds and provided financial services to Hezbollah.

240. By using foreign correspondent and intermediary banks to obtain foreign currency and process cross-border payments, the Bank Defendants also preserved the international financial channels through which those resources could be transferred.

241. Between 2002 and 2006 alone, Bank Melli was used to transfer at least $100 million to the IRGC-QF, increasing the financial resources available to the IRGC-QF while it was supporting the STOs and SMOs operating in Iraq.

242. During the same period, the IRGC-QF used its financial and operational resources to provide terrorist organizations operating in and around Iraq with safe haven, communications channels, documents, weapons, training, logistical assistance, and other material support, as alleged above.

243. Between 2001 and 2006, Bank Saderat also transferred approximately $50 million supplied by Bank Markazi to Hezbollah-controlled organizations in Lebanon, increasing the resources available to Hezbollah while it was supporting the SMOs in Iraq.

244. Bank Markazi's and Bank Melli's financial services therefore increased the IRGC-QF's capacity to support the STOs and SMOs, while Bank Markazi's and Bank Saderat's transfers increased Hezbollah's capacity to assist the IRGC-QF in organizing, training, arming, and supporting the SMOs.

245. The Bank Defendants' services did more than provide generalized economic support to Iran. They supplied and preserved resources for the IRGC-QF and Hezbollah while they were supporting terrorist organizations engaged in attacks against United States personnel.

246. The Bank Defendants' respective provision of funding and financial services was therefore a substantial factor in sustaining the support networks responsible for the relevant Terrorist Attacks, and Plaintiffs' resulting injuries were natural and reasonably foreseeable consequences of that support.

## X. THE STOS AND SMOS COMMITTED THE TERRORIST ATTACKS THAT KILLED OR INJURED PLAINTIFFS IN IRAQ

247. During the Relevant Period, the STOs and SMOs carried out the Terrorist Attacks described below against United States service members, government employees and contractors, and other persons in Iraq.

248. Each subsection identifies the organization responsible for the corresponding Terrorist Attack. Attribution is based on the available military, intelligence, forensic, and other evidence, together with expert analysis.

249. The support allegations applicable to each Terrorist Attack depend on the responsible organization.

250. For attacks attributed to an STO, the allegations concerning Iran's and Syria's material support for the STOs and Bank Markazi's and Bank Melli's financing of Iran's terrorist-support apparatus apply. For attacks attributed to AQI, the allegations concerning Assad's participation in sustaining Syria's support for AQI also apply.

251. For attacks attributed to an SMO, the allegations concerning Iran's and Hezbollah's support for the SMOs, Syria's assistance to Hezbollah, and the Bank Defendants' financing of the IRGC-QF and Hezbollah apply. The allegations concerning Assad's official acts sustaining Syria's support for Hezbollah also apply to the relevant SMO attacks.

252. The ATA claims against Hezbollah are asserted only by qualifying Plaintiffs and only with respect to SMO attacks that Hezbollah planned or authorized and whose perpetrators Hezbollah knowingly and substantially assisted.

253. As a direct and proximate result of the Terrorist Attacks, Plaintiffs suffered physical injuries, pain and suffering, emotional distress, and economic harm; and their qualifying family members suffered severe mental anguish, emotional pain and suffering, and loss of society and companionship.

## X. Terrorist Attacks Committed by the STO

### *(1)* ***The Myles Cody Sebastien Family (The December 20, 2006, Attack)***

(1) **Plaintiff Estate of Myles Cody Sebastien** was a citizen of the United States and a member of the United States Marine Corps when he was killed while serving in Iraq.

(2) On December 20, 2006, Mr. Sebastien was serving as a Humvee driver with Weapons Company, 1st Battalion, 6th Marine Regiment in Ramadi, Iraq, when terrorists brutally attacked his vehicle with rocket propelled grenades and small arms fire.

(3) As a result of the attack, Mr. Sebastien sustained severe and critical injuries and subsequently died.

(4) On information and belief, the attack was committed by AQI, who received material support and resources from Defendants as alleged herein.

(5) On information and belief, the terrorists deliberately and savagely blasted rocket propelled grenades and attacked with small arms fire at a United States military vehicle with the intent to kill or cause serious bodily injury. Because the attack unlawfully killed Mr.

Sebastien and was not authorized by a judgment pronounced by a regularly constituted court, the attack constituted an act of extrajudicial killing.

(6) **Plaintiff Kelie Sebastien** is the widow of Mr. Sebastien. She is, and was at all relevant times, a national of the United States.

(7) As a result of the December 20, 2006, attack and Mr. Sebastien's death, Mr. Sebastien endured excruciating physical pain and suffering, wrongful death, and other recoverable damages.

(8) As a result of the December 20, 2006, attack and Mr. Sebastien's death, Ms. Sebastien experienced severe mental anguish and emotional pain and suffering, and the loss of Mr. Sebastien's society, companionship, comfort, and counsel.

*(2)* ***The Brian Ansley Family (The October 15, 2006, Attack)***

(9) **Plaintiff Brian Ansley** was a citizen of the United States and a member of the United States Army when he was injured while serving in Iraq.

(10) On October 15, 2006, Mr. Ansley was serving as a Humvee driver with 1st Battalion, 319th Airborne Field Artillery Regiment in Tal Afar, Iraq, when terrorists maliciously detonated a suicide vest outside of a crowded Iraqi Army Patrol Base. Moments after the blast, the terrorists pummeled the base with a relentless firefight. Disregarding his own safety, Mr. Ansley heroically tended to injured Iraqi soldiers and civilians amidst the dangerous and life-threatening scene.

(11) As a result of the attack, Mr. Ansley developed severe and life-changing post-traumatic stress disorder, sustained excruciating tinnitus, hearing loss, and other physical and psychological injuries.

(12) The attack also killed three Iraqi civilians and police personnel who were engaged in operations in the area, all of whom sustained fatal injuries during the attack.

(13) On information and belief, the attack was committed by al-Qaeda, AQI, and/or AQI-affiliated terrorist operatives, who received material support and resources from Defendants as alleged herein.

(14) On information and belief, the perpetrators deliberately detonated a suicide vest and attacked United States military personnel with small arms fire with the intent to kill or cause serious bodily injury. Because the attack unlawfully murdered Iraqi civilians and was not authorized by a judgment pronounced by a regularly constituted court, the attack constituted an act of extrajudicial killing.

(15) As a result of the October 15, 2006, attack and Mr. Ansley's injuries, Mr. Ansley experienced severe physical pain and suffering, emotional distress, and other damages.

*(3)* ***The Antonio Banuelos-Sanchez Family (The June 3, 2007, Attack)***

(1) **Plaintiff Antonio Banuelos-Sanchez** was a citizen of the United States and a member of the United States Army when he was injured while serving in Iraq.

(2) On June 3, 2007, Mr. Banuelos-Sanchez was serving as part of a mounted patrol with 1st Battalion 7th FA 2nd Brigade 1st Infantry Division en route back to Camp Liberty, in the vicinity of Abu Gharib Market, Iraq, when terrorists brutally detonated a destructive victim-operated IED.

(3) As a result of the attack, Mr. Banuelos-Sanchez sustained severe and life-changing injuries, including tinnitus, severe and life-changing post-traumatic stress disorder, and other physical and psychological injuries.

(4) This explosion also savagely killed United States servicemember Kimmel Watt, who sustained fatal injuries during the attack.

(5) On information and belief, the attack was committed by al-Qaeda, AQI, and/or AQI-affiliated terrorist operatives, who received material support and resources from Defendants as alleged herein.

(6) On information and belief, the terrorists deliberately detonated the victim-operated IED at a United States military vehicle with the vicious intent to kill or cause serious bodily injury. Because the attack unlawfully killed a United States servicemember and a local national interpreter and was not authorized by a judgment pronounced by a regularly constituted court, the attack constituted an act of extrajudicial killing.

(7) As a result of the June 3, 2007, attack and Mr. Banuelos-Sanchez's injuries, Mr. Banuelos-Sanchez experienced severe physical pain and suffering, emotional distress, and other damages.

*(4)* ***The Philip Baucus Family (The July 29, 2006, Attack)***

(1) Servicemember Phillip Baucus was a citizen of the United States and a member of the United States Marine Corps when he was maliciously killed while serving in Iraq.

(2) On July 29, 2006, Mr. Baucus was serving with the 3rd Light Armored Reconnaissance Battalion in Rawah, Al Anbar Province, Iraq, when a terrorist suicide bomber detonated a powerful vehicle-borne IED on a traffic-control checkpoint occupied by Mr. Baucus and other United States Marines.

(3) The explosion killed Mr. Baucus and three other United States servicemembers: Christian Williams, Anthony Butterfield, and Jason Hanson, all of whom sustained fatal injuries in the attack.

(4) On information and belief, the attack was committed by al-Qaeda, AQI and/or AQI-affiliated terrorist operatives, who received material support and resources from Defendants as alleged herein.

(5) On information and belief, the terrorists deliberately drove to and detonated the vehicle-borne IED at United States military personnel with the ruthless intent to kill or cause serious bodily injury. Because the attack unlawfully killed Mr. Baucus and other United States servicemembers and was not authorized by a judgment pronounced by a regularly constituted court, the attack constituted an act of extrajudicial killing.

(6) **Plaintiff Katharine Baucus** is the widow of Mr. Baucus. She is, and was at all relevant times, a national of the United States.

(7) As a result of the July 29, 2006, attack and Mr. Baucus's death, Ms. Baucus experienced severe mental anguish and emotional pain and suffering, and the loss of Mr. Baucus's society, companionship, comfort, and counsel.

*(5)* ***The Giovanni Bennett Family (The April 4, 2004, Attack)***

(1) **Plaintiff Giovanni Bennett** was a citizen of the United States and a member of the United States Army when he was injured while serving in Iraq.

(2) On April 4, 2004, Mr. Bennett was serving as security on a cordon and search mission with Charlie Company, 1st Battalion, 21st Infantry Regiment, in Kirkuk, Iraq, when terrorists detonated a lethal vehicle-borne IED at the road intersection at which he was working.

(3) As a result of the attack, Mr. Bennett developed severe and life-changing post-traumatic stress disorder, and sustained shrapnel wounds, tinnitus, and other physical and psychological injuries.

(4) The savage explosion also killed United States servicemember John Amos II, who sustained fatal injuries during the attack.

(5) On information and belief, the attack was committed by AAI, who received material support and resources from Defendants as alleged herein.

(6) On information and belief, the terrorists deliberately detonated this fatal vehicle-borne IED at United States military personnel with the intent to kill or cause serious bodily injury.

Because the murderous attack unlawfully killed a United States servicemember and was not authorized by a judgment pronounced by a regularly constituted court, the attack constituted an act of extrajudicial killing.

(7) **Plaintiff Elizabeth Taylor** is the mother of Mr. Bennett. She is, and was at all relevant times, a national of the United States.

(8) **Plaintiff Michael Taylor** is the father of Mr. Bennett. He is, and was at all relevant times, a national of the United States.

(9) **Plaintiff Douglas Bennett, Jr.** is the brother of Mr. Bennett. He is, and was at all relevant times, a national of the United States.

(10) **Plaintiff Lavohn Williams** is the sister of Mr. Bennett. She is, and was at all relevant times, a national of the United States.

(11) As a result of the April 4, 2004, attack and Mr. Bennett's injuries, Mr. Bennett experienced severe physical pain and suffering, emotional distress, and other damages.

(12) As a result of the April 4, 2004, attack, each member of the Bennett Family as listed herein experienced severe mental anguish and emotional pain and suffering resulting from Mr. Bennett's injuries.

*(6)* ***<u>The Stewart Bennett Family (The October 1, 2005, Attack)</u>***

(1) **Plaintiff Stewart Bennett** was a citizen of the United States and a member of the United States Army when he was injured while serving in Iraq.

(2) On October 1, 2005, Mr. Bennett was serving at a United States military installation with 2/69 Armor Regiment, 3rd Brigade, in Ramadi, Iraq, when terrorists viciously attacked it with ferocious mortar rounds and indirect fire.

(3) As a result of the attack, Mr. Bennett developed severe and life-changing post-traumatic stress disorder and other injuries.

(4) The brutal attack also killed United States servicemember Jens Schelbert, who sustained fatal injuries during the attack.

(5) On information and belief, the attack was committed by al-Qaeda, AQI, and/or AQI-affiliated terrorist operatives, who received material support and resources from Defendants as alleged herein.

(6) On information and belief, the terrorists deliberately fired powerful mortar rounds at Camp Corregidor with the intent to kill or cause serious bodily injury to United States military personnel stationed there. Because the attack unlawfully killed a United States servicemember and was not authorized by a judgment pronounced by a regularly constituted court, the attack constituted an act of extrajudicial killing.

(7) As a result of the October 1, 2005, attack and Mr. Bennett's injuries, Mr. Bennett experienced severe physical pain and suffering, emotional distress, and other damages.

*(7)* ***<u>The Gerald Bowers Family (The December 21, 2004, Attack)</u>***

(1) **Plaintiff Gerald Bowers** was a citizen of the United States and a member of the United States Army when he was injured while serving in Iraq.

(2) On December 21, 2004, Mr. Bowers was serving with the 25th Infantry Division in Mosul, Iraq, when a suicide bomber entered the FOB Marez dining facility (DFAC) and detonated an explosive vest, unleashing a devastating blast inside the facility.

(3) As a result of the attack, Mr. Bowers developed severe and life-changing post-traumatic stress disorder and other physical and psychological injuries.

(4) The violent explosion also killed fourteen United States servicemembers, four Iraqi soldiers, and four civilians, who sustained fatal injuries during the attack.

(5) On information and belief, the attack was committed by AAI, who received material support and resources from Defendants as alleged herein.

(6) On information and belief, the terrorist savagely exploded their suicide vest inside a United States military camp with the intent to kill or cause serious bodily injury. Because the attack unlawfully killed United States servicemembers, Iraqi soldiers, and civilians, and was not authorized by a judgment pronounced by a regularly constituted court, the attack constituted an act of extrajudicial killing.

(7) **Plaintiff John Doe 1** is the mother of Mr. Bowers. She is a national of the United States.

(8) **Plaintiff John Doe 2** is the sibling of Mr. Bowers and is a national of the United States.

(9) **Plaintiff John Doe 3** is the sibling of Mr. Bowers and is a national of the United States.

(10) **Plaintiff John Doe 4** is the sibling of Mr. Bowers and is a national of the United States.

(11) Defendant Iran was previously found civilly liable for the December 21, 2004, terrorist attack by this Court. See Martino et al., v. Islamic Republic of Iran, No. 1:21-cv-01808 (D.D.C. September 30, 2024).

(12) As a result of the December 21, 2004, attack and Mr. Bowers' injuries, Mr. Bowers experienced severe physical pain and suffering, emotional distress, and other damages.

*(8)* ***The Curtis Brown Family (The April 8, 2004, Attack)***

(1) **Plaintiff Curtis Brown** was a citizen of the United States and a member of the United States Army when he was injured in Iraq.

(2) On April 8, 2004, Mr. Brown was serving as tactical command when traveling in a convoy with 1484th Transportation Company on MSR Mobile, east of Abu Ghraib, Iraq, when terrorists ambushed the convoy with relentless small-arms fire and destructive rocket-propelled grenades.

(3) As a result of the attack, Mr. Brown developed severe and life-changing post-traumatic stress disorder and sustained other physical and psychological injuries.

(4) The attack also killed a civilian contractor supporting United States military operations in Iraq, who sustained fatal injuries in the attack.

(5) On information and belief, the attack was committed by al-Qaeda and/or the Zarqawi network, who received material support and resources from Defendants as alleged herein.

(6) On information and belief, the terrorists deliberately and mercilessly fired small arms and rocket-propelled grenades at a United States military convoy with the intent to kill or cause serious bodily injury. Because the attack unlawfully killed a civilian contractor and was not authorized by a judgment pronounced by a regularly constituted court, the attack constituted an act of extrajudicial killing.

(7) As a result of the April 8, 2004, attack and Mr. Brown's injuries, Mr. Brown experienced severe physical pain and suffering, emotional distress, and other damages.

*(9)* ***The Thomas Broyles Family (The October 13, 2005, Attack)***

(1) **Plaintiff Thomas Broyles** was a citizen of the United States and a member of the United States Army when he was injured while serving in Iraq.

(2) On October 13, 2005, Mr. Broyles was serving as the gunner in a Humvee vehicle with the 3rd Squadron, 278th Armored Cavalry Regiment, 3rd Infantry Division in Dujayl, Iraq, when an IED planted by terrorists exploded on the vehicle.

(3) As a result of the attack, Mr. Broyles sustained severe and life-changing injuries, including a traumatic brain injury, debilitating post-traumatic stress disorder, and other physical and psychological injuries.

(4) The vicious explosion also murdered United States servicemember Robert Tucker, who sustained fatal injuries during the attack.

(5) On information and belief, the attack was likely committed by al-Qaeda, AQI, and/or AQI-affiliated terrorist operatives, who received material support and resources from Defendants as alleged herein.

(6) On information and belief, the terrorists deviously planted and detonated the IED on a United States patrol with the intent to kill or cause serious bodily injury. Because the attack

unlawfully killed a United States servicemember and was not authorized by a judgment pronounced by a regularly constituted court, the attack constituted an act of extrajudicial killing.

(7) As a result of the October 13, 2005, attack and Mr. Broyles' injuries, Mr. Broyles experienced severe physical pain and suffering, emotional distress, and other damages.

#### *(10)* ***The Jeffrey Butler Family (The September 8, 2004, Attack)***

(1) **Plaintiff Jeffrey Butler** was a citizen of the United States and a member of the United States Army when he was injured while serving in Iraq.

(2) On September 8, 2004, Mr. Butler was serving as a truck commander in a military convoy on MSR Sword, with HHC 16th Military Police Brigade in Baghdad, Iraq, when a lethal IED planted by terrorists blasted the Humvee in which he was traveling.

(3) As a result of the attack, Mr. Butler sustained a devastating traumatic brain injury and other severe and life-changing physical and psychological injuries.

(4) The attack also killed three Iraqi civilians who sustained fatal injuries during the attack.

(5) On information and belief, the attack was committed by al-Qaeda and/or the Zarqawi network, who received material support and resources from Defendants as alleged herein.

(6) On information and belief, the terrorists deliberately planted and detonated the powerful IED against a United States military vehicle with the intent to kill or cause serious bodily injury. Because the attack unlawfully killed Iraqi civilians and was not authorized by a judgment pronounced by a regularly constituted court, the attack constituted an act of extrajudicial killing.

(7) As a result of the September 8, 2004, attack and Mr. Butler's injuries, Mr. Butler experienced severe physical pain and suffering, emotional distress, and other damages.

#### *(11)* ***The Joseph Cedenopereira Family (The July 23, 2005, Attack)***

(1) **Plaintiff Joseph Cedenopereira** was a member of the United States Marine Corps when he was injured while serving in Iraq.

(2) On July 23, 2005, Mr. Cedenopereira was serving as a scout, conducting combat operations with 2nd Light Armored Reconnaissance Battalion, 2nd Marine Division, near Rutbah, Iraq, when an IED planted by terrorists exploded from a lamp post above his patrol.

(3) As a result of the attack, Mr. Cedenopereira developed severe and life-changing post-traumatic stress disorder and sustained other physical and psychological injuries.

(4) The devastating attack also killed United States servicemember Bryan Opskar, who sustained fatal injuries during the attack.

(5) On information and belief, the attack was committed by al-Qaeda, AQI, and/or AQI-affiliated terrorist operatives, who received material support and resources from Defendants as alleged herein.

(6) On information and belief, the terrorists deliberately placed and detonated the IED with the intent to kill or cause serious bodily injury to United States military personnel stationed there. Because the attack unlawfully killed a United States servicemember and was not authorized by a judgment pronounced by a regularly constituted court, the attack constituted an act of extrajudicial killing.

(7) **Plaintiff Estrellita Pereira** is the mother of Mr. Cedenopereira. She is a national of the United States.

(8) **Plaintiff Alex Cedeno** is the brother of Mr. Cedenopereira. He is a national of the United States.

(9) **Plaintiff Jonathan Cedeno** is the brother of Mr. Cedenopereira. He is a national of the United States.

(10) As a result of the July 23, 2005, attack and Mr. Cedenopereira's injuries, Mr. Cedenopereira experienced severe physical pain and suffering, emotional distress, and other damages.

(11) As a result of the July 23, 2005, attack and Mr. Cedenopereira's injuries, each member of the Cedenopereira Family as listed herein experienced severe mental anguish and emotional pain and suffering resulting from Mr. Cedenopereira's injuries.

### *(12) The Eduardo Correa-Vega Family (The October 1, 2005, Attack)*

(1) **Plaintiff Eduardo Correa-Vega** was a citizen of the United States and a member of the United States Army when he was injured while serving in Iraq.

(2) On October 1, 2005, Mr. Correa-Vega was serving at a United States military installation with 983rd Engineer Battalion in Ramadi, Iraq, when terrorists savagely attacked the installation with relentless mortar rounds and indirect fire.

(3) As a result of the attack, Mr. Correa-Vega sustained severe and life-changing post-traumatic stress disorder, debilitating hearing and vision loss, nerve damage, and other physical and psychological injuries.

(4) The lethal attack also killed United States servicemember Jens Schelbert, who sustained fatal injuries during the attack.

(5) On information and belief, the attack was committed by al-Qaeda, AQI, and/or AQI-affiliated terrorist operatives, who received material support and resources from Defendants as alleged herein.

(6) On information and belief, the terrorists deliberately fired mortar rounds at Camp Corregidor with the intent to kill or cause serious bodily injury to United States military personnel stationed there. Because the attack unlawfully killed a United States servicemember

and was not authorized by a judgment pronounced by a regularly constituted court, the attack constituted an act of extrajudicial killing.

(7) As a result of the October 1, 2005, attack and Mr. Correa-Vega's injuries, Mr. Correa-Vega experienced severe physical pain and suffering, emotional distress, and other damages.

### *(13)* ***<u>The Adam Davis Family (The February 24, 2007, Attack)</u>***

(1) **Plaintiff Adam Davis** was a citizen of the United States and a member of the United States Army when he was injured while serving in Iraq.

(2) On February 24, 2007, Mr. Davis was serving as an infantryman with Bravo Company 1st Combined Arms Battalion, 194th Armor Regiment, in Habbaniyah, Iraq, when a terrorist suicide bomber detonated an explosives-packed truck at a crowded intersection.

(3) As a result of the attack, Mr. Davis developed severe and life-changing post-traumatic stress disorder and sustained other physical and psychological injuries.

(4) The murderous attack also killed approximately forty Iraqi civilians, who sustained fatal injuries during the attack.

(5) On information and belief, the attack was committed by al-Qaeda, AQI, and/or AQI-affiliated terrorist operatives, who received material support and resources from Defendants as alleged herein.

(6) On information and belief, the terrorists deliberately detonated an explosive-packed truck in a crowded civilian area with the savage intent to kill or cause serious bodily injury to United States military personnel. Because the attack unlawfully killed Iraqi civilians and was not authorized by judgment pronounced by a regularly constituted court, the attack constituted an act of extrajudicial killing.

(7) As a result of the February 24, 2007, attack and Mr. Davis's injuries, Mr. Davis experienced severe physical pain and suffering, emotional distress, and other damages.

*(14)* ***<u>The Jonathan Dozier Family (January 9, 2008, Attack)</u>***

(1) Servicemember Jonathan Dozier was a citizen of the United States and a member of the United States Army when he was killed while serving in Iraq.

(2) On January 9, 2008, Mr. Dozier was serving as Staff Sargent with 3rd Squadron, 2nd Stryker Cavalry Regiment, 1st Armored Division, in Sinsil, Iraq when terrorists blasted a house-borne IED at a location Mr. Dozier were searching.

(3) As a result of the attack, Mr. Dozier sustained severe blast and thermal injuries which killed him instantly.

(4) The brutal attack also killed United States servicemembers Todd Davis, Sean Gaul, Zachary McBride, Matthew Pionk, Christopher Sanders and Iraqi Interpreter Mohammed Al Latefe, all of whom sustained fatal injuries during the attack.

(5) On information and belief, the attack was committed by al-Qaeda, AQI, and/or AQI-affiliated terrorist operatives, who received material support and resources from Defendants as alleged herein.

(6) On information and belief, the terrorists deliberately blasted the IED in a house with the intent to kill or cause serious bodily injury. Because the cruel attack unlawfully killed Mr. Dozier and other United States servicemembers and was not authorized by a judgment pronounced by a regularly constituted court, the attack constituted an act of extrajudicial killing.

(7) Defendant Iran was previously found civilly liable for the December 21, 2004, terrorist attack by this Court. See Martino et al., v. Islamic Republic of Iran, No. 1:21-cv-01808 (D.D.C. September 30, 2024).

(8) Plaintiff Jennifer Rider is the sister of Mr. Dozier. She is, and was at all relevant times, a national of the United States.

(9) As a result of the January 9, 2008, attack, Ms. Rider experienced severe mental anguish and emotional pain and suffering, and the loss of Mr. Dozier's society, companionship, comfort, and counsel.

### *(15)* ***The Robert Emerick Family (The May 16, 2004, Attack)***

(1) **Plaintiff Robert Emerick** was a citizen of the United States and a member of the United States Army when he was injured while serving in Iraq.

(2) On May 16, 2004, Mr. Emerick was serving as the team leader, participating in a patrol with Alpha Company, 89th Military Police Brigade, in Al Karmah, Iraq, when terrorists blasted an IED underneath the Humvee in which Mr. Emerick was traveling.

(3) As a result of the attack, Mr. Emerick sustained severe and life-changing post-traumatic stress disorder, excruciating tinnitus, and other physical and psychological injuries.

(4) The attack also killed United States servicemembers Carl Curran and Mark Kasecky, who sustained fatal injuries during the attack.

(5) On information and belief, the attack was committed by al-Qaeda, AQI, and/or AQI-affiliated terrorist operatives, who received material support and resources from Defendants as alleged herein.

(6) On information and belief, the terrorists deliberately placed and detonated the IED against a United States military vehicle with the intent to kill or cause serious bodily injury. Because the attack unlawfully killed United States servicemembers and was not authorized by a judgment pronounced by a regularly constituted court, the attack constituted an act of extrajudicial killing.

(7) As a result of the May 16, 2004, attack and Mr. Emerick's injuries, Mr. Emerick experienced severe physical pain and suffering, emotional distress, and other damages.

*(16)* ***<u>The Jerry Figueroa, Jr. Family (The November 20, 2005, Attack)</u>***

(1) **Plaintiff Jerry Figueroa, Jr.** was a citizen of the United States and a member of the United States Marine Corps when he was injured while serving in Iraq.

(2) On November 20, 2005, Mr. Figueroa, Jr. was serving as convoy security for gravel trucks with 2nd Battalion, 11th Marines, 1st Marine Division in Rawah, Iraq, when terrorists detonated an IED against the Humvee in which Mr. Figueroa, Jr. was traveling.

(3) As a result of the savage attack, Mr. Figueroa, Jr. developed severe and life-changing post-traumatic stress disorder and other physical and psychological injuries.

(4) The devastating explosion also killed United States servicemember Hugo Lopez-Lopez, who died on January 27, 2006, from fatal injuries sustained in the attack.

(5) On information and belief, the attack was committed by al-Qaeda, AQI, and/or AQI-affiliated terrorist operatives, who received material support and resources from Defendants as alleged herein.

(6) On information and belief, the terrorists deliberately placed and detonated an IED on United States military vehicles with the intent to mercilessly kill or cause serious bodily injury. Because the attack unlawfully killed a United States servicemember and was not authorized by a judgment pronounced by a regularly constituted court, the attack constituted an act of extrajudicial killing.

(7) As a result of the November 20, 2005, attack and Mr. Figueroa, Jr.'s injuries, Mr. Figueroa, Jr. experienced severe physical pain and suffering, emotional distress and other damages.

*(17)* ***<u>The Douglas Garner Family (The March 24, 2007, Attack)</u>***

(1) **Plaintiff Douglas Garner** was a citizen of the United States and a member of the United States Marine Corps when he was injured while serving in Iraq.

(2) On March 24, 2007, Mr. Garner was serving with Regimental Combat Team 2, 1st Marine Division, traveling through Hit, Iraq, when a roadside IED planted by terrorists blasted his military vehicle.

(3) As a result of the attack, Mr. Garner developed severe and life-changing post-traumatic stress disorder, and sustained tinnitus and other physical and psychological injuries.

(4) The lethal attack also killed United States servicemember Trevor Roberts, who sustained fatal injuries during the attack.

(5) On information and belief, the attack was committed by al-Qaeda, AQI, and/or AQI-affiliated terrorist operatives, who received material support and resources from Defendants as alleged herein.

(6) On information and belief, the terrorists deliberately placed and detonated the IED on United States military vehicles with the hateful intent to kill or cause serious bodily injury. Because the attack unlawfully killed a United States servicemember and was not authorized by a judgment pronounced by a regularly constituted court, the attack constituted an act of extrajudicial killing.

(7) As a result of the March 24, 2007, attack and Mr. Garner's injuries, Mr. Garner experienced severe physical pain and suffering, emotional distress, and other damages.

*(18)* ***The Edwin Ghee Family (The May 21, 2009, Attack)***

(1) **Plaintiff Edwin Ghee** was a citizen of the United States and a member of the United States Army when he was injured while serving in Iraq.

(2) On May 21, 2009, Mr. Ghee was serving as a transport operator, returning from a convoy with Headquarters and Headquarters Company, 30th Brigade Special Troops Battalion, in the Dora neighborhood of Baghdad, Iraq, when a terrorist suicide bomber wearing a suicide vest- IED rushed into the area and self-detonated the bomb.

(3) As a result of the shocking and devastating attack, Mr. Ghee developed severe and life-changing post-traumatic stress disorder, and sustained tinnitus and other physical and psychological injuries.

(4) The attack brutally murdered United States servicemembers Jason George, Leevi Barnard, and Paul Brooks, as well as eight Iraqi civilians, who sustained fatal injuries during the attack.

(5) On information and belief, the attack was committed by al-Qaeda, AQI, and/or AQI-affiliated terrorist operatives, who received material support and resources from Defendants as alleged herein.

(6) On information and belief, the terrorists deliberately detonated the IEDs near United States personnel and Iraqi civilians with the intent to kill or cause serious bodily injury. Because the attack unlawfully killed United States servicemembers and Iraqi civilians and was not authorized by a judgment pronounced by a regularly constituted court, the attack constituted an act of extrajudicial killing.

(7) As a result of the May 21, 2009, attack and Mr. Ghee's injuries, Mr. Ghee experienced severe physical pain and suffering, emotional distress, and other damages.

*(19)* ***The Rohan Golding Family (The March 31, 2004, Attack)***

(1) **Plaintiff Rohan Golding** was a member of the United States Army when he was injured while serving in Iraq.

(2) On March 31, 2004, Mr. Golding was serving as convoy security with 1st Brigade, 1st Battalion, in Habbaniyah, Iraq, when an IED planted by terrorists exploded underneath the vehicle in front of him, massacring the five servicemembers inside.

(3) As a result of the attack, Mr. Golding developed severe and debilitating post-traumatic stress disorder and sustained other physical and psychological injuries.

(4) The horrific explosion also killed United States servicemembers Doyle Hufstedler, Cleston Raney, Brandon Davis, Sean Mitchell, and Michael Karr who all died on March 31, 2004, from fatal injuries sustained during the attack.

(5) On information and belief, the attack was committed by al-Qaeda, AQI, and/or AQI-affiliated terrorist operatives affiliated terrorist operatives, who received material support and resources from Defendants as alleged herein.

(6) On information and belief, the perpetrators deliberately planted and detonated an IED beneath a United States military vehicle with the intent to kill or cause serious bodily injury. Because the attack unlawfully murdered United States servicemembers and was not authorized by a judgment pronounced by a regularly constituted court, the attack constituted an act of extrajudicial killing.

(7) As a result of the March 31, 2004, attack and Mr. Golding's injuries, Mr. Golding experienced physical pain and suffering, severe emotional distress and other damages.

*(20)* ***The William Green, Jr. Family (The August 4, 2007, Attack)***

(1) **Plaintiff William Green, Jr.** was a citizen of the United States and a member of the United States Army when he was injured while serving in Iraq.

(2) On August 4, 2007, Mr. Green, Jr. was serving as the Truck Commander with 1st Squadron, 4th Cavalry Regiment, 4th Infantry Brigade Combat Team, 1st Infantry Division in Baghdad, Iraq, when terrorists hurled grenades at the Humvee in which he was traveling as part of a mounted patrol.

(3) As a result of the savage attack, Mr. Green, Jr. sustained a devastating traumatic brain injury, developed severe and life-changing post-traumatic stress disorder, and sustained other physical and psychological injuries.

(4) The lethal explosion also murdered United States servicemember Braden Long, who sustained fatal injuries during the attack.

(5) On information and belief, the attack was committed by al-Qaeda, AQI, and/or AQI-affiliated terrorist operatives, who received material support and resources from Defendants as alleged herein.

(6) On information and belief, the terrorists deliberately hurled powerful grenades at United States military vehicles with the intent to kill or cause serious bodily injury. Because the attack unlawfully killed a United States servicemember and was not authorized by a judgment pronounced by a regularly constituted court, the attack constituted an act of extrajudicial killing.

(7) As a result of the August 4, 2007, attack and Mr. Green, Jr.'s injuries, Mr. Green, Jr. experienced severe physical pain and suffering, emotional distress, and other damages.

### *(21)* ***<u>The Mark Greninger, Jr. Family (The December 25, 2006, Attack)</u>***

(1) **Plaintiff Mark Greninger, Jr.** was a citizen of the United States and a member of the United States Army when he was injured while serving in Iraq.

(2) On December 25, 2006, Mr. Greninger, Jr. was serving as a gunner with Company D, 1st Battalion, 138th Infantry Regiment and 2nd Battalion, 14th Infantry Regiment, 2nd Brigade Combat Team in Sadr al-Yusufiyah, Iraq, when an IED planted by terrorists detonated on his unit.

(3) As a result of the destructive attack, Mr. Greninger, Jr. sustained a devastating traumatic brain injury, developed severe and life-changing post-traumatic stress disorder, and sustained tinnitus and other physical and psychological injuries.

(4) The murderous explosion also killed United States servicemember Jason Denfrund, who sustained fatal injuries during the attack.

(5) On information and belief, the attack was committed by al-Qaeda, AQI, and/or AQI-affiliated terrorist operatives, who received material support and resources from Defendants as alleged herein.

(6) On information and belief, the terrorists deliberately planted and detonated an IED on United States military personnel with the intent to kill or cause serious bodily injury. Because the attack unlawfully killed a United States servicemember and was not authorized by a judgment pronounced by a regularly constituted court, the attack constituted an act of extrajudicial killing.

(7) As a result of the December 25, 2006, attack and Mr. Greninger, Jr.'s injuries, Mr. Greninger, Jr. experienced severe physical pain and suffering, emotional distress, and other damages.

### *(22) The Daniel Grogman Family (The December 21, 2004, Attack)*

(1) **Plaintiff Daniel Grogman** was a citizen of the United States and a member of the United States Army when he was injured while serving in Iraq.

(2) On December 21, 2004, Mr. Grogman was serving with A Company, 25th Brigade Support Battalion, 1st Brigade Combat Team, 25th Infantry Division in Mosul, Iraq, when a terrorist suicide bomber cold-bloodedly detonated his explosive vest inside the in the FOB Marez dining facility.

(3) As a result of the attack, Mr. Grogman sustained a devastating traumatic brain injury, developed severe and life-changing post-traumatic stress disorder, and sustained painful tinnitus other physical and psychological injuries.

(4) The murderous explosion also killed fourteen United States servicemembers, four Iraqi soldiers, and four civilians, who sustained fatal injuries during the attack.

(5) On information and belief, the attack was committed by AAI, who received material support and resources from Defendants as alleged herein.

(6) On information and belief, the terrorists deliberately detonated their explosives inside a United States military camp with the brutal intent to kill or cause serious bodily injury. Because the attack unlawfully killed United States servicemembers, Iraqi soldiers, and civilians, and was not authorized by a judgment pronounced by a regularly constituted court, the attack constituted an act of extrajudicial killing.

(7) Defendant Iran was previously found liable for the December 21, 2004, terrorist attack by this Court. See Martino et al., v. Islamic Republic of Iran, No. 1:21-cv-01808 (D.D.C. September 30, 2024).

(8) As a result of the December 21, 2004, attack and Mr. Grogman's injuries, Mr. Grogman experienced severe physical pain and suffering, emotional distress, and other damages.

### *(23) **The Jason Hanson Family (The July 29, 2006, Attack)***

(1) Servicemember Jason Hanson was a citizen of the United States and a member of the United States Marine Corps when he was killed while serving in Iraq.

(2) On July 29, 2006, Mr. Hanson was serving with the 3rd Light Armored Reconnaissance Battalion in Rawah, Al Anbar Province, Iraq, when a terrorist suicide bomber detonated a vehicle-borne IED on a traffic-control checkpoint occupied by Mr. Hanson and other United States Marines.

(3) The explosion murdered Mr. Hanson and three other United States servicemembers: Christian Williams, Anthony Butterfield, and Phillip Baucus, who sustained fatal injuries during the attack.

(4) On information and belief, the attack was committed by al-Qaeda, AQI, and/or AQI-affiliated terrorist operatives, who received material support and resources from Defendants as alleged herein.

(5) On information and belief, the terrorists deliberately traveled to and detonated the destructive vehicle-borne IED on United States military personnel with the intent to kill or

cause serious bodily injury. Because the attack unlawfully killed Mr. Hanson and other United States servicemembers and was not authorized by a judgment pronounced by a regularly constituted court, the attack constituted an act of extrajudicial killing.

(6) **Plaintiff Carol Rortvedt** is the mother of Mr. Hanson. She is, and was at all relevant times, a national of the United States.

(7) As a result of the July 29, 2006, attack and Mr. Hanson's death, Ms. Rortvedt experienced severe mental anguish and emotional pain and suffering, and the loss of Mr. Hanson's society, companionship, comfort, and counsel.

### *(24) <u>The Robert Harbin Family (The January 3, 2005, Attack)</u>*

(1) **Plaintiff Robert Harbin** was a citizen of the United States and serving as a United States government contractor when he was injured while working in Iraq.

(2) On January 3, 2005, Mr. Harbin was working security at Checkpoint 12, near an entrance to the International Zone in Baghdad, Iraq, when a terrorist suicide bomber detonated an explosives-packed vehicle on a convoy of civilian contractors.

(3) As a result of the savage attack, Mr. Harbin developed severe and life-changing post-traumatic stress disorder and sustained other physical and psychological injuries.

(4) The attack also murdered American contractor Tracy Hushin and British contractors John Dolman, Nicholas Pears, and John Eardley, who sustained fatal injuries during the attack.

(5) On information and belief, the attack was committed by al-Qaeda, AQI, and/or AQI-affiliated terrorist operatives, who received material support and resources from Defendants as alleged herein.

(6) On information and belief, the perpetrator deliberately detonated the explosives-packed vehicle near a civilian-contractor convoy and a United States-manned checkpoint with the intent to mercilessly kill or cause serious bodily injury. Because the attack unlawfully killed

American and British contractors and was not authorized by a judgment pronounced by a regularly constituted court, the attack constituted an act of extrajudicial killing.

(7) As a result of the January 3, 2005, attack and Mr. Harbin's injuries, Mr. Harbin experienced severe physical pain and suffering, emotional distress, and other damages.

*(25)* ***The Brian Hawkins Family (The November 28, 2003, Attack)***

(1) **Plaintiff Brian Hawkins** was a citizen of the United States and a member of the United States Army when he was injured while serving in Iraq.

(2) On November 28, 2003, Mr. Hawkins was serving at a United States military base, formerly known as As-Salam Palace in Mosul, Iraq, when terrorists blasted four mortar rounds at the palace grounds.

(3) As a result of the attack, Mr. Hawkins developed severe and life-changing post-traumatic stress disorder, and other physical and psychological injuries.

(4) The attack also murdered United States servicemember Ariel Rico, who sustained fatal wounds during the attack.

(5) On information and belief, the attack was committed by AAI, who received material support and resources from Defendants as alleged herein.

(6) On information and belief, the terrorists deliberately fired mortar rounds with the intent to kill or cause serious bodily injury. Because the attack unlawfully killed a United States servicemember and was not authorized by a judgment pronounced by a regularly constituted court, the attack constituted an act of extrajudicial killing.

(7) As a result of the November 28, 2003, attack and Mr. Hawkins's injuries, Mr. Hawkins experienced severe emotional distress and other damages.

*(26)* ***The David Henderson Family (The June 24, 2010, Attack)***

(1) **Plaintiff David Henderson** was a citizen of the United States and a member of the United States Army when he was injured while serving in Iraq.

(2) On June 24, 2010, Mr. Henderson was serving as a field artillery officer with 1st Brigade, 1st Infantry Division, MITT Unit in Mosul, Iraq, when a suicide bomber exploded IED vest at a checkpoint jointly managed by Iraqi security forces, Kurdish security forces, and United States forces near Fob Marez.

(3) As a result of the attack, Mr. Henderson developed severe and life-changing post-traumatic stress disorder and other physical and psychological injuries.

(4) The attack also brutally murdered four Iraqi policemen, who sustained fatal injuries during the attack.

(5) On information and belief, the attack was committed by al-Qaeda, AQI, and/or AQI-affiliated terrorist operatives, who received material support and resources from Defendants as alleged herein.

(6) On information and belief, the terrorists savagely planted IEDs at a joint military checkpoint with the intent to kill or cause serious bodily injury. Because the attack unlawfully killed Iraqi policemen and was not authorized by a judgment pronounced by a regularly constituted court, the attack constituted an act of extrajudicial killing.

(7) As a result of the June 24, 2010, attack and Mr. Henderson's injuries, Mr. Henderson experienced severe physical pain and suffering, emotional distress, and other damages.

### *(27) The Marcus Hensley Family (The May 31, 2005, Attack)*

(1) **Plaintiff Marcus Hensley** was a citizen of the United States and a member of the United States Army when he was injured while serving in Iraq.

(2) On or about May 31, 2005, Mr. Hensley was serving with 392nd Chemical Company attached to 82nd Airbourne at Camp Liberty in Baghdad, Iraq, when terrorists fired a 120-millimeter rocket at a plaza near the installation's post exchange. The destructive explosion

murdered one soldier and wounded at least twenty other soldiers, contractors, and Iraqi workers.

(3) As a result of the attack, Mr. Hensley sustained a serious and painful injury to his right knee, developed severe and life-changing post-traumatic stress disorder, and sustained other physical and psychological injuries.

(4) The attack also killed United States servicemember Miguel Ramos, who sustained fatal injuries during the attack.

(5) On information and belief, the attack was committed by al-Qaeda, AQI, and/or AQI-affiliated terrorist operatives, who received material support and resources from Defendants as alleged herein.

(6) On information and belief, the terrorists deliberately fired the rocket into an occupied United States military installation with the intent to kill or cause serious bodily injury. Because the attack unlawfully killed a United States servicemember and was not authorized by a judgment pronounced by a regularly constituted court, the attack constituted an act of extrajudicial killing.

(7) As a result of the May 31, 2005, attack and Mr. Hensley's injuries, Mr. Hensley experienced severe physical pain and suffering, emotional distress, and other damages.

*(28)* ***The Joel House Family (The June 23, 2007, Attack)***

(1) Servicemember Joel House was a citizen of the United States and a member of the United States Army when he was killed while serving in Iraq.

(2) On June 23, 2007, Mr. House was serving as M1 Armor Crewman with 2nd Battalion, 8th Cavalry Regiment, 1st Brigade Combat Team, 1st Cavalry Division in Taji, Iraq when an IED planted by terrorists detonated on the vehicle in which he was travelling.

(3) As a result of the cruel attack, Mr. House sustained severe injuries and subsequently died.

(4) The attack also murdered United States servicemembers Daniel Riordan, Jimy Malone and Derek Calhoun, all of whom sustained fatal injuries during the attack.

(5) On information and belief, the attack was committed by al-Qaeda, AQI, and/or AQI-affiliated terrorist operatives, who received material support and resources from Defendants as alleged herein.

(6) On information and belief, the terrorists deliberately placed and detonated the IED at United States military vehicle with the intent to kill or cause serious bodily injury. Because the attack unlawfully killed Mr. House and other United States servicemembers and was not authorized by a judgment pronounced by a regularly constituted court, the attack constituted an act of extrajudicial killing.

(7) **Plaintiff Luke House** is the brother of Mr. House. He is, and was at all relevant times, a national of the United States.

(8) As a result of the June 23, 2007, attack, Mr. Luke House experienced severe mental anguish and emotional pain and suffering, and the loss of Mr. Joel House's society, companionship, comfort, and counsel.

*(29)* ***The Andrew Keith Family (The December 13, 2007, Attack)***

(1) **Plaintiff Andrew Keith** was a citizen of the United States and a member of the United States Army when he was injured while serving in Iraq.

(2) On December 13, 2007, Mr. Keith was serving as an infantryman with 4th Brigade, 3rd Infantry Division in North Babil, Iraq, when terrorists detonated multiple IEDs on a dismounted United States military patrol.

(3) As a result of the vicious attack, Mr. Keith developed severe and life-changing post-traumatic stress disorder, and other physical and psychological injuries.

(4) The attack also murdered United States servicemember Samuel Kelsey, who sustained fatal wounds during the attack.

(5) On information and belief, the attack was likely committed by al-Qaeda, AQI, and/or AQI-affiliated terrorist operatives, who received material support and resources from Defendants as alleged herein.

(6) On information and belief, the terrorists deliberately placed and detonated the IEDs on a United States military dismounted patrol with the intent to kill or cause serious bodily injury. Because the attack unlawfully killed a United States servicemember and was not authorized by a judgment pronounced by a regularly constituted court, the attack constituted an act of extrajudicial killing.

(7) **Plaintiff Lauren Keith** is the wife of Mr. Keith. She is, and was at all relevant times, a national of the United States.

(8) As a result of the December 13, 2007, attack and Mr. Keith's injuries, Mr. Keith experienced severe physical pain and suffering, emotional distress, and other damages.

(9) As a result of the December 13, 2007, attack, Ms. Keith experienced severe mental anguish and emotional pain and suffering resulting from Mr. Keith's injuries.

*(30)* ***The Arcadio Lacayanga, Jr. Family (The August 19, 2003, Attack)***

(1) **Plaintiff Arcadio Lacayanga, Jr.** was a citizen of the United States and a member of the United States Army when he was injured while serving in Iraq.

(2) On August 19, 2003, Mr. Lacayanga, Jr. was serving as a wheeled vehicle mechanic with the 84th Engineer Company, 2nd Squadron, 2nd Armored Calvary Regiment at or near the Canal Hotel, which housed the United Nations headquarters in Baghdad, Iraq, when a terrorist suicide bomber maliciously detonated a flatbed truck carrying approximately 1,000 kilograms of explosives on a service road adjacent to the hotel. The explosion destroyed the building and devastatingly wounded more than 150 people.

(3) The explosion killed United Nations Special Representative Sergio Vieira de Mello and at least twenty-one others.

(4) As a result of the attack, Mr. Lacayanga, Jr. developed severe and life-changing post-traumatic stress disorder and sustained other physical and psychological injuries.

(5) On information and belief, the attack was committed by the al-Qaeda and/or the Zarqawi network, who received material support and resources from Defendants as alleged herein.

(6) On information and belief, the terrorists cold-bloodedly and deliberately detonated the explosives-packed truck immediately adjacent to the occupied United Nations headquarters with the intent to kill or cause serious bodily injury. Because the attack unlawfully killed Mr. Vieira de Mello and numerous others and was not authorized by a judgment pronounced by a regularly constituted court, the attack constituted an act of extrajudicial killing.

(7) As a result of the August 19, 2003, attack and Mr. Lacayanga, Jr.'s injuries, Mr. Lacayanga, Jr. experienced severe physical pain and suffering, emotional distress, and other damages.

*(31)* ***The Kevin Adam Lucas Family (The May 26, 2006, Attack)***

(1) Servicemember Kevin Adam Lucas was a citizen of the United States and a member of the United States Marine Corps when he was killed while serving in Iraq.

(2) On May 26, 2006, Mr. Lucas was serving on foot patrol with 3rd Battalion, 8th Marine Regiment, 2nd Marine Division Expeditionary Force in Ramadi, Iraq, when a terrorist sniper ferociously fired multiple rounds directly at Mr. Lucas.

(3) As a result of the atrocious attack, Mr. Lucas sustained a gunshot wound to his head and subsequently died from his injuries.

(4) On information and belief, the attack was committed by al-Qaeda, AQI, and/or AQI-affiliated terrorist operatives, who received material support and resources from Defendants as alleged herein.

(5) On information and belief, the terrorists deliberately fired at United States military personnel with the intent to kill or cause serious bodily injury. Because the attack unlawfully murdered Mr. Lucas and was not authorized by a judgment pronounced by a regularly constituted court, the attack constituted an act of extrajudicial killing.

(6) **Plaintiff Sandra Lucas** is the mother of Mr. Lucas. She is, and was at all relevant times, a national of the United States.

(7) **Plaintiff Kevin Arthur Lucas** is the father of Mr. Lucas. He is, and was at all relevant times, a national of the United States.

(8) **Plaintiff Devin Lucas Yokeley** is the sister of Mr. Lucas. She is, and was at all relevant times, a national of the United States.

(9) As a result of the May 26, 2006, lethal attack, each member of the Lucas Family as listed herein experienced severe mental anguish and emotional pain and suffering, and the loss of Mr. Lucas' society, companionship, comfort, and counsel.

*(32)* ***The Robert Martin Family (The May 4, 2005, Attack)***

(1) **Plaintiff Robert Martin** was a citizen of the United States and a member of the United States Army when he was injured while serving in Iraq.

(2) On May 4, 2005, Mr. Martin was serving with Headquarters and Headquarters Troop of the 11th Armored Cavalry Regiment in Mosul, Iraq, when terrorists ferociously fired mortars on FOB Courage, where Mr. Martin was located.

(3) As a result of the attack, Mr. Martin sustained severe and life-changing injuries, including post-traumatic stress disorder and other physical and psychological injuries.

(4) The explosion also savagely killed United States servicemember Randy Collins, who died on May 24, 2005, from fatal injuries sustained during the attack.

(5) On information and belief, the attack was committed by al-Qaeda, AQI, and/or AQI-affiliated terrorist operatives, who received material support and resources from Defendants as alleged herein.

(6) On information and belief, the terrorists deliberately fired mortars at a United States military camp with the intent to mercilessly kill or cause serious bodily injury. Because the brutal attack unlawfully killed a United States servicemember and was not authorized by a judgment pronounced by a regularly constituted court, the attack constituted an act of extrajudicial killing.

(7) **Plaintiff Suzanne Martin** is the mother of Mr. Martin. She is, and was at all relevant times, a national of the United States.

(8) **Plaintiff Keltie Pasko** is the sister of Mr. Martin. She is, and was at all relevant times, a national of the United States.

(9) **Plaintiff Taylor Phillips** is the sister of Mr. Martin. She is, and was at all relevant times, a national of the United States.

(10) As a result of the May 4, 2005, attack and Mr. Martin's injuries, Mr. Martin experienced severe physical pain and suffering, emotional distress, and other damages.

(11) As a result of the May 4, 2005, attack, each member of the Martin Family as listed herein experienced severe mental anguish and emotional pain and suffering resulting from Mr. Martin's injuries.

### *(33)* ***The Michael McGrath Family (The September 14, 2006, Attack)***

(1) **Plaintiff Michael McGrath** was a citizen of the United States and a member of the United States Marine Corps when he was injured while serving in Iraq.

(2) On September 14, 2006, Mr. McGrath was serving as a marine rifleman with 3rd Battalion, 3rd Marine Regiment in Barwanah, Iraq, on a foot patrol when an IED planted by terrorists devastatingly detonated during on his unit.

(3) As a result of the attack, Mr. McGrath developed severe and life-changing post-traumatic stress disorder and sustained relentless tinnitus and other physical and psychological injuries.

(4) The attack also murdered United States servicemember Ryan Miller, who sustained fatal injuries during the attack.

(5) On information and belief, the attack was committed by al-Qaeda, AQI, or AQI-affiliated operatives, who received material support and resources from Defendants as alleged herein.

(6) On information and belief, the terrorists deliberately planted and detonated the IED on United States military personnel with the intent to kill or cause serious bodily injury. Because the attack unlawfully killed a United States servicemember and was not authorized by a judgment pronounced by a regularly constituted court, the attack constituted an act of extrajudicial killing.

(7) **Plaintiff Susan McGrath** is the mother of Mr. McGrath. She is, and was at all relevant times, a national of the United States.

(8) As a result of the September 14, 2006, attack and Mr. McGrath's injuries, Mr. McGrath experienced severe physical pain and suffering, emotional distress, and other damages.

(9) As a result of the September 14, 2006, attack, Ms. McGrath experienced severe mental anguish and emotional pain and suffering resulting from Mr. McGrath's injuries.

*(34)* ***The George Munn Family (The October 18, 2005, Attack)***

(1) **Plaintiff George Munn** was a citizen of the United States and a member of the United States Army when he was injured while serving in Iraq.

(2) On October 18, 2005, Mr. Munn was serving as a gunner with 2nd Battalion, 142nd Infantry Regiment, 56th Brigade Combat Team, 36th Infantry Division in Iskandariya, Iraq, when an IED planted by terrorists savagely detonated on Mr. Munn's convoy.

(3) As a result of the brutal attack, Mr. Munn developed severe and life-changing post-traumatic stress disorder and sustained other psychological and physical injuries.

(4) The explosion also murdered United States servicemember Tommy Folks, Jr., who died on October 19, 2005, from fatal injuries sustained during the attack.

(5) On information and belief, the attack was committed by al-Qaeda, AQI, or AQI-affiliated terrorist operatives, who received material support and resources from Defendants as alleged herein.

(6) On information and belief, the terrorists deliberately planted and detonated an IED on United States military vehicles with the intent to kill or cause serious bodily injury. Because the attack unlawfully killed a United States servicemember and was not authorized by a judgment pronounced by a regularly constituted court, the attack constituted an act of extrajudicial killing.

(7) **Plaintiff Stormie D'Ann Munn** is the wife of Mr. Munn. She is, and was at all relevant times, a national of the United States.

(8) **Plaintiff Ruby Munn** is the mother of Mr. Munn. She is, and was at all relevant times, a national of the United States.

(9) **Plaintiff Larry Munn** is the brother of Mr. Munn. He is, and was at all relevant times, a national of the United States.

(10) As a result of the October 18, 2005, attack and Mr. Munn's injuries, Mr. Munn experienced severe physical pain and suffering, emotional distress, and other damages.

(11) As a result of the October 18, 2005, attack, each member of the Munn Family as listed herein experienced severe mental anguish and emotional pain and suffering resulting from Mr. Munns's injuries.

#### *(35) __The John Price Family (The December 29, 2006, Attack)__*

(1) **Plaintiff John Price** was a citizen of the United States and a member of the United States Marine Corps when he was injured while serving in Iraq.

(2) On December 29, 2026, Mr. Price was serving as an Infantry Officer with 1st Battalion, 1st Marines in between Fallujah and Ramadi, Iraq, when a suicide vehicle-borne IED planted by terrorists was detonated, followed by a complex firefight.

(3) As a result of the attack, Mr. Price developed severe and life-changing post-traumatic stress disorder and sustained other physical and psychological injuries.

(4) The explosion also murdered at least three Iraqi soldiers and two Iraqi civilians, who sustained fatal injuries during the attack.

(5) On information and belief, the attack was committed by al-Qaeda, AQI, or AQI-affiliated operatives, who received material support and resources from Defendants as alleged herein.

(6) On information and belief, the terrorists deliberately and mercilessly detonated explosives on, fired rocket propelled grenades and mortar rounds at, and attacked with small arms fire United States military personnel with the intent to kill or cause serious bodily injury. Because the attack unlawfully killed Iraqi civilians and was not authorized by a judgment pronounced by a regularly constituted court, the attack constituted an act of extrajudicial killing.

(7) As a result of the December 29, 2006, attack and Mr. Price's injuries, Mr. Price experienced severe physical pain and suffering, emotional distress and other damages.

### *(36) The Kyle Rager Family (The November 4, 2004, Attack)*

(1) **Plaintiff Kyle Rager** was a citizen of the United States and a member of the United States Marine Corps when he was injured while serving in Iraq.

(2) On November 4, 2004, Mr. Rager was serving as a machine gunner with 2nd Battalion, 5th Marine Regiment in Ramadi, Iraq, when an IED planted by terrorists detonated on his unit.

(3) The attack murdered United States Marine servicemembers Jeremiah Baro and Jared Hubbard, both of whom sustained fatal injuries during the attack.

(4) As a result of the attack, Mr. Rager developed severe and life-changing post-traumatic stress disorder, and other physical and psychological injuries.

(5) On information and belief, the attack was committed by al-Qaeda, AQI, and/or AQI-affiliated operatives, who received material support and resources from Defendants as alleged herein.

(6) On information and belief, the terrorists deliberately placed and detonated the IED on United States military personnel with the intent to kill or cause serious bodily injury. Because the attack unlawfully killed United States servicemembers and was not authorized by a judgment pronounced by a regularly constituted court, the attack constituted an act of extrajudicial killing.

(7) As a result of the November 4, 2004, attack and Mr. Rager's injuries, Mr. Rager experienced severe physical pain and suffering, emotional distress and other damages.

### *(37) The Andrew Sinclair Family (The December 24, 2006, Attack)*

(1) **Plaintiff Andrew Sinclair** was a citizen of the United States and a member of the United States Marine Corps when he was injured while serving in Iraq.

(2) On December 24, 2006, Mr. Sinclair was serving as the gunner in a Humvee with 2nd Battalion, 3rd Marine Regiment in Albu Hayatt, Iraq, when an IED planted by terrorists detonated on his Humvee while he was traveling in a military convoy.

(3) As a result of the attack, Mr. Sinclair sustained significant and painful injuries to his knee, developed severe and life-changing post-traumatic stress disorder, and sustained other physical and psychological injuries.

(4) The attack also murdered United States servicemember Stephen Morris, who sustained fatal injuries during the attack.

(5) On information and belief, the savage attack was committed by the al-Qaeda, AQI, and/or AQI-affiliated terrorist operatives, who received material support and resources from Defendants as alleged herein.

(6) On information and belief, the terrorists deliberately planted and detonated the powerful IED on the United States military vehicle with the intent to kill or cause serious bodily injury. Because the attack unlawfully killed a United States servicemember and was not authorized by a judgment pronounced by a regularly constituted court, the attack constituted an act of extrajudicial killing.

(7) As a result of the December 24, 2006, attack and Mr. Sinclair's injuries, Mr. Sinclair experienced severe physical pain and suffering, emotional distress, and other damages.

*(38)* ***<u>The Michael Smith, Jr. Family (The November 8, 2004, Attack)</u>***

(1) **Plaintiff Michael Smith, Jr.** was a citizen of the United States and a member of the United States Marine Corps when he was injured while serving in Iraq.

(2) On November 8, 2004, Mr. Smith, Jr. was serving as a motor vehicle operator with Combat Service Support Battalion 1 in Al Anbar, Iraq, when an IED planted by terrorists detonated on his convoy.

(3) As a result of the attack, Mr. Smith, Jr. sustained severe and life-changing injuries, including a traumatic brain injury, a broken right femur that resulted in the loss of muscle on his inner right thigh, severe and life-changing post-traumatic stress disorder, a hole in his left eardrum, and other physical and psychological injuries.

(4) The explosion also savagely killed United States servicemembers David Ries and Thomas Zapp, both of whom sustained fatal injuries during the attack.

(5) On information and belief, the attack was committed by al-Qaeda, AQI, and/or AQI-affiliated terrorist operatives, who received material support and resources from Defendants as alleged herein.

(6) On information and belief, the terrorists deliberately planted and exploded an IED on United States military vehicles with the vicious intent to kill or cause serious bodily injury. Because the brutal attack unlawfully killed United States servicemembers and was not authorized by a judgment pronounced by a regularly constituted court, the attack constituted an act of extrajudicial killing.

(7) **Plaintiff Karla Dimmit** is the mother of Mr. Smith, Jr. She is, and was at all relevant times, a national of the United States.

(8) As a result of the November 8, 2004, attack and Mr. Smith, Jr.'s injuries, Mr. Smith, Jr. experienced severe physical pain and suffering, emotional distress, and other damages.

(9) As a result of the November 8, 2004, attack, Ms. Dimmit experienced severe mental anguish and emotional pain and suffering resulting from Mr. Smith, Jr.'s injuries.

### *(39) **__The Brandon Stubblefield Family (The February 5, 2008, Attack)__***

(1) **Plaintiff Brandon Stubblefield** was a citizen of the United States and a member of the United States Army when he was injured while serving in Iraq.

(2) On February 5, 2008, Mr. Stubblefield was serving as part of a Quick Reaction Force (QRF) with 1st Battalion, 325th Airborne Infantry Regiment in Al Muqdadiyah, Iraq when IEDs planted by terrorists blasted his unit.

(3) As a result of the attack, Mr. Stubblefield sustained severe and life-changing injuries, including post-traumatic stress disorder and other physical and psychological injuries.

(4) The explosion also savagely killed United States servicemembers Miguel Baez, John Osmolski, and Timothy Van Orman.

(5) On information and belief, the attack was committed by al-Qaeda, AQI, and/or AQI-affiliated terrorist operatives, who received material support and resources from Defendants as alleged herein.

(6) On information and belief, the terrorists maliciously and deliberately planted and detonated IEDs against United States military personnel with the intent to mercilessly kill or cause serious bodily injury. Because the brutal attack unlawfully killed United States servicemembers and was not authorized by a judgment pronounced by a regularly constituted court, the attack constituted an act of extrajudicial killing.

(7) **Plaintiff Thomas Stubblefield** is the father of Mr. Stubblefield. He is, and was at all relevant times, a national of the United States.

(8) As a result of the February 5, 2008, attack and Mr. Stubblefield's injuries, Mr. Stubblefield experienced severe physical pain and suffering, emotional distress, and other damages.

(9) As a result of the February 5, 2008, attack, Mr. Thomas Stubblefield experienced severe mental anguish and emotional pain and suffering resulting from Mr. Brandon Stubblefield's injuries.

*(40)* ***<u>The Samuel Turner Family (The August 27, 2003, Attack)</u>***

(1) **Plaintiff Samuel Turner** was a citizen of the United States and a member of the United States Army when he was injured while serving in Iraq.

(2) On August 27, 2003, Mr. Turner was traveling in a Humvee as the lead patrol vehicle with 2nd Battalion, 5th Field Artillery in Fallujah, Iraq, when an IED planted by terrorists detonated on a vehicle in the patrol.

(3) The attack murdered United States servicemember Rafael Navea, who sustained fatal injuries during the attack.

(4) As a result of the attack, Mr. Turner developed severe and life-changing post-traumatic stress disorder, and he also sustained painful and lasting tinnitus and degenerative disc disease and other physical and psychological injuries.

(5) On information and belief, the attack was committed by al-Qaeda or the Zarqawi network, who received material support and resources from Defendants as alleged herein.

(6) On information and belief, the terrorists cruelly and deliberately planted and detonated the IED on United States military personnel with the intent to kill or cause serious bodily injury. Because the attack unlawfully killed a United States servicemember and was not authorized by a judgment pronounced by a regularly constituted court, the attack constituted an act of extrajudicial killing.

(7) As a result of the August 27, 2003, attack and Mr. Turner's injuries, Mr. Turner experienced physical pain and suffering, emotional distress, and other damages.

*(41)* ***<u>The Jason Ward Family (The March 7, 2005, Attack)</u>***

(1) **Plaintiff Jason Ward** was a citizen of the United States and a member of the United States Army when he was injured while serving in Iraq.

(2) On March 7, 2005, Mr. Ward was serving as a combat engineer with 2nd Infantry Division at or near a military screening area outside Combat Outpost Ramadi on Route

Michigan in Ramadi, Iraq, when a terrorist suicide bomber detonated a vehicle-borne IED at the checkpoint on Mr. Ward and other United States military personnel.

(3) The explosion killed United States servicemembers Andrew Bossert and Michael Franklin, who sustained fatal injuries during the attack.

(4) As a result of the attack, Mr. Ward developed severe and life-changing post-traumatic stress disorder and sustained other physical and psychological injuries.

(5) On information and belief, the attack was committed by the al-Qaeda, AQI, and/or AQI-affiliated terrorist operatives, who received material support and resources from Defendants as alleged herein.

(6) On information and belief, the terrorists deliberately drove and detonated the explosives-laden vehicle near the United States military screening area with the intent to kill or cause serious bodily injury. Because the attack unlawfully killed United States servicemembers and was not authorized by a judgment pronounced by a regularly constituted court, the attack constituted an act of extrajudicial killing.

(7) As a result of the March 7, 2005, attack and Mr. Ward's injuries, Mr. Ward experienced severe physical pain and suffering, emotional distress, and other damages.

### *(42)* ***The Nathan Wiens Family (The April 15, 2008, Attack)***

(1) **Plaintiff Nathan Wiens** was a citizen of the United States and a member of the United States Army when he was injured while serving in Iraq.

(2) On April 15, 2008, Mr. Wiens was serving as a combat engineer with the 4th Brigade Secondary Infantry Division in Baqubah, Iraq, near the Diyala provincial government headquarters and central courthouse, when terrorists detonated a vehicle-borne IED in a crowded area outside the government complex.

(3) The malicious explosion killed at least thirty-five Iraqi civilians and wounded at least sixty-six others. One Iraqi police officer was among those killed. The explosion also destroyed three buses and damaged ten nearby shops.

(4) As a result of the attack, Mr. Wiens developed severe and life-changing post-traumatic stress disorder and sustained other physical and psychological injuries.

(5) On information and belief, the attack was committed by al-Qaeda, AQI, and/or AQI-affiliated terrorist operatives, who received material support and resources from Defendants as alleged herein.

(6) On information and belief, the terrorists deliberately planted and detonated the explosives-packed vehicle in a crowded area outside the provincial government headquarters and courthouse with the intent to kill or cause serious bodily injury. Because the attack unlawfully killed Iraqi civilians and was not authorized by a judgment pronounced by a regularly constituted court, the attack constituted an act of extrajudicial killing.

(7) **Plaintiff Randell Wiens** is the wife of Mr. Wiens. She is, and was at all relevant times, a national of the United States.

(8) **Plaintiff Finnly Wiens** is the daughter of Mr. Wiens. She is, and was at all relevant times, a national of the United States.

(9) **Plaintiff Hudson Wiens** is the son of Mr. Wiens. He is, and was at all relevant times, a national of the United States.

(10) As a result of the April 15, 2008, attack and Mr. Wiens's injuries, Mr. Wiens experienced severe physical pain and suffering, emotional distress, and other damages.

(11) As a result of the April 15, 2008, attack and Mr. Wiens's injuries, each member of the Wiens Family as listed herein experienced severe mental anguish and emotional pain and suffering resulting from Mr. Wiens's injuries.

*(43) **The Jomar Wooten Family (The July 11, 2004, Attack)***

(1) **Plaintiff Jomar Wooten** was a citizen of the United States and a member of the United States Army when he was injured while serving in Iraq.

(2) On July 11, 2004, Mr. Wooten was serving as a motor transport operator with 267th Ordnance Company in Samarra, Iraq, when an IED planted by terrorists detonated on his convoy.

(3) As a result of the attack, Mr. Wooten sustained severe and life-changing injuries, including post-traumatic stress disorder, tinnitus, and other physical and psychological injuries.

(4) The explosion also savagely killed United States servicemembers Linda Tarango-Griess and Jeremy Fischer, both of whom sustained fatal injuries during the attack.

(5) On information and belief, the attack was committed by al-Qaeda, AQI, and/or AQI-affiliated terrorist operatives, who received material support and resources from Defendants as alleged herein.

(6) On information and belief, the terrorists maliciously and deliberately planted and exploded an IED at United States military vehicles with the intent to brutally kill or cause serious bodily injury. Because the cruel attack unlawfully killed United States servicemembers and was not authorized by a judgment pronounced by a regularly constituted court, the attack constituted an act of extrajudicial killing.

(7) Defendants Iran, IRGC, MOIS, Bank Melli, and Bank Markazi were previously found liable for the July 11, 2004, terrorist attack by this Court. See Fishbeck et al., v. Islamic Republic of Iran et al., No. 18-cv-02248 (D.D.C. August 20, 2025).

(8) As a result of the July 11, 2004, attack and Mr. Wooten's injuries, Mr. Wooten experienced severe physical pain and suffering, emotional distress, and other damages.

*(44) **The Bryan Wyrich Family (The June 6, 2005, Attack)***

(1) **Plaintiff Bryan Wyrich** was a citizen of the United States and the United States Army National Guard when he was injured while serving in Iraq.

(2) On June 6, 2006, Mr. Wyrich was serving as the driver of a Humvee vehicle with A Battery, 2nd Battalion, 123rd Field Artillery in Baghdad, Iraq, on a convoy back from Balad when his unit was savagely attacked by a destructive IED planted by terrorists.

(3) As a result of the attack, Mr. Wyrich developed severe and life-changing post-traumatic stress disorder and sustained an excruciating back injury with resultant degenerative disc disease and painful tinnitus, and other physical and psychological injuries.

(4) The attack murdered United States servicemember Brian Romines, who sustained fatal injuries from the attack.

(5) On information and belief, the attack was committed by al-Qaeda, AQI, and/or AQI-affiliated terrorist operatives, who received material support and resources from Defendants as alleged herein.

(6) On information and belief, the terrorists deliberately planted and detonated the devastating explosive on a United States military patrol with the intent to kill or cause bodily injury. Because the attack unlawfully killed a United States servicemember and was not authorized by a judgment pronounced by a regularly constituted court, the attack constituted an act of extrajudicial killing.

(7) As a result of the June 6, 2006, attack and Mr. Wyrich's injuries, Mr. Wyrich experienced severe physical pain and suffering, emotional distress, and other damages.

### *(45)* ***<u>The Chiawen Yang Family (The June 7, 2006, Attack)</u>***

(1) **Plaintiff Chiawen Yang** was a citizen of the United States and a member of the United States Army when he was injured while serving in Iraq.

(2) On June 7, 2006, Mr. Yang was serving in Mosul, Iraq, as the driver of a Stryker vehicle with 3rd Platoon, Charlie Company, 2-1 Infantry, 172nd Stryker Brigade Combat Team during

a mounted patrol when his unit was attacked by terrorist sniper and small-arms fire. During the attack, a United States Army sergeant was shot in the neck.

(3) United States servicemember John Vaughan sustained fatal injuries in the attack and was murdered.

(4) As a result of the attack, Mr. Yang sustained painful and relentless tinnitus, developed severe and life-changing post-traumatic stress disorder, and sustained other physical and psychological injuries.

(5) On information and belief, the attack was committed by al-Qaeda, AQI or AQI-affiliated terrorist operatives, who received material support and resources from Defendants as alleged herein.

(6) On information and belief, the terrorists deliberately pummeled sniper rounds at United States military personnel with the intent to kill or cause serious bodily injury. Because the attack unlawfully killed a United States servicemember and was not authorized by a judgment pronounced by a regularly constituted court, the attack constituted an act of extrajudicial killing.

(7) As a result of the June 7, 2006, attack and Mr. Yang's injuries, Mr. Yang experienced severe physical pain and suffering, emotional distress, and other damages.

*(46)* ***The John Doe 5 Family (Attack)***

(1) **Plaintiff John Doe 5** was a citizen of the United States and a member of the United States armed forces when injured while serving in Iraq.

(2) As a result of the attack, John Doe 5 was killed and/or wounded in the attack, and as a result, suffered wrongful death and/or suffered significant and permanent physical and psychological injuries and has past and future noneconomic damages, including severe pain and suffering and loss of enjoyment of life.

(3) The attack also killed a person who received fatal injuries from the attack.

(4) On information and belief, the attack was committed by terrorists who received material support and resources from Defendants as alleged herein.

(5) On information and belief, the terrorists deliberately attacked with the intent to kill or cause serious bodily injury. Because the attack unlawfully killed a person and was not authorized by a judgment pronounced by a regularly constituted court, the attack constituted an act of extrajudicial killing.

(6) Plaintiff John Doe 5 has relatives who were at all relevant times, nationals of the United States.

(7) As a result of the attack and John Doe 5's injuries, John Doe 5 endured excruciating physical pain and suffering, wrongful death, and other recoverable damages, and/or experienced severe physical pain and suffering, emotional distress, and other damages.

(8) As a result of the attack and John Doe 5's injuries, each relative of the Doe 5 Family as listed herein experienced severe mental anguish and emotional pain and suffering resulting from John Doe 5's injuries and/or death.

### *(47) **The John Doe 6 Family (Attack)***

(9) **Plaintiff John Doe 6** was a citizen of the United States and a member of the United States armed forces when injured while serving in Iraq.

(10) As a result of the attack, John Doe 6 was killed and/or wounded in the attack, and as a result, suffered wrongful death and/or suffered significant and permanent physical and psychological injuries and has past and future noneconomic damages, including severe pain and suffering and loss of enjoyment of life.

(11) The attack also killed a person who received fatal injuries from the attack.

(12) On information and belief, the attack was committed by terrorists who received material support and resources from Defendants as alleged herein.

(13) On information and belief, the terrorists deliberately attacked with the intent to kill or cause serious bodily injury. Because the attack unlawfully killed a person and was not authorized by a judgment pronounced by a regularly constituted court, the attack constituted an act of extrajudicial killing.

(14) Plaintiff John Doe 6 has relatives who were at all relevant times, nationals of the United States.

(15) As a result of the attack and John Doe 6's injuries, John Doe 6 endured excruciating physical pain and suffering, wrongful death, and other recoverable damages, and/or experienced severe physical pain and suffering, emotional distress, and other damages.

(16) As a result of the attack and John Doe 6's injuries, each relative of the Doe 6 Family as listed herein experienced severe mental anguish and emotional pain and suffering resulting from John Doe 6's injuries and/or death.

*(48)* ***The John Doe 7 Family (Attack)***

(17) **Plaintiff John Doe 7** was a citizen of the United States and a member of the United States armed forces when injured while serving in Iraq.

(18) As a result of the attack, John Doe 7 was killed and/or wounded in the attack, and as a result, suffered wrongful death and/or suffered significant and permanent physical and psychological injuries and has past and future noneconomic damages, including severe pain and suffering and loss of enjoyment of life.

(19) The attack also killed a person who received fatal injuries from the attack.

(20) On information and belief, the attack was committed by terrorists who received material support and resources from Defendants as alleged herein.

(21) On information and belief, the terrorists deliberately attacked with the intent to kill or cause serious bodily injury. Because the attack unlawfully killed a person and was not

authorized by a judgment pronounced by a regularly constituted court, the attack constituted an act of extrajudicial killing.

(22) Plaintiff John Doe 7 has relatives who were at all relevant times, nationals of the United States.

(23) As a result of the attack and John Doe 7's injuries, John Doe 7 endured excruciating physical pain and suffering, wrongful death, and other recoverable damages, and/or experienced severe physical pain and suffering, emotional distress, and other damages.

(24) As a result of the attack and John Doe 7's injuries, each relative of the Doe 7 Family as listed herein experienced severe mental anguish and emotional pain and suffering resulting from John Doe 7's injuries and/or death.

### *(49) **The John Doe 8 Family (Attack)***

(25) **Plaintiff John Doe 8** was a citizen of the United States and a member of the United States armed forces when injured while serving in Iraq.

(26) As a result of the attack, John Doe 8 was killed and/or wounded in the attack, and as a result, suffered wrongful death and/or suffered significant and permanent physical and psychological injuries and has past and future noneconomic damages, including severe pain and suffering and loss of enjoyment of life.

(27) The attack also killed a person who received fatal injuries from the attack.

(28) On information and belief, the attack was committed by terrorists who received material support and resources from Defendants as alleged herein.

(29) On information and belief, the terrorists deliberately attacked with the intent to kill or cause serious bodily injury. Because the attack unlawfully killed a person and was not authorized by a judgment pronounced by a regularly constituted court, the attack constituted an act of extrajudicial killing.

(30) Plaintiff John Doe 8 has relatives who were at all relevant times, nationals of the United States.

(31) As a result of the attack and John Doe 8's injuries, John Doe 8 endured excruciating physical pain and suffering, wrongful death, and other recoverable damages, and/or experienced severe physical pain and suffering, emotional distress, and other damages.

(32) As a result of the attack and John Doe 8's injuries, each relative of the Doe 8 Family as listed herein experienced severe mental anguish and emotional pain and suffering resulting from John Doe 8's injuries and/or death.

### *(50) **The John Doe 9 Family (Attack)***

(33) **Plaintiff John Doe 9** was a citizen of the United States and a member of the United States armed forces when injured while serving in Iraq.

(34) As a result of the attack, John Doe 9 was killed and/or wounded in the attack, and as a result, suffered wrongful death and/or suffered significant and permanent physical and psychological injuries and has past and future noneconomic damages, including severe pain and suffering and loss of enjoyment of life.

(35) The attack also killed a person who received fatal injuries from the attack.

(36) On information and belief, the attack was committed by terrorists who received material support and resources from Defendants as alleged herein.

(37) On information and belief, the terrorists deliberately attacked with the intent to kill or cause serious bodily injury. Because the attack unlawfully killed a person and was not authorized by a judgment pronounced by a regularly constituted court, the attack constituted an act of extrajudicial killing.

(38) Plaintiff John Doe 9 has relatives who were at all relevant times, nationals of the United States.

(39) As a result of the attack and John Doe 9's injuries, John Doe 9 endured excruciating physical pain and suffering, wrongful death, and other recoverable damages, and/or experienced severe physical pain and suffering, emotional distress, and other damages.

(40) As a result of the attack and John Doe 9's injuries, each relative of the Doe 9 Family as listed herein experienced severe mental anguish and emotional pain and suffering resulting from John Doe 9's injuries and/or death.

### *(51)* ***The John Doe 10 Family (Attack)***

(41) **Plaintiff John Doe 10** was a citizen of the United States and a member of the United States armed forces when injured while serving in Iraq.

(42) As a result of the attack, John Doe 10 was killed and/or wounded in the attack, and as a result, suffered wrongful death and/or suffered significant and permanent physical and psychological injuries and has past and future noneconomic damages, including severe pain and suffering and loss of enjoyment of life.

(43) The attack also killed a person who received fatal injuries from the attack.

(44) On information and belief, the attack was committed by terrorists who received material support and resources from Defendants as alleged herein.

(45) On information and belief, the terrorists deliberately attacked with the intent to kill or cause serious bodily injury. Because the attack unlawfully killed a person and was not authorized by a judgment pronounced by a regularly constituted court, the attack constituted an act of extrajudicial killing.

(46) Plaintiff John Doe 10 has relatives who were at all relevant times, nationals of the United States.

(47) As a result of the attack and John Doe 10's injuries, John Doe 10 endured excruciating physical pain and suffering, wrongful death, and other recoverable damages, and/or experienced severe physical pain and suffering, emotional distress, and other damages.

(48) As a result of the attack and John Doe 10's injuries, each relative of the Doe 10 Family as listed herein experienced severe mental anguish and emotional pain and suffering resulting from John Doe 10's injuries and/or death.

### *(52) The John Doe 11 Family (Attack)*

(1) **Plaintiff John Doe 11** was a citizen of the United States and a member of the United States armed forces when injured while serving in Iraq.

(2) As a result of the attack, John Doe 11 was killed and/or wounded in the attack, and as a result, suffered wrongful death and/or suffered significant and permanent physical and psychological injuries and has past and future noneconomic damages, including severe pain and suffering and loss of enjoyment of life.

(3) The attack also killed a person who received fatal injuries from the attack.

(4) On information and belief, the attack was committed by terrorists who received material support and resources from Defendants as alleged herein.

(5) On information and belief, the terrorists deliberately attacked with the intent to kill or cause serious bodily injury. Because the attack unlawfully killed a person and was not authorized by a judgment pronounced by a regularly constituted court, the attack constituted an act of extrajudicial killing.

(6) Plaintiff John Doe 11 has relatives who were at all relevant times, nationals of the United States.

(7) As a result of the attack and John Doe 11's injuries, John Doe 11 endured excruciating physical pain and suffering, wrongful death, and other recoverable damages, and/or experienced severe physical pain and suffering, emotional distress, and other damages.

(8) As a result of the attack and John Doe 11's injuries, each relative of the Doe 11 Family as listed herein experienced severe mental anguish and emotional pain and suffering resulting from John Doe 11's injuries and/or death.

*(53) __The John Doe 12 Family (Attack)__*

(9) **Plaintiff John Doe 12** was a citizen of the United States and a member of the United States armed forces when injured while serving in Iraq.

(10) As a result of the attack, John Doe 12 was killed and/or wounded in the attack, and as a result, suffered wrongful death and/or suffered significant and permanent physical and psychological injuries and has past and future noneconomic damages, including severe pain and suffering and loss of enjoyment of life.

(11) The attack also killed a person who received fatal injuries from the attack.

(12) On information and belief, the attack was committed by terrorists who received material support and resources from Defendants as alleged herein.

(13) On information and belief, the terrorists deliberately attacked with the intent to kill or cause serious bodily injury. Because the attack unlawfully killed a person and was not authorized by a judgment pronounced by a regularly constituted court, the attack constituted an act of extrajudicial killing.

(14) Plaintiff John Doe 12 has relatives who were at all relevant times, nationals of the United States.

(15) As a result of the attack and John Doe 12's injuries, John Doe 12 endured excruciating physical pain and suffering, wrongful death, and other recoverable damages, and/or experienced severe physical pain and suffering, emotional distress, and other damages.

(16) As a result of the attack and John Doe 12's injuries, each relative of the Doe 12 Family as listed herein experienced severe mental anguish and emotional pain and suffering resulting from John Doe 12's injuries and/or death.

*(54) __The John Doe 13 Family (Attack)__*

(17) **Plaintiff John Doe 13** was a citizen of the United States and a member of the United States armed forces when injured while serving in Iraq.

(18) As a result of the attack, John Doe 13 was killed and/or wounded in the attack, and as a result, suffered wrongful death and/or suffered significant and permanent physical and psychological injuries and has past and future noneconomic damages, including severe pain and suffering and loss of enjoyment of life.

(19) The attack also killed a person who received fatal injuries from the attack.

(20) On information and belief, the attack was committed by terrorists who received material support and resources from Defendants as alleged herein.

(21) On information and belief, the terrorists deliberately attacked with the intent to kill or cause serious bodily injury. Because the attack unlawfully killed a person and was not authorized by a judgment pronounced by a regularly constituted court, the attack constituted an act of extrajudicial killing.

(22) Plaintiff John Doe 13 has relatives who were at all relevant times, nationals of the United States.

(23) As a result of the attack and John Doe 13's injuries, John Doe 13 endured excruciating physical pain and suffering, wrongful death, and other recoverable damages, and/or experienced severe physical pain and suffering, emotional distress, and other damages.

(24) As a result of the attack and John Doe 13's injuries, each relative of the Doe 13 Family as listed herein experienced severe mental anguish and emotional pain and suffering resulting from John Doe 13's injuries and/or death.

### *(55) **The John Doe 14 Family (Attack)***

(25) **Plaintiff John Doe 14** was a citizen of the United States and a member of the United States armed forces when injured while serving in Iraq.

(26) As a result of the attack, John Doe 14 was killed and/or wounded in the attack, and as a result, suffered wrongful death and/or suffered significant and permanent physical and psychological injuries and has past and future noneconomic damages, including severe pain and suffering and loss of enjoyment of life.

(27) The attack also killed a person who received fatal injuries from the attack.

(28) On information and belief, the attack was committed by terrorists who received material support and resources from Defendants as alleged herein.

(29) On information and belief, the terrorists deliberately attacked with the intent to kill or cause serious bodily injury. Because the attack unlawfully killed a person and was not authorized by a judgment pronounced by a regularly constituted court, the attack constituted an act of extrajudicial killing.

(30) Plaintiff John Doe 14 has relatives who were at all relevant times, nationals of the United States.

(31) As a result of the attack and John Doe 14's injuries, John Doe 14 endured excruciating physical pain and suffering, wrongful death, and other recoverable damages, and/or experienced severe physical pain and suffering, emotional distress, and other damages.

(32) As a result of the attack and John Doe 14's injuries, each relative of the Doe 14 Family as listed herein experienced severe mental anguish and emotional pain and suffering resulting from John Doe 14's injuries and/or death.

### *(56)* ***<u>The John Doe 15 Family (Attack)</u>***

(33) **Plaintiff John Doe 15** was a citizen of the United States and a member of the United States armed forces when injured while serving in Iraq.

(34) As a result of the attack, John Doe 15 was killed and/or wounded in the attack, and as a result, suffered wrongful death and/or suffered significant and permanent physical and

psychological injuries and has past and future noneconomic damages, including severe pain and suffering and loss of enjoyment of life.

(35) The attack also killed a person who received fatal injuries from the attack.

(36) On information and belief, the attack was committed by terrorists who received material support and resources from Defendants as alleged herein.

(37) On information and belief, the terrorists deliberately attacked with the intent to kill or cause serious bodily injury. Because the attack unlawfully killed a person and was not authorized by a judgment pronounced by a regularly constituted court, the attack constituted an act of extrajudicial killing.

(38) Plaintiff John Doe 15 has relatives who were at all relevant times, nationals of the United States.

(39) As a result of the attack and John Doe 15's injuries, John Doe 15 endured excruciating physical pain and suffering, wrongful death, and other recoverable damages, and/or experienced severe physical pain and suffering, emotional distress, and other damages.

(40) As a result of the attack and John Doe 15's injuries, each relative of the Doe 15 Family as listed herein experienced severe mental anguish and emotional pain and suffering resulting from John Doe 15's injuries and/or death.

### *(57)* ***The John Doe 16 Family (Attack)***

(41) **Plaintiff John Doe 16** was a citizen of the United States and a member of the United States armed forces when injured while serving in Iraq.

(42) As a result of the attack, John Doe 16 was killed and/or wounded in the attack, and as a result, suffered wrongful death and/or suffered significant and permanent physical and psychological injuries and has past and future noneconomic damages, including severe pain and suffering and loss of enjoyment of life.

(43) The attack also killed a person who received fatal injuries from the attack.

(44) On information and belief, the attack was committed by terrorists who received material support and resources from Defendants as alleged herein.

(45) On information and belief, the terrorists deliberately attacked with the intent to kill or cause serious bodily injury. Because the attack unlawfully killed a person and was not authorized by a judgment pronounced by a regularly constituted court, the attack constituted an act of extrajudicial killing.

(46) Plaintiff John Doe 16 has relatives who were at all relevant times, nationals of the United States.

(47) As a result of the attack and John Doe 16's injuries, John Doe 16 endured excruciating physical pain and suffering, wrongful death, and other recoverable damages, and/or experienced severe physical pain and suffering, emotional distress, and other damages.

(48) As a result of the attack and John Doe 16's injuries, each relative of the Doe 16 Family as listed herein experienced severe mental anguish and emotional pain and suffering resulting from John Doe 16's injuries and/or death.

### *(58)* ***The John Doe 17 Family (Attack)***

(49) **Plaintiff John Doe 17** was a citizen of the United States and a member of the United States armed forces when injured while serving in Iraq.

(50) As a result of the attack, John Doe 17 was killed and/or wounded in the attack, and as a result, suffered wrongful death and/or suffered significant and permanent physical and psychological injuries and has past and future noneconomic damages, including severe pain and suffering and loss of enjoyment of life.

(51) The attack also killed a person who received fatal injuries from the attack.

(52) On information and belief, the attack was committed by terrorists who received material support and resources from Defendants as alleged herein.

(53) On information and belief, the terrorists deliberately attacked with the intent to kill or cause serious bodily injury. Because the attack unlawfully killed a person and was not authorized by a judgment pronounced by a regularly constituted court, the attack constituted an act of extrajudicial killing.

(54) Plaintiff John Doe 17 has relatives who were at all relevant times, nationals of the United States.

(55) As a result of the attack and John Doe 17's injuries, John Doe 17 endured excruciating physical pain and suffering, wrongful death, and other recoverable damages, and/or experienced severe physical pain and suffering, emotional distress, and other damages.

(56) As a result of the attack and John Doe 17's injuries, each relative of the Doe 17 Family as listed herein experienced severe mental anguish and emotional pain and suffering resulting from John Doe 17's injuries and/or death.

*(59)* ***The John Doe 18 Family (Attack)***

(57) **Plaintiff John Doe 18** was a citizen of the United States and a member of the United States armed forces when injured while serving in Iraq.

(58) As a result of the attack, John Doe 18 was killed and/or wounded in the attack, and as a result, suffered wrongful death and/or suffered significant and permanent physical and psychological injuries and has past and future noneconomic damages, including severe pain and suffering and loss of enjoyment of life.

(59) The attack also killed a person who received fatal injuries from the attack.

(60) On information and belief, the attack was committed by terrorists who received material support and resources from Defendants as alleged herein.

(61) On information and belief, the terrorists deliberately attacked with the intent to kill or cause serious bodily injury. Because the attack unlawfully killed a person and was not

authorized by a judgment pronounced by a regularly constituted court, the attack constituted an act of extrajudicial killing.

(62) Plaintiff John Doe 18 has relatives who were at all relevant times, nationals of the United States.

(63) As a result of the attack and John Doe 18's injuries, John Doe 18 endured excruciating physical pain and suffering, wrongful death, and other recoverable damages, and/or experienced severe physical pain and suffering, emotional distress, and other damages.

(64) As a result of the attack and John Doe 18's injuries, each relative of the Doe 18 Family as listed herein experienced severe mental anguish and emotional pain and suffering resulting from John Doe 18's injuries and/or death.

### *(60)* ***<u>The John Doe 19 Family (Attack)</u>***

(65) **Plaintiff John Doe 19** was a citizen of the United States and a member of the United States armed forces when injured while serving in Iraq.

(66) As a result of the attack, John Doe 19 was killed and/or wounded in the attack, and as a result, suffered wrongful death and/or suffered significant and permanent physical and psychological injuries and has past and future noneconomic damages, including severe pain and suffering and loss of enjoyment of life.

(67) The attack also killed a person who received fatal injuries from the attack.

(68) On information and belief, the attack was committed by terrorists who received material support and resources from Defendants as alleged herein.

(69) On information and belief, the terrorists deliberately attacked with the intent to kill or cause serious bodily injury. Because the attack unlawfully killed a person and was not authorized by a judgment pronounced by a regularly constituted court, the attack constituted an act of extrajudicial killing.

(70) Plaintiff John Doe 19 has relatives who were at all relevant times, nationals of the United States.

(71) As a result of the attack and John Doe 19's injuries, John Doe 19 endured excruciating physical pain and suffering, wrongful death, and other recoverable damages, and/or experienced severe physical pain and suffering, emotional distress, and other damages.

(72) As a result of the attack and John Doe 19's injuries, each relative of the Doe 19 Family as listed herein experienced severe mental anguish and emotional pain and suffering resulting from John Doe 19's injuries and/or death.

### *(61) **The John Doe 20 Family (Attack)***

(73) **Plaintiff John Doe 20** was a citizen of the United States and a member of the United States armed forces when injured while serving in Iraq.

(74) As a result of the attack, John Doe 20 was killed and/or wounded in the attack, and as a result, suffered wrongful death and/or suffered significant and permanent physical and psychological injuries and has past and future noneconomic damages, including severe pain and suffering and loss of enjoyment of life.

(75) The attack also killed a person who received fatal injuries from the attack.

(76) On information and belief, the attack was committed by terrorists who received material support and resources from Defendants as alleged herein.

(77) On information and belief, the terrorists deliberately attacked with the intent to kill or cause serious bodily injury. Because the attack unlawfully killed a person and was not authorized by a judgment pronounced by a regularly constituted court, the attack constituted an act of extrajudicial killing.

(78) Plaintiff John Doe 20 has relatives who were at all relevant times, nationals of the United States.

(79) As a result of the attack and John Doe 20's injuries, John Doe 20 endured excruciating physical pain and suffering, wrongful death, and other recoverable damages, and/or experienced severe physical pain and suffering, emotional distress, and other damages.

(80) As a result of the attack and John Doe 20's injuries, each relative of the Doe 20 Family as listed herein experienced severe mental anguish and emotional pain and suffering resulting from John Doe 20's injuries and/or death.

### *(62)* ***The John Doe 21 Family (Attack)***

(1) **Plaintiff John Doe 21** was a citizen of the United States and a member of the United States armed forces when injured while serving in Iraq.

(2) As a result of the attack, John Doe 21 was killed and/or wounded in the attack, and as a result, suffered wrongful death and/or suffered significant and permanent physical and psychological injuries and has past and future noneconomic damages, including severe pain and suffering and loss of enjoyment of life.

(3) The attack also killed a person who received fatal injuries from the attack.

(4) On information and belief, the attack was committed by terrorists who received material support and resources from Defendants as alleged herein.

(5) On information and belief, the terrorists deliberately attacked with the intent to kill or cause serious bodily injury. Because the attack unlawfully killed a person and was not authorized by a judgment pronounced by a regularly constituted court, the attack constituted an act of extrajudicial killing.

(6) Plaintiff John Doe 21 has relatives who were at all relevant times, nationals of the United States.

(7) As a result of the attack and John Doe 21's injuries, John Doe 21 endured excruciating physical pain and suffering, wrongful death, and other recoverable damages, and/or experienced severe physical pain and suffering, emotional distress, and other damages.

(8) As a result of the attack and John Doe 21's injuries, each relative of the Doe 21 Family as listed herein experienced severe mental anguish and emotional pain and suffering resulting from John Doe 21's injuries and/or death.

### *(63) __The John Doe 22 Family (Attack)__*

(9) **Plaintiff John Doe 22** was a citizen of the United States and a member of the United States armed forces when injured while serving in Iraq.

(10) As a result of the attack, John Doe 22 was killed and/or wounded in the attack, and as a result, suffered wrongful death and/or suffered significant and permanent physical and psychological injuries and has past and future noneconomic damages, including severe pain and suffering and loss of enjoyment of life.

(11) The attack also killed a person who received fatal injuries from the attack.

(12) On information and belief, the attack was committed by terrorists who received material support and resources from Defendants as alleged herein.

(13) On information and belief, the terrorists deliberately attacked with the intent to kill or cause serious bodily injury. Because the attack unlawfully killed a person and was not authorized by a judgment pronounced by a regularly constituted court, the attack constituted an act of extrajudicial killing.

(14) Plaintiff John Doe 22 has relatives who were at all relevant times, nationals of the United States.

(15) As a result of the attack and John Doe 22's injuries, John Doe 22 endured excruciating physical pain and suffering, wrongful death, and other recoverable damages, and/or experienced severe physical pain and suffering, emotional distress, and other damages.

(16) As a result of the attack and John Doe 22's injuries, each relative of the Doe 22 Family as listed herein experienced severe mental anguish and emotional pain and suffering resulting from John Doe 22's injuries and/or death.

### *(64) The John Doe 23 Family (Attack)*

(17) **Plaintiff John Doe 23** was a citizen of the United States and a member of the United States armed forces when injured while serving in Iraq.

(18) As a result of the attack, John Doe 23 was killed and/or wounded in the attack, and as a result, suffered wrongful death and/or suffered significant and permanent physical and psychological injuries and has past and future noneconomic damages, including severe pain and suffering and loss of enjoyment of life.

(19) The attack also killed a person who received fatal injuries from the attack.

(20) On information and belief, the attack was committed by terrorists who received material support and resources from Defendants as alleged herein.

(21) On information and belief, the terrorists deliberately attacked with the intent to kill or cause serious bodily injury. Because the attack unlawfully killed a person and was not authorized by a judgment pronounced by a regularly constituted court, the attack constituted an act of extrajudicial killing.

(22) Plaintiff John Doe 23 has relatives who were at all relevant times, nationals of the United States.

(23) As a result of the attack and John Doe 23's injuries, John Doe 23 endured excruciating physical pain and suffering, wrongful death, and other recoverable damages, and/or experienced severe physical pain and suffering, emotional distress, and other damages.

(24) As a result of the attack and John Doe 23's injuries, each relative of the Doe 23 Family as listed herein experienced severe mental anguish and emotional pain and suffering resulting from John Doe 23's injuries and/or death.

### *(65) The John Doe 24 Family (Attack)*

(25) **Plaintiff John Doe 24** was a citizen of the United States and a member of the United States armed forces when injured while serving in Iraq.

(26) As a result of the attack, John Doe 24 was killed and/or wounded in the attack, and as a result, suffered wrongful death and/or suffered significant and permanent physical and psychological injuries and has past and future noneconomic damages, including severe pain and suffering and loss of enjoyment of life.

(27) The attack also killed a person who received fatal injuries from the attack.

(28) On information and belief, the attack was committed by terrorists who received material support and resources from Defendants as alleged herein.

(29) On information and belief, the terrorists deliberately attacked with the intent to kill or cause serious bodily injury. Because the attack unlawfully killed a person and was not authorized by a judgment pronounced by a regularly constituted court, the attack constituted an act of extrajudicial killing.

(30) Plaintiff John Doe 24 has relatives who were at all relevant times, nationals of the United States.

(31) As a result of the attack and John Doe 24's injuries, John Doe 24 endured excruciating physical pain and suffering, wrongful death, and other recoverable damages, and/or experienced severe physical pain and suffering, emotional distress, and other damages.

(32) As a result of the attack and John Doe 24's injuries, each relative of the Doe 24 Family as listed herein experienced severe mental anguish and emotional pain and suffering resulting from John Doe 24's injuries and/or death.

### *(66)* ***The John Doe 25 Family (Attack)***

(33) **Plaintiff John Doe 25** was a citizen of the United States and a member of the United States armed forces when injured while serving in Iraq.

(34) As a result of the attack, John Doe 25 was killed and/or wounded in the attack, and as a result, suffered wrongful death and/or suffered significant and permanent physical and psychological injuries and has past and future noneconomic damages, including severe pain and suffering and loss of enjoyment of life.

(35) The attack also killed a person who received fatal injuries from the attack.

(36) On information and belief, the attack was committed by terrorists who received material support and resources from Defendants as alleged herein.

(37) On information and belief, the terrorists deliberately attacked with the intent to kill or cause serious bodily injury. Because the attack unlawfully killed a person and was not authorized by a judgment pronounced by a regularly constituted court, the attack constituted an act of extrajudicial killing.

(38) Plaintiff John Doe 25 has relatives who were at all relevant times, nationals of the United States.

(39) As a result of the attack and John Doe 25's injuries, John Doe 25 endured excruciating physical pain and suffering, wrongful death, and other recoverable damages, and/or experienced severe physical pain and suffering, emotional distress, and other damages.

(40) As a result of the attack and John Doe 25's injuries, each relative of the Doe 25 Family as listed herein experienced severe mental anguish and emotional pain and suffering resulting from John Doe 25's injuries and/or death.

### *(67)* ***<u>The John Doe 26 Family (Attack)</u>***

(41) **Plaintiff John Doe 26** was a citizen of the United States and a member of the United States armed forces when injured while serving in Iraq.

(42) As a result of the attack, John Doe 26 was killed and/or wounded in the attack, and as a result, suffered wrongful death and/or suffered significant and permanent physical and

psychological injuries and has past and future noneconomic damages, including severe pain and suffering and loss of enjoyment of life.

(43) The attack also killed a person who received fatal injuries from the attack.

(44) On information and belief, the attack was committed by terrorists who received material support and resources from Defendants as alleged herein.

(45) On information and belief, the terrorists deliberately attacked with the intent to kill or cause serious bodily injury. Because the attack unlawfully killed a person and was not authorized by a judgment pronounced by a regularly constituted court, the attack constituted an act of extrajudicial killing.

(46) Plaintiff John Doe 26 has relatives who were at all relevant times, nationals of the United States.

(47) As a result of the attack and John Doe 26's injuries, John Doe 26 endured excruciating physical pain and suffering, wrongful death, and other recoverable damages, and/or experienced severe physical pain and suffering, emotional distress, and other damages.

(48) As a result of the attack and John Doe 26's injuries, each relative of the Doe 26 Family as listed herein experienced severe mental anguish and emotional pain and suffering resulting from John Doe 26's injuries and/or death.

### *(68)* ***The John Doe 27 Family (Attack)***

(49) **Plaintiff John Doe 27** was a citizen of the United States and a member of the United States armed forces when injured while serving in Iraq.

(50) As a result of the attack, John Doe 27 was killed and/or wounded in the attack, and as a result, suffered wrongful death and/or suffered significant and permanent physical and psychological injuries and has past and future noneconomic damages, including severe pain and suffering and loss of enjoyment of life.

(51) The attack also killed a person who received fatal injuries from the attack.

(52) On information and belief, the attack was committed by terrorists who received material support and resources from Defendants as alleged herein.

(53) On information and belief, the terrorists deliberately attacked with the intent to kill or cause serious bodily injury. Because the attack unlawfully killed a person and was not authorized by a judgment pronounced by a regularly constituted court, the attack constituted an act of extrajudicial killing.

(54) Plaintiff John Doe 27 has relatives who were at all relevant times, nationals of the United States.

(55) As a result of the attack and John Doe 27's injuries, John Doe 27 endured excruciating physical pain and suffering, wrongful death, and other recoverable damages, and/or experienced severe physical pain and suffering, emotional distress, and other damages.

(56) As a result of the attack and John Doe 27's injuries, each relative of the Doe 27 Family as listed herein experienced severe mental anguish and emotional pain and suffering resulting from John Doe 27's injuries and/or death.

### *(69)* ***<u>The John Doe 28 Family (Attack)</u>***

(57) **Plaintiff John Doe 28** was a citizen of the United States and a member of the United States armed forces when injured while serving in Iraq.

(58) As a result of the attack, John Doe 28 was killed and/or wounded in the attack, and as a result, suffered wrongful death and/or suffered significant and permanent physical and psychological injuries and has past and future noneconomic damages, including severe pain and suffering and loss of enjoyment of life.

(59) The attack also killed a person who received fatal injuries from the attack.

(60) On information and belief, the attack was committed by terrorists who received material support and resources from Defendants as alleged herein.

(61) On information and belief, the terrorists deliberately attacked with the intent to kill or cause serious bodily injury. Because the attack unlawfully killed a person and was not authorized by a judgment pronounced by a regularly constituted court, the attack constituted an act of extrajudicial killing.

(62) Plaintiff John Doe 28 has relatives who were at all relevant times, nationals of the United States.

(63) As a result of the attack and John Doe 28's injuries, John Doe 28 endured excruciating physical pain and suffering, wrongful death, and other recoverable damages, and/or experienced severe physical pain and suffering, emotional distress, and other damages.

(64) As a result of the attack and John Doe 28's injuries, each relative of the Doe 28 Family as listed herein experienced severe mental anguish and emotional pain and suffering resulting from John Doe 28's injuries and/or death.

### *(70)* ***<u>The John Doe 29 Family (Attack)</u>***

(65) **Plaintiff John Doe 29** was a citizen of the United States and a member of the United States armed forces when injured while serving in Iraq.

(66) As a result of the attack, John Doe 29 was killed and/or wounded in the attack, and as a result, suffered wrongful death and/or suffered significant and permanent physical and psychological injuries and has past and future noneconomic damages, including severe pain and suffering and loss of enjoyment of life.

(67) The attack also killed a person who received fatal injuries from the attack.

(68) On information and belief, the attack was committed by terrorists who received material support and resources from Defendants as alleged herein.

(69) On information and belief, the terrorists deliberately attacked with the intent to kill or cause serious bodily injury. Because the attack unlawfully killed a person and was not

authorized by a judgment pronounced by a regularly constituted court, the attack constituted an act of extrajudicial killing.

(70) Plaintiff John Doe 29 has relatives who were at all relevant times, nationals of the United States.

(71) As a result of the attack and John Doe 29's injuries, John Doe 29 endured excruciating physical pain and suffering, wrongful death, and other recoverable damages, and/or experienced severe physical pain and suffering, emotional distress, and other damages.

(72) As a result of the attack and John Doe 29's injuries, each relative of the Doe 29 Family as listed herein experienced severe mental anguish and emotional pain and suffering resulting from John Doe 29's injuries and/or death.

### *(71)* ***<u>The John Doe 30 Family (Attack)</u>***

(73) **Plaintiff John Doe 30** was a citizen of the United States and a member of the United States armed forces when injured while serving in Iraq.

(74) As a result of the attack, John Doe 30 was killed and/or wounded in the attack, and as a result, suffered wrongful death and/or suffered significant and permanent physical and psychological injuries and has past and future noneconomic damages, including severe pain and suffering and loss of enjoyment of life.

(75) The attack also killed a person who received fatal injuries from the attack.

(76) On information and belief, the attack was committed by terrorists who received material support and resources from Defendants as alleged herein.

(77) On information and belief, the terrorists deliberately attacked with the intent to kill or cause serious bodily injury. Because the attack unlawfully killed a person and was not authorized by a judgment pronounced by a regularly constituted court, the attack constituted an act of extrajudicial killing.

(78) Plaintiff John Doe 30 has relatives who were at all relevant times, nationals of the United States.

(79) As a result of the attack and John Doe 30's injuries, John Doe 30 endured excruciating physical pain and suffering, wrongful death, and other recoverable damages, and/or experienced severe physical pain and suffering, emotional distress, and other damages.

(80) As a result of the attack and John Doe 30's injuries, each relative of the Doe 30 Family as listed herein experienced severe mental anguish and emotional pain and suffering resulting from John Doe 30's injuries and/or death.

*(72) **The John Doe 31 Family (Attack)***

(81) **Plaintiff John Doe 31** was a citizen of the United States and a member of the United States armed forces when injured while serving in Iraq.

(82) As a result of the attack, John Doe 31 was killed and/or wounded in the attack, and as a result, suffered wrongful death and/or suffered significant and permanent physical and psychological injuries and has past and future noneconomic damages, including severe pain and suffering and loss of enjoyment of life.

(83) The attack also killed a person who received fatal injuries from the attack.

(84) On information and belief, the attack was committed by terrorists who received material support and resources from Defendants as alleged herein.

(85) On information and belief, the terrorists deliberately attacked with the intent to kill or cause serious bodily injury. Because the attack unlawfully killed a person and was not authorized by a judgment pronounced by a regularly constituted court, the attack constituted an act of extrajudicial killing.

(86) Plaintiff John Doe 31 has relatives who were at all relevant times, nationals of the United States.

(87) As a result of the attack and John Doe 31's injuries, John Doe 31 endured excruciating physical pain and suffering, wrongful death, and other recoverable damages, and/or experienced severe physical pain and suffering, emotional distress, and other damages.

(88) As a result of the attack and John Doe 31's injuries, each relative of the Doe 31 Family as listed herein experienced severe mental anguish and emotional pain and suffering resulting from John Doe 31's injuries and/or death.

### *(73) **The John Doe 32 Family (Attack)***

(89) **Plaintiff John Doe 32** was a citizen of the United States and a member of the United States armed forces when injured while serving in Iraq.

(90) As a result of the attack, John Doe 32 was killed and/or wounded in the attack, and as a result, suffered wrongful death and/or suffered significant and permanent physical and psychological injuries and has past and future noneconomic damages, including severe pain and suffering and loss of enjoyment of life.

(91) The attack also killed a person who received fatal injuries from the attack.

(92) On information and belief, the attack was committed by terrorists who received material support and resources from Defendants as alleged herein.

(93) On information and belief, the terrorists deliberately attacked with the intent to kill or cause serious bodily injury. Because the attack unlawfully killed a person and was not authorized by a judgment pronounced by a regularly constituted court, the attack constituted an act of extrajudicial killing.

(94) Plaintiff John Doe 32 has relatives who were at all relevant times, nationals of the United States.

(95) As a result of the attack and John Doe 32's injuries, John Doe 32 endured excruciating physical pain and suffering, wrongful death, and other recoverable damages, and/or experienced severe physical pain and suffering, emotional distress, and other damages.

(96) As a result of the attack and John Doe 32's injuries, each relative of the Doe 32 Family as listed herein experienced severe mental anguish and emotional pain and suffering resulting from John Doe 32's injuries and/or death.

### *(74) **The John Doe 33 Family (Attack)***

(97) **Plaintiff John Doe 33** was a citizen of the United States and a member of the United States armed forces when injured while serving in Iraq.

(98) As a result of the attack, John Doe 33 was killed and/or wounded in the attack, and as a result, suffered wrongful death and/or suffered significant and permanent physical and psychological injuries and has past and future noneconomic damages, including severe pain and suffering and loss of enjoyment of life.

(99) The attack also killed a person who received fatal injuries from the attack.

(100) On information and belief, the attack was committed by terrorists who received material support and resources from Defendants as alleged herein.

(101) On information and belief, the terrorists deliberately attacked with the intent to kill or cause serious bodily injury. Because the attack unlawfully killed a person and was not authorized by a judgment pronounced by a regularly constituted court, the attack constituted an act of extrajudicial killing.

(102) Plaintiff John Doe 33 has relatives who were at all relevant times, nationals of the United States.

(103) As a result of the attack and John Doe 33's injuries, John Doe 33 endured excruciating physical pain and suffering, wrongful death, and other recoverable damages, and/or experienced severe physical pain and suffering, emotional distress, and other damages.

(104) As a result of the attack and John Doe 33's injuries, each relative of the Doe 33 Family as listed herein experienced severe mental anguish and emotional pain and suffering resulting from John Doe 33's injuries and/or death.

*(75)* ***The John Doe 34 Family (Attack)***

(49) **Plaintiff John Doe 34** was a citizen of the United States and a member of the United States armed forces when injured while serving in Iraq.

(50) As a result of the attack, John Doe 34 was killed and/or wounded in the attack, and as a result, suffered wrongful death and/or suffered significant and permanent physical and psychological injuries and has past and future noneconomic damages, including severe pain and suffering and loss of enjoyment of life.

(51) The attack also killed a person who received fatal injuries from the attack.

(52) On information and belief, the attack was committed by terrorists who received material support and resources from Defendants as alleged herein.

(53) On information and belief, the terrorists deliberately attacked with the intent to kill or cause serious bodily injury. Because the attack unlawfully killed a person and was not authorized by a judgment pronounced by a regularly constituted court, the attack constituted an act of extrajudicial killing.

(54) Plaintiff John Doe 34 has relatives who were at all relevant times, nationals of the United States.

(55) As a result of the attack and John Doe 34's injuries, John Doe 34 endured excruciating physical pain and suffering, wrongful death, and other recoverable damages, and/or experienced severe physical pain and suffering, emotional distress, and other damages.

(56) As a result of the attack and John Doe 34's injuries, each relative of the Doe 34 Family as listed herein experienced severe mental anguish and emotional pain and suffering resulting from John Doe 34's injuries and/or death.

**Y. Terrorist Attacks Committed by the SMOs**

*(1)* ***The William Barrera Family (The August 16, 2004, Attack)***

(1) **Plaintiff William Barrera** was a citizen of the United States and a member of the United States Army when he was injured while serving in Iraq.

(2) On August 16, 2004, Mr. Barrera was serving as a dismounted SAW gunner with Charlie Company, 2-70 Armor, 1st Battalion, 41st Infantry Regiment, 3rd Brigade, 1st Armored Division in Sadr City, Iraq, when terrorists launched rocket-propelled-grenades at him and detonated IEDs on the Bradley Fighting Vehicle in which he was traveling, and then battered him with small-arms fire.

(3) As a result of the attack, Mr. Barrera sustained a devastating traumatic brain injury and other physical and psychological injuries.

(4) The explosion also killed United States servicemember David Heath, who sustained fatal injuries during the attack.

(5) On information and belief, the attack was committed by JAM, who received material support and resources from Defendants as alleged herein.

(6) On information and belief, the terrorists deliberately launched rocket-propelled-grenades at, planted and detonated IEDs on, and targeted small arms fire at United States military personnel with the intent to kill or cause serious bodily injury. Because the attack unlawfully killed a United States servicemember and was not authorized by a judgment pronounced by a regularly constituted court, the attack constituted an act of extrajudicial killing.

(7) Defendant Iran was previously found civilly liable for the August 16, 2004, terrorist attack by this Court. *See* *Lee et al., v. Islamic Republic of Iran*, No. 19-cv-00830 (D.D.C. May 6, 2026).

(8) **Plaintiff Jessica Barrera** is the wife of Mr. Barrera. She is, and was at all relevant times, a national of the United States.

(9) **Plaintiff Martha Arreola** is the mother of Mr. Barrera. She is, and was at all relevant times, a national of the United States.

(10) **Plaintiff Demetrio Barrera** is the father of Mr. Barrera. He is, and was at all relevant times, a national of the United States.

(11) As a result of the August 16, 2004, attack and Mr. Barrera's injuries, Mr. Barrera experienced severe physical pain and suffering, emotional distress, and other damages.

(12) As a result of the August 16, 2004, attack and Mr. Barrera's injuries, each member of the Barrera Family as listed herein experienced severe mental anguish and emotional pain and suffering resulting from Mr. Barrera's injuries.

*(2)* ***The Joseph Cherry Family (The December 20, 2006, Attack)***

(1) **Plaintiff Joseph Cherry** was a citizen of the United States and a member of the United States Army when he was injured while serving in Iraq.

(2) On December 20, 2006, Mr. Cherry was serving as a radio telephone operator with 4th Brigade Combat Team (Airborne), 25th Infantry Division, on a convoy along Route Tampa in the Northern Babil Province of Iraq, when an IED planted by terrorists detonated on the convoy in which Mr. Cherry was traveling.

(3) As a result of the attack, Mr. Cherry sustained relentless and painful tinnitus and other physical and psychological injuries.

(4) The explosion also killed United States servicemember Jacob McMillan, who sustained fatal injuries during the attack.

(5) On information and belief, the attack was committed by Special Groups, who received material support and resources from Defendants as alleged herein.

(6) On information and belief, the terrorists deliberately planted and detonated a powerful IED on United States military vehicles with the intent to kill or cause serious bodily injury. Because the attack unlawfully killed a United States servicemember and was not authorized by

a judgment pronounced by a regularly constituted court, the attack constituted an act of extrajudicial killing.

(7) **Plaintiff Cindy Cherry** is the wife of Mr. Cherry. She is, and was at all relevant times, a national of the United States.

(8) As a result of the December 20, 2006, attack and Mr. Cherry's injuries, Mr. Cherry experienced severe physical pain and suffering, emotional distress, and other damages.

(9) As a result of the December 20, 2006, attack and Mr. Cherry's injuries, Ms. Cherry experienced severe mental anguish and emotional pain and suffering resulting from Mr. Cherry's injuries.

### *(3) **The Jonathan Chia Family (The May 17, 2007, Attack)***

(1) **Plaintiff Jonathan Chia** was a citizen of the United States and a member of the United States Army when he was injured while serving in Iraq.

(2) On May 17, 2007, Mr. Chia was serving as part of a Quick Reaction Force (QRF) with 2nd Battalion, 23rd Infantry Regiment, conducting operations in Baghdad, Iraq, when a command-wire IED planted by terrorists exploded on a Stryker in his convoy.

(3) As a result of the attack, Mr. Chia sustained severe and life-changing injuries, including a traumatic brain injury, debilitating post-traumatic stress disorder, and other physical and psychological injuries.

(4) The catastrophic explosion also murdered United States servicemember Aaron Gautier, who sustained fatal injuries during the attack.

(5) On information and belief, the attack was committed by al-Qaeda, AQI, and/or AQI-affiliated terrorist operatives, who received material support and resources from Defendants as alleged herein.

(6) On information and belief, the terrorists maliciously planted and detonated a command-wire IED at a United States military vehicle with the intent to kill or cause serious bodily injury.

Because the attack unlawfully killed a United States servicemember and was not authorized by a judgment pronounced by a regularly constituted court, the attack constituted an act of extrajudicial killing.

(7) **Plaintiff Dominick Chia** is the son of Mr. Chia. He is, and was at all relevant times, a national of the United States.

(8) **Plaintiff Diane Chia** is the mother of Mr. Chia. She is, and was at all relevant times, a national of the United States.

(9) **Plaintiff Carlos Chia** is the father of Mr. Chia.

(10) As a result of the May 17, 2007, attack and Mr. Chia's injuries, Mr. Chia experienced severe physical pain and suffering, emotional distress, and other damages.

(11) As a result of the May 17, 2007, attack, each member of the Chia Family as listed herein experienced severe mental anguish and emotional pain and suffering resulting from Mr. Chia's injuries.

*(4)* ***The Garth Dalson Family (The November 20, 2007, Attack)***

(1) **Plaintiff Garth Dalson** was a citizen of the United States and a member of the United States Army when he was injured while serving in Iraq.

(2) On November 20, 2007, Mr. Dalson was serving as ground patrol with 1st Battalion, 8th Cavalry Regiment, 1st Cavalry Division in Baghdad, Iraq, when an IED planted by terrorists blasted his convoy.

(3) As a result of the attack, Mr. Dalson developed severe and life-changing post-traumatic stress disorder and sustained other physical and psychological injuries.

(4) The explosion also killed United States servicemember Alfred Paredez, Jr. and interpreter Ahmed Nazraelobadi, who sustained fatal injuries during the attack.

(5) On information and belief, the attack was committed by KH who received material support and resources from Defendants as alleged herein.

(6) On information and belief, the terrorists deliberately planted and detonated an IED aimed at a United States military vehicle with the intent to kill or cause serious bodily injury. Because the attack unlawfully killed a United States servicemember and an interpreter and was not authorized by a judgment pronounced by a regularly constituted court, the attack constituted an act of extrajudicial killing.

(7) **Plaintiff Kathy Dalson** is the mother of Mr. Dalson. She is, and was at all relevant times, a national of the United States.

(8) **Plaintiff Richard Dalson** is the father of Mr. Dalson. He is, and was at all relevant times, a national of the United States.

(9) As a result of the November 20, 2007, attack and Mr. Dalson's injuries, Mr. Dalson severe physical pain and suffering, emotional distress, and other damages.

(10) As a result of the November 20, 2007, attack and Mr. Dalson's injuries, each member of the Dalson Family as detailed herein experienced severe mental anguish and emotional pain and suffering resulting from Mr. Dalson's injuries.

### *(5) __The Gloria Downey Family (The July 10, 2007, Attack)__*

(1) **Plaintiff Gloria Downey** was a citizen of the United States and a member of the United States Air Force when she was injured while serving in Iraq.

(2) On July 10, 2007, Ms. Downey was serving as a judge advocate with the Multi-National Force Iraq task force in the Green Zone of Baghdad, Iraq, when terrorists attacked the United States Embassy and surrounding areas with persistent and lethal mortar rounds and rockets.

(3) As a result of the attack, Ms. Downey sustained relentless and painful tinnitus, developed severe and life-changing post-traumatic stress disorder, and sustained other physical and psychological injuries.

(4) The attack also killed United States servicemember Maria Ortiz, who sustained fatal injuries during the attack.

(5) On information and belief, the attack was committed by JAM, who received material support and resources from Defendants as alleged herein.

(6) On information and belief, the terrorists deliberately pelted mortar rounds at the United States Embassy and surrounding areas within the Green Zone with the intent to kill or cause serious bodily injury. Because the attack unlawfully killed a United States servicemember and was not authorized by a judgment pronounced by a regularly constituted court, the attack constituted an act of extrajudicial killing.

(7) As a result of the July 10, 2007, attack and Ms. Downey's injuries, Ms. Downey experienced severe physical pain and suffering, emotional distress, and other damages.

*(6)* ***The Stacy Hendrix Family (The April 19, 2005, Attack)***

(1) **Plaintiff Stacy Hendrix** was a citizen of the United States and a member of the United States Army when he was injured while serving in Iraq.

(2) On April 19, 2005, Mr. Hendrix was serving as a truck commander when traveling in a Humvee with 2nd Battalion, 114th Artillery in Iskandariyah, Iraq, when an IED planted by terrorists detonated on Mr. Hendrix's convoy.

(3) As a result of the attack, Mr. Hendrix sustained a devastating traumatic brain injury and painful and relentless tinnitus, developed severe and life-changing post-traumatic stress disorder, and sustained other physical and psychological injuries.

(4) The explosion also killed United States servicemember Tommy Little, who died on May 2, 2005, from fatal injuries sustained during the attack.

(5) On information and belief, the attack was committed by Special Groups, who received material support and resources from Defendants as alleged herein.

(6) On information and belief, the terrorists deliberately planted and detonated the IED at a United States military convoy with the intent to kill or cause serious bodily injury. Because the attack unlawfully murdered a United States servicemember and was not authorized by a

judgment pronounced by a regularly constituted court, the attack constituted an act of extrajudicial killing.

(7) **Plaintiff Mary Hendrix** is the wife of Mr. Hendrix. She is, and was at all relevant times, a national of the United States.

(8) **Plaintiff Deanna Deloach** is the stepdaughter of Mr. Hendrix. She is, and was at all relevant times, a national of the United States.

(9) **Plaintiff Denisa Deloach** is the stepdaughter of Mr. Hendrix. She is, and was at all relevant times, a national of the United States.

(10) As a result of the April 19, 2005, attack and Mr. Hendrix's injuries, Mr. Hendrix experienced severe physical pain and suffering, emotional distress, and other damages.

(11) As a result of the April 19, 2005, attack and Mr. Hendrix's injuries, each member of the Hendrix Family as listed herein experienced severe mental anguish and emotional pain and suffering resulting from Mr. Hendrix's injuries.

### *(7) **The Joseph James Family (The April 8, 2008, Attack)***

(1) **Plaintiff Joseph James** was a citizen of the United States and a member of the United States Army when he was injured while serving in Iraq.

(2) On April 8, 2008, Mr. James was serving as gunner with 3rd Brigade Combat Team, 4th Infantry Division, on the outskirts of Sadr City, Baghdad, Iraq, when his vehicle was blasted by an IED, and then attacked a second time by another IED moments later.

(3) As a result of the attack, Mr. James sustained horrific bilateral severing of his legs and gruesome shrapnel injuries, developed severe and life-changing post-traumatic stress disorder, and other physical and psychological injuries.

(4) The explosion also killed United States servicemember Mark Rosenberg, who sustained fatal injuries during the attack.

(5) On information and belief, the attack was committed by AAH, who received material support and resources from Defendants as alleged herein.

(6) On information and belief, the terrorists deliberately planted an IED on the route of a United States military vehicle with the intent to kill or cause serious bodily injury. Because the attack unlawfully killed a United States servicemember and was not authorized by a judgment pronounced by a regularly constituted court, the attack constituted an act of extrajudicial killing.

(7) **Plaintiff Jarin James** is the wife of Mr. James. She is, and was at all relevant times, a national of the United States.

(8) **Plaintiff Rachel James** is the daughter of Mr. James. She is, and was at all relevant times, a national of the United States.

(9) **Plaintiff Sally Adams** is the mother of Mr. James. She is, and was at all relevant times, a national of the United States.

(10) **Plaintiff Mark James** is the father of Mr. James. He is, and was at all relevant times, a national of the United States.

(11) **Plaintiff Carrie Nunez** is the sister of Mr. James. She is, and was at all relevant times, a national of the United States.

(12) **Plaintiff Jason McCorkle** is the brother of Mr. James. He is, and was at all relevant times, a national of the United States.

(13) **Plaintiff Kelsey Park** is the sister of Mr. James. She is, and was at all relevant times, a national of the United States.

(14) As a result of the April 8, 2008, attack and Mr. James's injuries, Mr. James experienced severe physical pain and suffering, emotional distress, and other damages.

(15) As a result of the April 8, 2008, attack and Mr. James's injuries, each member of the James Family as listed herein experienced severe mental anguish and emotional pain and suffering resulting from Mr. James's injuries.

*(8)* ***The Adolfo Martinez-Morales Family (The September 6, 2005, Attack)***

(1) **Plaintifff Adolfo Martinez-Morales** was a citizen of the United States and a member of the United States Army when he was injured while serving in Iraq.

(2) On September 6, 2005, Mr. Martinez-Morales was a passenger in a Humvee vehicle with Headquarters and Headquarters Company, 3D Combat Support Battalion, in Taji, Iraq, when terrorists detonated an EFP on the vehicle.

(3) As a result of the attack, Mr. Martinez-Morales sustained severe and life-changing injuries, including a traumatic brain injury, post-traumatic stress disorder, persistent tinnitus, and other physical and psychological injuries.

(4) The attack also savagely killed United States servicemembers Franklin Vilorio and Jude Jonaus, both of whom sustained fatal injuries from the attack.

(5) On information and belief, the attack was committed by Special Groups, who received material support and resources from Defendants as alleged herein.

(6) On information and belief, the terrorists deliberately blasted an EFP at a United States military patrol with the intent to brutally kill or cause bodily injury. Because the cruel attack unlawfully killed United States servicemembers and was not authorized by a judgment pronounced by a regularly constituted court, the attack constituted an act of extrajudicial killing.

(7) As a result of the September 6, 2005, attack and Mr. Martinez- Morales's injuries, Mr. Martinez-Morales experienced severe physical pain and suffering, emotional distress, and other damages.

(9) ***<u>The Noe Santos Dilone Family (The September 6, 2005, Attack)</u>***

(1) **Plaintiff Noe Santos Dilone** was a member of the United States Army when he was injured while serving in Iraq.

(2) On September 6, 2005, Mr. Santos Dilone was serving as the gunner in a Humvee vehicle with A Company, 3D Combat Support Battalion, in Taji, Iraq, when terrorists detonated an EFP on the vehicle.

(3) As a result of the attack, Mr. Santos Dilone sustained severe and life-changing injuries, including the severing of his left leg at the hip, a traumatic brain injury, suffocating post-traumatic stress disorder, persistent tinnitus, and other physical and psychological injuries.

(4) The attack also savagely killed United States servicemembers Franklin Vilorio and Jude Jonaus, both of whom sustained fatal injuries from the attack.

(5) On information and belief, the attack was committed by Special Groups, who received material support and resources from Defendants as alleged herein.

(6) On information and belief, the terrorists deliberately blasted an EFP at a United States military patrol with the intent to mercilessly kill or cause bodily injury. Because the brutal attack unlawfully killed United States servicemembers and was not authorized by a judgment pronounced by a regularly constituted court, the attack constituted an act of extrajudicial killing.

(7) **Plaintiff Rosmery Dilone de Santos** is the mother of Mr. Santos Dilone. She is, and was at all relevant times, a national of the United States.

(8) **Plaintiff Stefany Santos** is the sister of Mr. Santos Dilone. She is, and was at all relevant times, a national of the United States.

(9) **Plaintiff Gabriel Santos** is the brother of Mr. Santos Dilone. He is, and was at all relevant times, a national of the United States.

(10) As a result of the September 6, 2005, attack and Mr. Santos Dilone's injuries, Mr. Santos Dilone experienced severe physical pain and suffering, emotional distress, and other damages.

(11) As a result of the September 6, 2005, attack, each member of the Santos Dilone Family as listed herein experienced severe mental anguish and emotional pain and suffering resulting from Mr. Santos Dilone's injuries.

### *(10) The Brandon Sapp Family (The August 15, 2004, Attack)*

(1) **Plaintiff Estate of Brandon Sapp** was a citizen of the United States and a member of the United States Army when he was killed while serving in Iraq.

(2) On August 15, 2004, Mr. Sapp was serving as the driver of an M2 Bradley Fighting Vehicle on patrol with 2nd Battalion, 7th Cavalry Regiment, 1st Cavalry Division in Najaf, Iraq, when an IED planted by terrorists detonated on the vehicle in which he was traveling.

(3) As a result of the attack, Mr. Sapp suffered critical injuries and subsequently died from his injuries.

(4) On information and belief, the attack was committed by JAM who received material support and resources from Defendants as alleged herein.

(5) On information and belief, the terrorists deliberately planted and detonated an IED on a United States military vehicle with the intent to kill or cause serious bodily injury. Because the attack unlawfully killed a United States servicemember and was not authorized by a judgment pronounced by a regularly constituted court, the attack constituted an act of extrajudicial killing.

(6) Defendant Iran was previously found civilly liable for the August 15, 2004, terrorist attack by this Court. *See Lee et al., v. Islamic Republic of Iran*, No. 19-cv-00830 (D.D.C. May 6, 2026).

(7) **Plaintiff John Sapp** is the father of Mr. Sapp. He is, and was at all relevant times, a national of the United States.

(8) **Plaintiff Heidi Sapp** is the stepmother of Mr. Sapp. She is, and was at all relevant times, a national of the United States.

(9) **Plaintiff Christopher Sapp** is the brother of Mr. Sapp. He is, and was at all relevant times, a national of the United States.

(10) **Plaintiff Hailee Scheirer** is the sister of Mr. Sapp. She is, and was at all relevant times, a national of the United States.

(11) **Plaintiff Harrison Sapp** is the brother of Mr. Sapp. He is, and was at all relevant times, a national of the United States.

(12) **Plaintiff Shawn Sapp** is the brother of Mr. Sapp. He is, and was at all relevant times, a national of the United States.

(13) As a result of the August 15, 2004, attack and Mr. Sapp's death, Mr. Sapp experienced severe physical pain and suffering, wrongful death, and other recoverable damages.

(14) As a result of the August 15, 2004, attack and Mr. Sapp's death, each member of the Sapp family as listed herein experienced severe mental anguish and emotional pain and suffering, and the loss of Mr. Sapp's society, companionship, comfort, and counsel.

#### *(11) **The Darrel Sawyer, Jr. Family (The September 11, 2007, Attack)***

(1) **Plaintiff Darrel Sawyer, Jr.** was a citizen of the United States and a member of the United States Army when he was injured while serving in Iraq.

(2) On September 11, 2007, Mr. Sawyer, Jr. was serving with 1st Cavalry Division in Baghdad, Iraq, when terrorists ferociously fired rockets at Victory Base Complex.

(3) As a result of the attack, Mr. Sawyer, Jr. developed severe and life-changing post-traumatic stress disorder and other physical and psychological injuries.

(4) The explosions also brutally killed an Iraqi civilian, who sustained fatal injuries during the attack.

(5) On information and belief, the attack was committed by Special Groups, who received material support and resources from Defendants as alleged herein.

(6) On information and belief, the terrorists ruthlessly fired rockets at a United States military base with the intent to kill or cause serious bodily injury. Because the attack unlawfully killed an Iraqi civilian and was not authorized by a judgment pronounced by a regularly constituted court, the attack constituted an act of extrajudicial killing.

(7) As a result of the September 11, 2007, attack and Mr. Sawyer, Jr.'s injuries, Mr. Sawyer, Jr. experienced severe physical pain and suffering, emotional distress, and other damages.

### *(12) <u>The Kevan Sipla Family (The March 27, 2008, Attack)</u>*

(1) **Plaintiff Kevan Sipla** was a citizen of the United States and a member of the United States Army when he was injured while serving in Iraq.

(2) On March 27, 2008, Mr. Sipla was serving as an infantryman with 1st Squadron, 2nd Cavalry Regiment in Sadr City, Iraq, when his unit was suddenly struck by an IED planted by terrorists followed by a vicious attack with small-arms fire.

(3) As a result of the attack, Mr. Sipla sustained severe and life-changing injuries, including a traumatic brain injury, debilitating post-traumatic stress disorder, tinnitus, and other physical and psychological injuries.

(4) The explosion also murdered United States servicemember Joshua Molina, who sustained fatal injuries during the attack.

(5) On information and belief, the attack was committed by Special Groups, who received material support and resources from Defendants as alleged herein.

(6) On information and belief, the terrorists intentionally planted and detonated an IED on United States military personnel and brutally attacked them with small arms fire with the intent to kill or cause serious bodily injury. Because the attack unlawfully killed a United States

servicemember and was not authorized by a judgment pronounced by a regularly constituted court, the attack constituted an act of extrajudicial killing.

(7) **Plaintiff Matthew Sipla** is the brother of Mr. Sipla. He is, and was at all relevant times, a national of the United States.

(8) As a result of the March 27, 2008, attack and Mr. Sipla's injuries, Mr. Sipla experienced severe physical pain and suffering, emotional distress, and other damages.

(9) As a result of the March 27, 2008, attack, Mr. Matthew Sipla experienced severe mental anguish and emotional pain and suffering resulting from Mr. Sipla's injuries.

### *(13) The Robert Skinner Family (The August 19, 2009, Attack)*

(1) **Plaintiff Robert Skinner** was a United States government contractor when he was injured while serving in Iraq.

(2) On August 19, 2009, Mr. Skinner was on base at Camp Echo in Ad Diwaniyah, Iraq, when terrorists launched rocket fire at his quarters and blasted the building.

(3) As a result of the attack, Mr. Skinner sustained severe and life-changing injuries, including post-traumatic stress disorder and other physical and psychological injuries.

(4) The explosion also savagely killed United States servicemember William Vanosdol, who sustained fatal injuries during the attack.

(5) On information and belief, the attack was committed by Special Groups, who received material support and resources from Defendants as alleged herein.

(6) On information and belief, the terrorists deliberately fired rockets at a United States coalition military base with the intent to brutally kill or cause serious bodily injury. Because the cruel attack unlawfully killed a United States servicemember and was not authorized by a judgment pronounced by a regularly constituted court, the attack constituted an act of extrajudicial killing.

(7) As a result of the August 19, 2009, attack and Mr. Skinner's injuries, Mr. Skinner experienced severe physical pain and suffering, emotional distress, and other damages.

### *(14)* ***The John Doe 35 Family (Attack)***

(1) **Plaintiff John Doe 35** was a citizen of the United States and a member of the United States armed forces when injured while serving in Iraq.

(2) As a result of the attack, John Doe 35 was killed and/or wounded in the attack, and as a result, suffered wrongful death and/or suffered significant and permanent physical and psychological injuries and has past and future noneconomic damages, including severe pain and suffering and loss of enjoyment of life.

(3) The attack also killed a person who received fatal injuries from the attack.

(4) On information and belief, the attack was committed by terrorists who received material support and resources from Defendants as alleged herein.

(5) On information and belief, the terrorists deliberately attacked with the intent to kill or cause serious bodily injury. Because the attack unlawfully killed a person and was not authorized by a judgment pronounced by a regularly constituted court, the attack constituted an act of extrajudicial killing.

(6) Plaintiff John Doe 35 has relatives who were at all relevant times, nationals of the United States.

(7) As a result of the attack and John Doe 35's injuries, John Doe 35 endured excruciating physical pain and suffering, wrongful death, and other recoverable damages, and/or experienced severe physical pain and suffering, emotional distress, and other damages.

(8) As a result of the attack and John Doe 35's injuries, each relative of the Doe 35 Family as listed herein experienced severe mental anguish and emotional pain and suffering resulting from John Doe 35's injuries and/or death.

*(15)* ***The John Doe 36 Family (Attack)***

(9) **Plaintiff John Doe 36** was a citizen of the United States and a member of the United States armed forces when injured while serving in Iraq.

(10) As a result of the attack, John Doe 36 was killed and/or wounded in the attack, and as a result, suffered wrongful death and/or suffered significant and permanent physical and psychological injuries and has past and future noneconomic damages, including severe pain and suffering and loss of enjoyment of life.

(11) The attack also killed a person who received fatal injuries from the attack.

(12) On information and belief, the attack was committed by terrorists who received material support and resources from Defendants as alleged herein.

(13) On information and belief, the terrorists deliberately attacked with the intent to kill or cause serious bodily injury. Because the attack unlawfully killed a person and was not authorized by a judgment pronounced by a regularly constituted court, the attack constituted an act of extrajudicial killing.

(14) Plaintiff John Doe 36 has relatives who were at all relevant times, nationals of the United States.

(15) As a result of the attack and John Doe 36's injuries, John Doe 36 endured excruciating physical pain and suffering, wrongful death, and other recoverable damages, and/or experienced severe physical pain and suffering, emotional distress, and other damages.

(16) As a result of the attack and John Doe 36's injuries, each relative of the Doe 36 Family as listed herein experienced severe mental anguish and emotional pain and suffering resulting from John Doe 36's injuries and/or death.

*(16)* ***The John Doe 37 Family (Attack)***

(17) **Plaintiff John Doe 37** was a citizen of the United States and a member of the United States armed forces when injured while serving in Iraq.

(18) As a result of the attack, John Doe 37 was killed and/or wounded in the attack, and as a result, suffered wrongful death and/or suffered significant and permanent physical and psychological injuries and has past and future noneconomic damages, including severe pain and suffering and loss of enjoyment of life.

(19) The attack also killed a person who received fatal injuries from the attack.

(20) On information and belief, the attack was committed by terrorists who received material support and resources from Defendants as alleged herein.

(21) On information and belief, the terrorists deliberately attacked with the intent to kill or cause serious bodily injury. Because the attack unlawfully killed a person and was not authorized by a judgment pronounced by a regularly constituted court, the attack constituted an act of extrajudicial killing.

(22) Plaintiff John Doe 37 has relatives who were at all relevant times, nationals of the United States.

(23) As a result of the attack and John Doe 37's injuries, John Doe 37 endured excruciating physical pain and suffering, wrongful death, and other recoverable damages, and/or experienced severe physical pain and suffering, emotional distress, and other damages.

(24) As a result of the attack and John Doe 37's injuries, each relative of the Doe 37 Family as listed herein experienced severe mental anguish and emotional pain and suffering resulting from John Doe 37's injuries and/or death.

### *(17)* ***<u>The John Doe 38 Family (Attack)</u>***

(25) **Plaintiff John Doe 38** was a citizen of the United States and a member of the United States armed forces when injured while serving in Iraq.

(26) As a result of the attack, John Doe 38 was killed and/or wounded in the attack, and as a result, suffered wrongful death and/or suffered significant and permanent physical and

psychological injuries and has past and future noneconomic damages, including severe pain and suffering and loss of enjoyment of life.

(27) The attack also killed a person who received fatal injuries from the attack.

(28) On information and belief, the attack was committed by terrorists who received material support and resources from Defendants as alleged herein.

(29) On information and belief, the terrorists deliberately attacked with the intent to kill or cause serious bodily injury. Because the attack unlawfully killed a person and was not authorized by a judgment pronounced by a regularly constituted court, the attack constituted an act of extrajudicial killing.

(30) Plaintiff John Doe 38 has relatives who were at all relevant times, nationals of the United States.

(31) As a result of the attack and John Doe 38's injuries, John Doe 38 endured excruciating physical pain and suffering, wrongful death, and other recoverable damages, and/or experienced severe physical pain and suffering, emotional distress, and other damages.

(32) As a result of the attack and John Doe 38's injuries, each relative of the Doe 38 Family as listed herein experienced severe mental anguish and emotional pain and suffering resulting from John Doe 38's injuries and/or death.

*(18)* ***The John Doe 39 Family (Attack)***

(33) **Plaintiff John Doe 39** was a citizen of the United States and a member of the United States armed forces when injured while serving in Iraq.

(34) As a result of the attack, John Doe 39 was killed and/or wounded in the attack, and as a result, suffered wrongful death and/or suffered significant and permanent physical and psychological injuries and has past and future noneconomic damages, including severe pain and suffering and loss of enjoyment of life.

(35) The attack also killed a person who received fatal injuries from the attack.

(36) On information and belief, the attack was committed by terrorists who received material support and resources from Defendants as alleged herein.

(37) On information and belief, the terrorists deliberately attacked with the intent to kill or cause serious bodily injury. Because the attack unlawfully killed a person and was not authorized by a judgment pronounced by a regularly constituted court, the attack constituted an act of extrajudicial killing.

(38) Plaintiff John Doe 39 has relatives who were at all relevant times, nationals of the United States.

(39) As a result of the attack and John Doe 39's injuries, John Doe 39 endured excruciating physical pain and suffering, wrongful death, and other recoverable damages, and/or experienced severe physical pain and suffering, emotional distress, and other damages.

(40) As a result of the attack and John Doe 39's injuries, each relative of the Doe 39 Family as listed herein experienced severe mental anguish and emotional pain and suffering resulting from John Doe 39's injuries and/or death.

### *(19)* ***The John Doe 40 Family (Attack)***

(41) **Plaintiff John Doe 40** was a citizen of the United States and a member of the United States armed forces when injured while serving in Iraq.

(42) As a result of the attack, John Doe 40 was killed and/or wounded in the attack, and as a result, suffered wrongful death and/or suffered significant and permanent physical and psychological injuries and has past and future noneconomic damages, including severe pain and suffering and loss of enjoyment of life.

(43) The attack also killed a person who received fatal injuries from the attack.

(44) On information and belief, the attack was committed by terrorists who received material support and resources from Defendants as alleged herein.

(45) On information and belief, the terrorists deliberately attacked with the intent to kill or cause serious bodily injury. Because the attack unlawfully killed a person and was not authorized by a judgment pronounced by a regularly constituted court, the attack constituted an act of extrajudicial killing.

(46) Plaintiff John Doe 40 has relatives who were at all relevant times, nationals of the United States.

(47) As a result of the attack and John Doe 40's injuries, John Doe 40 endured excruciating physical pain and suffering, wrongful death, and other recoverable damages, and/or experienced severe physical pain and suffering, emotional distress, and other damages.

(48) As a result of the attack and John Doe 40's injuries, each relative of the Doe 40 Family as listed herein experienced severe mental anguish and emotional pain and suffering resulting from John Doe 40's injuries and/or death.

### *(20) **<u>The John Doe 41 Family (Attack)</u>***

(49) **Plaintiff John Doe 41** was a citizen of the United States and a member of the United States armed forces when injured while serving in Iraq.

(50) As a result of the attack, John Doe 41 was killed and/or wounded in the attack, and as a result, suffered wrongful death and/or suffered significant and permanent physical and psychological injuries and has past and future noneconomic damages, including severe pain and suffering and loss of enjoyment of life.

(51) The attack also killed a person who received fatal injuries from the attack.

(52) On information and belief, the attack was committed by terrorists who received material support and resources from Defendants as alleged herein.

(53) On information and belief, the terrorists deliberately attacked with the intent to kill or cause serious bodily injury. Because the attack unlawfully killed a person and was not

authorized by a judgment pronounced by a regularly constituted court, the attack constituted an act of extrajudicial killing.

(54) Plaintiff John Doe 41 has relatives who were at all relevant times, nationals of the United States.

(55) As a result of the attack and John Doe 41's injuries, John Doe 41 endured excruciating physical pain and suffering, wrongful death, and other recoverable damages, and/or experienced severe physical pain and suffering, emotional distress, and other damages.

(56) As a result of the attack and John Doe 41's injuries, each relative of the Doe 41 Family as listed herein experienced severe mental anguish and emotional pain and suffering resulting from John Doe 41's injuries and/or death.

### *(21)* ***The John Doe 42 Family (Attack)***

(57) **Plaintiff John Doe 42** was a citizen of the United States and a member of the United States armed forces when injured while serving in Iraq.

(58) As a result of the attack, John Doe 42 was killed and/or wounded in the attack, and as a result, suffered wrongful death and/or suffered significant and permanent physical and psychological injuries and has past and future noneconomic damages, including severe pain and suffering and loss of enjoyment of life.

(59) The attack also killed a person who received fatal injuries from the attack.

(60) On information and belief, the attack was committed by terrorists who received material support and resources from Defendants as alleged herein.

(61) On information and belief, the terrorists deliberately attacked with the intent to kill or cause serious bodily injury. Because the attack unlawfully killed a person and was not authorized by a judgment pronounced by a regularly constituted court, the attack constituted an act of extrajudicial killing.

(62) Plaintiff John Doe 42 has relatives who were at all relevant times, nationals of the United States.

(63) As a result of the attack and John Doe 42's injuries, John Doe 42 endured excruciating physical pain and suffering, wrongful death, and other recoverable damages, and/or experienced severe physical pain and suffering, emotional distress, and other damages.

(64) As a result of the attack and John Doe 42's injuries, each relative of the Doe 42 Family as listed herein experienced severe mental anguish and emotional pain and suffering resulting from John Doe 42's injuries and/or death.

*(22) **The John Doe 43 Family (Attack)***

(65) **Plaintiff John Doe 43** was a citizen of the United States and a member of the United States armed forces when injured while serving in Iraq.

(66) As a result of the attack, John Doe 43 was killed and/or wounded in the attack, and as a result, suffered wrongful death and/or suffered significant and permanent physical and psychological injuries and has past and future noneconomic damages, including severe pain and suffering and loss of enjoyment of life.

(67) The attack also killed a person who received fatal injuries from the attack.

(68) On information and belief, the attack was committed by terrorists who received material support and resources from Defendants as alleged herein.

(69) On information and belief, the terrorists deliberately attacked with the intent to kill or cause serious bodily injury. Because the attack unlawfully killed a person and was not authorized by a judgment pronounced by a regularly constituted court, the attack constituted an act of extrajudicial killing.

(70) Plaintiff John Doe 43 has relatives who were at all relevant times, nationals of the United States.

(71) As a result of the attack and John Doe 43's injuries, John Doe 43 endured excruciating physical pain and suffering, wrongful death, and other recoverable damages, and/or experienced severe physical pain and suffering, emotional distress, and other damages.

(72) As a result of the attack and John Doe 43's injuries, each relative of the Doe 43 Family as listed herein experienced severe mental anguish and emotional pain and suffering resulting from John Doe 43's injuries and/or death.

### *(23)* ***<u>The John Doe 44 Family (Attack)</u>***

(73) **Plaintiff John Doe 44** was a citizen of the United States and a member of the United States armed forces when injured while serving in Iraq.

(74) As a result of the attack, John Doe 44 was killed and/or wounded in the attack, and as a result, suffered wrongful death and/or suffered significant and permanent physical and psychological injuries and has past and future noneconomic damages, including severe pain and suffering and loss of enjoyment of life.

(75) The attack also killed a person who received fatal injuries from the attack.

(76) On information and belief, the attack was committed by terrorists who received material support and resources from Defendants as alleged herein.

(77) On information and belief, the terrorists deliberately attacked with the intent to kill or cause serious bodily injury. Because the attack unlawfully killed a person and was not authorized by a judgment pronounced by a regularly constituted court, the attack constituted an act of extrajudicial killing.

(78) Plaintiff John Doe 44 has relatives who were at all relevant times, nationals of the United States.

(79) As a result of the attack and John Doe 44's injuries, John Doe 44 endured excruciating physical pain and suffering, wrongful death, and other recoverable damages, and/or experienced severe physical pain and suffering, emotional distress, and other damages.

(80) As a result of the attack and John Doe 44's injuries, each relative of the Doe 44 Family as listed herein experienced severe mental anguish and emotional pain and suffering resulting from John Doe 44's injuries and/or death.

### *(24) **The John Doe 45 Family (Attack)***

(81) **Plaintiff John Doe 45** was a citizen of the United States and a member of the United States armed forces when injured while serving in Iraq.

(82) As a result of the attack, John Doe 45 was killed and/or wounded in the attack, and as a result, suffered wrongful death and/or suffered significant and permanent physical and psychological injuries and has past and future noneconomic damages, including severe pain and suffering and loss of enjoyment of life.

(83) The attack also killed a person who received fatal injuries from the attack.

(84) On information and belief, the attack was committed by terrorists who received material support and resources from Defendants as alleged herein.

(85) On information and belief, the terrorists deliberately attacked with the intent to kill or cause serious bodily injury. Because the attack unlawfully killed a person and was not authorized by a judgment pronounced by a regularly constituted court, the attack constituted an act of extrajudicial killing.

(86) Plaintiff John Doe 45 has relatives who were at all relevant times, nationals of the United States.

(87) As a result of the attack and John Doe 45's injuries, John Doe 45 endured excruciating physical pain and suffering, wrongful death, and other recoverable damages, and/or experienced severe physical pain and suffering, emotional distress, and other damages.

(88) As a result of the attack and John Doe 45's injuries, each relative of the Doe 45 Family as listed herein experienced severe mental anguish and emotional pain and suffering resulting from John Doe 45's injuries and/or death.

*(25)* ***The John Doe 46 Family (Attack)***

(89) **Plaintiff John Doe 46** was a citizen of the United States and a member of the United States armed forces when injured while serving in Iraq.

(90) As a result of the attack, John Doe 46 was killed and/or wounded in the attack, and as a result, suffered wrongful death and/or suffered significant and permanent physical and psychological injuries and has past and future noneconomic damages, including severe pain and suffering and loss of enjoyment of life.

(91) The attack also killed a person who received fatal injuries from the attack.

(92) On information and belief, the attack was committed by terrorists who received material support and resources from Defendants as alleged herein.

(93) On information and belief, the terrorists deliberately attacked with the intent to kill or cause serious bodily injury. Because the attack unlawfully killed a person and was not authorized by a judgment pronounced by a regularly constituted court, the attack constituted an act of extrajudicial killing.

(94) Plaintiff John Doe 46 has relatives who were at all relevant times, nationals of the United States.

(95) As a result of the attack and John Doe 46's injuries, John Doe 46 endured excruciating physical pain and suffering, wrongful death, and other recoverable damages, and/or experienced severe physical pain and suffering, emotional distress, and other damages.

(96) As a result of the attack and John Doe 46's injuries, each relative of the Doe 46 Family as listed herein experienced severe mental anguish and emotional pain and suffering resulting from John Doe 46's injuries and/or death.

*(26)* ***The John Doe 47 Family (Attack)***

(97) **Plaintiff John Doe 47** was a citizen of the United States and a member of the United States armed forces when injured while serving in Iraq.

(98) As a result of the attack, John Doe 47 was killed and/or wounded in the attack, and as a result, suffered wrongful death and/or suffered significant and permanent physical and psychological injuries and has past and future noneconomic damages, including severe pain and suffering and loss of enjoyment of life.

(99) The attack also killed a person who received fatal injuries from the attack.

(100) On information and belief, the attack was committed by terrorists who received material support and resources from Defendants as alleged herein.

(101) On information and belief, the terrorists deliberately attacked with the intent to kill or cause serious bodily injury. Because the attack unlawfully killed a person and was not authorized by a judgment pronounced by a regularly constituted court, the attack constituted an act of extrajudicial killing.

(102) Plaintiff John Doe 47 has relatives who were at all relevant times, nationals of the United States.

(103) As a result of the attack and John Doe 47's injuries, John Doe 47 endured excruciating physical pain and suffering, wrongful death, and other recoverable damages, and/or experienced severe physical pain and suffering, emotional distress, and other damages.

(104) As a result of the attack and John Doe 47's injuries, each relative of the Doe 47 Family as listed herein experienced severe mental anguish and emotional pain and suffering resulting from John Doe 47's injuries and/or death.

### *(27)* ***The John Doe 48 Family (Attack)***

(105) **Plaintiff John Doe 48** was a citizen of the United States and a member of the United States armed forces when injured while serving in Iraq.

(106) As a result of the attack, John Doe 48 was killed and/or wounded in the attack, and as a result, suffered wrongful death and/or suffered significant and permanent physical and

psychological injuries and has past and future noneconomic damages, including severe pain and suffering and loss of enjoyment of life.

(107) The attack also killed a person who received fatal injuries from the attack.

(108) On information and belief, the attack was committed by terrorists who received material support and resources from Defendants as alleged herein.

(109) On information and belief, the terrorists deliberately attacked with the intent to kill or cause serious bodily injury. Because the attack unlawfully killed a person and was not authorized by a judgment pronounced by a regularly constituted court, the attack constituted an act of extrajudicial killing.

(110) Plaintiff John Doe 48 has relatives who were at all relevant times, nationals of the United States.

(111) As a result of the attack and John Doe 48's injuries, John Doe 48 endured excruciating physical pain and suffering, wrongful death, and other recoverable damages, and/or experienced severe physical pain and suffering, emotional distress, and other damages.

(112) As a result of the attack and John Doe 48's injuries, each relative of the Doe 48 Family as listed herein experienced severe mental anguish and emotional pain and suffering resulting from John Doe 48's injuries and/or death.

### *(28)* ***<u>The John Doe 49 Family (Attack)</u>***

(113) **Plaintiff John Doe 49** was a citizen of the United States and a member of the United States armed forces when injured while serving in Iraq.

(114) As a result of the attack, John Doe 49 was killed and/or wounded in the attack, and as a result, suffered wrongful death and/or suffered significant and permanent physical and psychological injuries and has past and future noneconomic damages, including severe pain and suffering and loss of enjoyment of life.

(115) The attack also killed a person who received fatal injuries from the attack.

(116) On information and belief, the attack was committed by terrorists who received material support and resources from Defendants as alleged herein.

(117) On information and belief, the terrorists deliberately attacked with the intent to kill or cause serious bodily injury. Because the attack unlawfully killed a person and was not authorized by a judgment pronounced by a regularly constituted court, the attack constituted an act of extrajudicial killing.

(118) Plaintiff John Doe 49 has relatives who were at all relevant times, nationals of the United States.

(119) As a result of the attack and John Doe 49's injuries, John Doe 49 endured excruciating physical pain and suffering, wrongful death, and other recoverable damages, and/or experienced severe physical pain and suffering, emotional distress, and other damages.

(120) As a result of the attack and John Doe 49's injuries, each relative of the Doe 49 Family as listed herein experienced severe mental anguish and emotional pain and suffering resulting from John Doe 49's injuries and/or death.

### *(29)* ***The John Doe 50 Family (Attack)***

(121) **Plaintiff John Doe 50** was a citizen of the United States and a member of the United States armed forces when injured while serving in Iraq.

(122) As a result of the attack, John Doe 50 was killed and/or wounded in the attack, and as a result, suffered wrongful death and/or suffered significant and permanent physical and psychological injuries and has past and future noneconomic damages, including severe pain and suffering and loss of enjoyment of life.

(123) The attack also killed a person who received fatal injuries from the attack.

(124) On information and belief, the attack was committed by terrorists who received material support and resources from Defendants as alleged herein.

(125) On information and belief, the terrorists deliberately attacked with the intent to kill or cause serious bodily injury. Because the attack unlawfully killed a person and was not authorized by a judgment pronounced by a regularly constituted court, the attack constituted an act of extrajudicial killing.

(126) Plaintiff John Doe 50 has relatives who were at all relevant times, nationals of the United States.

(127) As a result of the attack and John Doe 50's injuries, John Doe 50 endured excruciating physical pain and suffering, wrongful death, and other recoverable damages, and/or experienced severe physical pain and suffering, emotional distress, and other damages.

(128) As a result of the attack and John Doe 50's injuries, each relative of the Doe 50 Family as listed herein experienced severe mental anguish and emotional pain and suffering resulting from John Doe 50's injuries and/or death.

### *(30) The John Doe 51 Family (Attack)*

(129) **Plaintiff John Doe 51** was a citizen of the United States and a member of the United States armed forces when injured while serving in Iraq.

(130) As a result of the attack, John Doe 51 was killed and/or wounded in the attack, and as a result, suffered wrongful death and/or suffered significant and permanent physical and psychological injuries and has past and future noneconomic damages, including severe pain and suffering and loss of enjoyment of life.

(131) The attack also killed a person who received fatal injuries from the attack.

(132) On information and belief, the attack was committed by terrorists who received material support and resources from Defendants as alleged herein.

(133) On information and belief, the terrorists deliberately attacked with the intent to kill or cause serious bodily injury. Because the attack unlawfully killed a person and was not

authorized by a judgment pronounced by a regularly constituted court, the attack constituted an act of extrajudicial killing.

(134) Plaintiff John Doe 51 has relatives who were at all relevant times, nationals of the United States.

(135) As a result of the attack and John Doe 51's injuries, John Doe 51 endured excruciating physical pain and suffering, wrongful death, and other recoverable damages, and/or experienced severe physical pain and suffering, emotional distress, and other damages.

(136) As a result of the attack and John Doe 51's injuries, each relative of the Doe 51 Family as listed herein experienced severe mental anguish and emotional pain and suffering resulting from John Doe 51's injuries and/or death.

*(31)* ***The John Doe 52 Family (Attack)***

(137) **Plaintiff John Doe 52** was a citizen of the United States and a member of the United States armed forces when injured while serving in Iraq.

(138) As a result of the attack, John Doe 52 was killed and/or wounded in the attack, and as a result, suffered wrongful death and/or suffered significant and permanent physical and psychological injuries and has past and future noneconomic damages, including severe pain and suffering and loss of enjoyment of life.

(139) The attack also killed a person who received fatal injuries from the attack.

(140) On information and belief, the attack was committed by terrorists who received material support and resources from Defendants as alleged herein.

(141) On information and belief, the terrorists deliberately attacked with the intent to kill or cause serious bodily injury. Because the attack unlawfully killed a person and was not authorized by a judgment pronounced by a regularly constituted court, the attack constituted an act of extrajudicial killing.

(142) Plaintiff John Doe 52 has relatives who were at all relevant times, nationals of the United States.

(143) As a result of the attack and John Doe 52's injuries, John Doe 52 endured excruciating physical pain and suffering, wrongful death, and other recoverable damages, and/or experienced severe physical pain and suffering, emotional distress, and other damages.

(144) As a result of the attack and John Doe 52's injuries, each relative of the Doe 52 Family as listed herein experienced severe mental anguish and emotional pain and suffering resulting from John Doe 52's injuries and/or death.

### *(32) **The John Doe 53 Family (Attack)***

(145) **Plaintiff John Doe 53** was a citizen of the United States and a member of the United States armed forces when injured while serving in Iraq.

(146) As a result of the attack, John Doe 53 was killed and/or wounded in the attack, and as a result, suffered wrongful death and/or suffered significant and permanent physical and psychological injuries and has past and future noneconomic damages, including severe pain and suffering and loss of enjoyment of life.

(147) The attack also killed a person who received fatal injuries from the attack.

(148) On information and belief, the attack was committed by terrorists who received material support and resources from Defendants as alleged herein.

(149) On information and belief, the terrorists deliberately attacked with the intent to kill or cause serious bodily injury. Because the attack unlawfully killed a person and was not authorized by a judgment pronounced by a regularly constituted court, the attack constituted an act of extrajudicial killing.

(150) Plaintiff John Doe 53 has relatives who were at all relevant times, nationals of the United States.

(151) As a result of the attack and John Doe 53's injuries, John Doe 53 endured excruciating physical pain and suffering, wrongful death, and other recoverable damages, and/or experienced severe physical pain and suffering, emotional distress, and other damages.

(152) As a result of the attack and John Doe 53's injuries, each relative of the Doe 53 Family as listed herein experienced severe mental anguish and emotional pain and suffering resulting from John Doe 53's injuries and/or death.

### *(33)* ***The John Doe 54 Family (Attack)***

(57) **Plaintiff John Doe 54** was a citizen of the United States and a member of the United States armed forces when injured while serving in Iraq.

(58) As a result of the attack, John Doe 54 was killed and/or wounded in the attack, and as a result, suffered wrongful death and/or suffered significant and permanent physical and psychological injuries and has past and future noneconomic damages, including severe pain and suffering and loss of enjoyment of life.

(59) The attack also killed a person who received fatal injuries from the attack.

(60) On information and belief, the attack was committed by terrorists who received material support and resources from Defendants as alleged herein.

(61) On information and belief, the terrorists deliberately attacked with the intent to kill or cause serious bodily injury. Because the attack unlawfully killed a person and was not authorized by a judgment pronounced by a regularly constituted court, the attack constituted an act of extrajudicial killing.

(62) Plaintiff John Doe 54 has relatives who were at all relevant times, nationals of the United States.

(63) As a result of the attack and John Doe 54's injuries, John Doe 54 endured excruciating physical pain and suffering, wrongful death, and other recoverable damages, and/or experienced severe physical pain and suffering, emotional distress, and other damages.

(64) As a result of the attack and John Doe 54's injuries, each relative of the Doe 54 Family as listed herein experienced severe mental anguish and emotional pain and suffering resulting from John Doe 54's injuries and/or death.

## CLAIMS FOR RELIEF

### COUNT I: ACTION FOR DAMAGES – GENERAL
### Against the Iran Defendants, Syria, and Assad, On Behalf of All Plaintiffs
### (Under 28 U.S.C. § 1605A(c))

254. Plaintiffs incorporate the preceding allegations by reference.

255. Each Plaintiff's claim arises from a Terrorist Attack in which that Plaintiff or the victim associated with the Plaintiff's claim was injured or killed. Each Terrorist Attack included at least one completed act of extrajudicial killing.

256. The STO or SMO identified in the corresponding attack-specific allegations committed the Terrorist Attack underlying each Plaintiff's claim.

257. Defendant Iran is, and was at all relevant times, a designated State Sponsor of Terrorism within the meaning of § 1605A(h)(6).

258. Defendants IRGC and MOIS are political subdivisions of Iran, and NIOC, Bank Markazi, Bank Melli, and Bank Saderat are agencies and instrumentalities of Iran and are treated as the State of Iran for purpose of bringing suit under 28 U.S.C. § 1603(a).

259. Defendant Syria was at all relevant times a designated State Sponsor of Terrorism within the meaning of § 1605A(h)(6) and remained so designated within the six-month period preceding the filing of this action.

260. During the Relevant Period, Assad was an official of Syria. Acting within the scope of his office as President of Syria, Assad sustained Syria's provision of material support or resources to AQI and Hezbollah through the personnel, foreign policy, and security decisions

alleged above. Assad is sued solely in his individual capacity, and Plaintiffs seek recovery against him personally rather than against Syria.

261. The Iran Defendants and Syria, acting directly or through their officials, employees, or agents acting within the scope of their offices, employment, or agency, provided material support or resources through the support chain applicable to the corresponding Terrorist Attack.

262. Each Defendant's respective provision of material support was a substantial factor in the sequence of events that led to the corresponding Terrorist Attacks, and Plaintiffs' resulting injuries were natural and reasonably foreseeable consequences of that support.

263. The Plaintiffs suffered severe harm, including personal injury, emotional distress, mental anguish, pain and suffering, loss of companionship and society, loss of solatium and consortium, and loss of services as a direct and proximate cause of the actions of the Defendants.

264. The conduct of the Iran Defendants, Syria, and Assad was criminal in nature, outrageous, extreme, wanton, willful, malicious, and constitutes a threat to the public warranting an award of punitive damages under 28 U.S.C. § 1605A.

265. The Iran Defendants, Syria, and Assad are therefore jointly and severally liable for the full amount of Plaintiffs' noneconomic damages, solatium, pain and suffering, and punitive damages under 28 U.S.C. § 1605A(c), jointly and severally, in an amount to be determined herein.

**COUNT II: PERSONAL INJURY – ASSAULT AND BATTERY**
**Against the Iran Defendants, Syria, and Assad, On Behalf of All Plaintiffs Present at the Terrorist Attacks**
**(Under 28 U.S.C. § 1605A(c))**

266. Plaintiffs incorporate the preceding allegations by reference.

267. The Iran Defendants, Syria, and Assad provided material support for acts of extrajudicial killing (within the definition of 28 U.S.C. § 1605A(h)) to terror organizations and operatives who injured Plaintiffs in the Terrorist Attacks identified in the foregoing paragraphs.

268. Each Plaintiff asserting this Count is a national of the United States who was injured in person, property, or business by reason of an act of international terrorism, or is the estate, survivor, or heir of such a national, within the meaning of 18 U.S.C. § 2333(a).

269. These Defendants intended to and did cause great harmful or offensive contact, and fear and apprehension such contact, to the Plaintiffs present at the scene of the Terrorist Attacks.

270. These willful, wrongful, and intentional acts constitute a violent assault and battery upon the bodies and minds of the Plaintiffs present at the scene of the Terrorist Attacks.

271. As a direct and proximate result of the willful, wrongful, and intentional acts of the Iran Defendants, Syria, and Assad, Plaintiffs identified in the foregoing paragraphs were injured and endured severe physical injuries, extreme mental anguish, pain and suffering, and economic losses.

272. Plaintiffs' compensatory damages include, but are not limited to, their severe physical injuries, extreme mental anguish, pain and suffering, solatium, and any economic losses determined by the trier of fact.

273. The Defendants' conduct was criminal, outrageous and extreme, wanton and willful, malicious, and constitutes a threat to the public warranting an award of punitive damages under 28 U.S.C. § 1605A(c).

**COUNT III. PERSONAL INJURY - WRONGFUL DEATH AND SURVIVAL Against the Iran Defendants, Syria, and Assad, On Behalf of All U.S. Citizen Plaintiffs Estates**
**(Under 28 U.S.C. § 1605A(c))**

274. Plaintiffs incorporate the allegations of the preceding paragraphs as though fully set forth below.

275. The estate Plaintiffs listed in the foregoing paragraphs assert claims on behalf of the estates who were killed by the Iran Defendants, Syria, and Assad's provision of material support to terror organizations and operatives who engaged in acts of torture and extrajudicial killing that caused the decedent's deaths.

276. The estates of Plaintiffs listed in the foregoing paragraphs also assert claims for the pain and suffering of the estates' decedents who were grievously injured by the Defendants' provision of material (within the definitions of 28 U.S.C. § 1605A(h)) to terror organizations an operatives who engaged in acts of torture, extrajudicial killing, and hostage taking that caused the decedents' deaths

277. The Defendants armed, funded, trained, and provided other types of material support (as defined in 18 U.S.C. § 2339A) for and to terror organizations and operatives who engaged in acts of torture, extrajudicial killing, and hostage taking, injuring and killing the estates' decedents.

278. The Defendants provided this material support through their officials, employees, and agents while they were acting within the scope of their offices, employments, or agencies.

279. As a direct and proximate result of the willful, wrongful, and intentional acts of the Iran Defendants, the estate Plaintiffs listed in the foregoing paragraphs endured economic losses resulting from the estates' decedents' premature deaths. These economic losses include loss of income and unreimbursed funeral expenses.

280. As a direct and proximate result of the willful, wrongful, and intentional acts of the Iran Defendants, the estate Plaintiffs listed in the foregoing paragraphs also endured physical injury, extreme mental anguish, and pain and suffering prior to their deaths.

281. The Defendants are therefore liable for the full measure of estate Plaintiffs' compensatory damages, including physical injuries, extreme mental anguish, and pain and suffering prior to their deaths.

282. The Defendants' conduct was criminal, outrageous, extreme, wanton, willful, malicious, and constitutes a threat to the public, warranting an award of punitive damages against the Defendants pursuant to 28 U.S.C. § 1605A(c).

**COUNT IV. INTENTIONAL INFLICTION OF EMOTIONAL DISTRESS**
**Against the Iran Defendants, Syria, and Assad, On Behalf of All U.S. Citizen Plaintiffs**
**(Under 28 U.S.C. § 1605A(c))**

283. Plaintiffs incorporate the allegations of the preceding paragraphs as though fully set forth below.

284. Defendants provided material support for acts of extrajudicial killing to terror organizations and operatives with the intent that these organizations and operatives would carry out attacks that would cause Plaintiffs severe emotional distress.

285. Defendants intentionally inflicted emotional distress on Plaintiffs by intending to terrorize, and in fact terrorizing, Plaintiffs, causing them severe emotional distress.

286. This included terrorizing Plaintiffs who were present at the scene of the Terrorist Attacks and Plaintiffs whose immediate family members were injured in the Terrorist Attacks.

287. As a direct and proximate result of the willful, wrongful, and intentional acts of the Defendants, Plaintiffs identified in the foregoing paragraphs were injured and endured extreme mental anguish, pain and suffering, and economic losses.

288. Plaintiffs' compensatory damages include, but are not limited to, extreme mental anguish, pain and suffering, solatium, and any economic loss determined by the trier of fact.

289. Defendants' conduct was criminal, outrageous and extreme, wanton and willful, malicious, and constitutes a threat to the public warranting an award of punitive damages under 28 U.S.C. § 1605A(c).

## COUNT V. INTENTIONAL INFLICTION OF EMOTIONAL DISTRESS Against the Iran Defendants, Syria, and Assad, On Behalf of All Non-U.S. Citizen Plaintiffs (Under District of Columbia Law or Applicable Foreign State Law)

290. Plaintiffs incorporate the allegations of the preceding paragraphs as though fully set forth below.

291. The family member Plaintiffs of individuals identified in the foregoing paragraphs as injured or killed as a result of the Defendants' provision of material support for acts of extrajudicial killing have suffered severe emotional distress, extreme mental anguish, and severe physical manifestations, as well as loss of solatium and other harms to be set forth to the trier of fact.

292. The Defendants' material support for extrajudicial killing were intended to inflict severe emotional distress on Plaintiffs.

293. Family member Plaintiffs who are U.S. citizens bring claims pursuant to 28 U.S.C. § 1605A's federal cause of action, § 1605A(c), as set forth in the Count III.

294. District of Columbia District Courts are split over whether to apply D.C. law, the law of non-U.S. national plaintiffs' domiciles, or the law of the place of the attack to intentional infliction of emotional distress claims brought by plaintiffs who are not nationals of the United States. The issue is currently on appeal to the Court of Appeals for the District of Columbia in *Roberts v. Islamic Republic of Iran*, No. 23-cv-7106.

295. Accordingly, family member Plaintiffs who are not U.S. nationals bring claims pursuant to District of Columbia law, or alternatively, under the laws of the foreign state of which they are a national.

296. The family member Plaintiffs who are not U.S. nationals bring claims for all possible damages, including for pain and suffering, emotional distress, economic losses, and punitive damages, as set forth below.

297. District of Columbia law provides for intentional infliction of emotional distress claims, including punitive damages. The family member Plaintiffs who are not U.S. nationals accordingly bring claims for intentional infliction of emotional distress, including punitive damages, under District of Columbia law.

298. As set forth in detail above, the Defendants' conduct was intentional and reckless, necessarily causing the family member Plaintiffs severe emotional distress.

299. To the extent necessary, the non-U.S. national Plaintiffs bring claims for relief under the laws of other countries or U.S. States, for the same injuries and damages described above.

## COUNT VI. ACTION FOR INTERNATIONAL TERRORISM AND AIDING AND ABETTING
**Against Hezbollah, On Behalf of Plaintiffs Injured by SMO Attacks**
**(Under 18 U.S.C. § 2333(a) and 2333(d)(2))**

300. Plaintiffs incorporate the allegations of the preceding paragraphs as though fully set forth below.

301. Each qualifying Attack was carried out by nonstate operatives outside the command structure of any nation's armed forces or other identifiable military force engaged in armed conflict. Each constituted "international terrorism" within the meaning of 18 U.S.C. § 2331(1) and was not an "act of war" within the meaning of §§ 2331(4) and 2336(a).

302. JAM, AAH, or KH committed the Terrorist Attacks underlying this Count.

303. Hezbollah planned or authorized each qualifying Terrorist Attack while designated as a Foreign Terrorist Organization.

304. Hezbollah knowingly provided substantial assistance to the persons who committed each qualifying Attack by organizing, training, arming, equipping, advising, or directing the responsible SMO and its operatives.

305. Hezbollah was generally aware that, through its role in assisting the IRGC-QF and the SMOs, it was participating in campaigns of terrorist violence directed against United States and Coalition personnel in Iraq.

306. The nature, amount, and duration of Hezbollah's assistance; its relationships with the perpetrators; its state of mind; and its participation in planning and directing SMO operations establish that Hezbollah knowingly and substantially assisted the persons who committed the qualifying Terrorist Attacks.

307. Hezbollah thereby aided and abetted qualifying acts of international terrorism under 18 U.S.C. § 2333(d)(2). As a result, Plaintiffs suffered the resulting deaths, injuries, and damages, and are therefore entitled to remedies provided under § 2333(a).

**COUNT VII. ASSAULT AND BATTERY UNDER APPLICABLE STATE LAW**
**Against Bashar al-Assad, On Behalf of All Plaintiffs**

308. Plaintiffs incorporate the preceding allegations by reference.

309. The perpetrators of the relevant Terrorist Attacks intentionally placed victims in apprehension of imminent harmful contact and caused harmful physical contact, bodily injury, and death, thereby committing assaults and batteries under applicable state law.

310. Assad knowingly and substantially assisted those torts by sustaining Syria's support for AQI and Hezbollah despite knowing that those organizations were supporting campaigns of violence against United States personnel in Iraq.

311. Assad's assistance was a substantial factor in causing the relevant Terrorist Attacks and Plaintiffs' resulting injuries.

312. Plaintiffs are entitled to recover compensatory and punitive damages under applicable state law.

**COUNT VIII. WRONGFUL DEATH AND SURVIVAL UNDER APPLICABLE STATE LAW**
**Against Bashar al-Assad, On Behalf of All Plaintiffs**

313. Plaintiffs incorporate the preceding allegations by reference.

314. Assad's conduct alleged above, including his knowing and substantial assistance to the assaults, batteries, and other tortious acts committed in the relevant Terrorist Attacks, was a substantial factor in causing the resulting deaths.

315. Had they survived, the decedents would have been entitled to maintain actions against Assad for the injuries they sustained.

316. The decedents' estates and personal representatives may maintain survival actions, and their eligible survivors and beneficiaries may maintain wrongful-death actions, under the governing state law identified for each claimant.

317. Plaintiffs are entitled to recover the compensatory, punitive, and other damages permitted by the governing law applicable to each claim.

**COUNT IX. INTENTIONAL INFLICTION OF EMOTIONAL DISTRESS UNDER APPLICABLE STATE LAW**
**Against Bashar al-Assad, On Behalf of All Plaintiffs**

318. Plaintiffs incorporate the preceding allegations by reference.

319. Assad knowingly sustained Syria's support for AQI and Hezbollah despite knowing that those organizations were supporting campaigns of terrorist violence against United States personnel in Iraq.

320. Assad's conduct was extreme and outrageous and was intended to facilitate such violence or undertaken with reckless disregard of the resulting harm.

321. Assad's conduct directly and proximately caused severe emotional distress to the direct victims and their immediate family members.

322. Plaintiffs are entitled to recover compensatory and punitive damages under applicable state law.

## PRAYER FOR RELIEF

WHEREFORE, Plaintiffs request that the Court:

a. enter judgment against Iran, Syria, IRGC, MOIS, NIOC, Bank Markazi, Bank Melli, Bank Saderat, and Bashar al-Assad and find them liable under 28 U.S.C. § 1605A(c);

b. enter judgment against Hezbollah and find it liable under 18 U.S.C. § 2333(a) and 2333(d)(2);

c. award Plaintiffs asserting claims under § 1605A(c) compensatory damages, including economic damages, pain-and-suffering damages, and solatium damages, as applicable to each Plaintiff;

d. award Plaintiffs asserting claims under § 1605A(c) punitive damages to the maximum extent permitted by law;

e. award Plaintiffs seeking § 2333(d)(2) claims threefold the damages they sustained and the costs of this action, including reasonable attorneys' fees, as provided by 18 U.S.C. § 2333(a);

f. award Plaintiffs prejudgment interest to the extent permitted by law;

g. award Plaintiffs their taxable costs; and

h. award Plaintiffs any such further relief the Court deems just and proper.

Dated: September 28, 2026

Respectfully submitted,

Gavriel Mairone
Bar No. 159461
Christine N. Crane
to be admitted pro hac vice
MM~LAW LLC
875 North Michigan Avenue
Suite 3100
Chicago, IL 60611
Tel: (312) 253-7444
ctlaw@mm-law.com
christine@mm-law.com
docket@mm-law.com

*Counsel for Plaintiffs*